# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MICHAEL A. WILLNER, as debtor in possession,
      11521 Potomac Road
      Lorton, VA  22079-4264
      703-550-2791

MARGUERITE EVANS WILLNER, individually
      11521 Potomac Road
      Lorton, VA 22079-4264
      703-550-2791

      Plaintiffs,

          v.

JAMES DIMON, individually, as President and
CEO of JP Morgan Chase Bank, N.A.

Serve: James Dimon, President and CEO
      JPMorgan Chase Bank, N.A.
      270 Park Avenue
      New York, NY 10017

JP MORGAN CHASE BANK, NATIONAL
ASSOCIATION, N.A.

Serve:  James Dimon, President and CEO
      JPMorgan Chase Bank, N.A.
      270 Park Avenue
      New York, NY 10017

U.S. BANK NATIONAL ASSOCIATION, as Trustee,
Successor in Interest to Bank of America, National
Association, as Trustee, successor by merger to
LaSalle Bank, National Association, as Trustee for
WaMu Mortgage Pass-Through Certificates Series
2006-AR15 Trust, a Delaware statutory trust

Case: 1:15-cv-01840   Jury Demand
Assigned To : Cooper, Christopher R.
Assign. Date : 10/29/2015
Description: Contract   M Deck

**COMPLAINT**

**JURY TRIAL
DEMANDED**

**RECEIVED**

OCT 2 9 2015

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

Serve: Registered Agent:
  CT Corporation System
  4701 Cox Road, Suite 285
  Glen Allen, VA  23060

SELECT PORTFOLIO SERVICING, INC.,
a Utah corporation

Serve: Registered Agent:
  Corporation Service Company
  Bank of America Center, 16th Floor
  1111 East Main Street
  Richmond, VA 23219

DOES (1-19), inclusive, persons yet to be determined,
if any, involved in the acts complained of herein.

  Defendants.

# COMPLAINT

Plaintiffs Michael A. Willner, as debtor in possession of his Chapter 11 bankruptcy estate, and Marguerite Evans Willner, for herself (together, the "**Willners**" or "**Plaintiffs**") file this Complaint against James Dimon ("**Dimon**"), JPMorgan Chase Bank, N.A. ("**Chase**"); US Bank National Association, ("**USBank**") as successor Trustee for the WaMu Mortgage Pass-Through Certificates Series 2006-AR15 Trust ("**2006-AR15 Trust**"), and Select Portfolio Servicing, Inc. ("**SPS**") (together, the "**Defendants**"), and allege as follows.

The following allegations are based upon information and belief, except as to those specifically pertaining to the Willners themselves, which are based on personal knowledge. Each allegation in this Complaint has evidentiary support, provided in substantial part by Defendants themselves in response to Qualified Written Requests ("QWRs") propounded by Mr. Willner pursuant to RESPA for information concerning the purported loan at issue (the "**Loan**").

## I.     INTRODUCTION

1.     The claims asserted in this Complaint are in the nature of defenses and affirmative defenses made in direct response to claims filed by Defendant USBank in Mr. Willner's bankruptcy case and other actions taken by USBank and its servicing agents to forcibly acquire the Willners' home via a credit bid at a non-judicial foreclosure sale, despite knowing USBank had no right to do so without first seeking the aid and direction of a court of equity.

2.     Since 1989 the Willners have held record legal title to their home (the "**Property**") as tenants by the entirety and have continuously resided there for the last 25 years.

3.     On September 5, 2006, purportedly entered into a loan transaction (the "**Loan Transaction**") whereby Mr. Willner – but not Mrs. Willner - signed a purported $3 million note (the "**Note**") payable to Washington Mutual Bank,

FA ("**WMBFA**") as lender; and both spouses signed a Deed of Trust ("**First Trust**") naming WMBFA the beneficiary.

4.      The Property is currently appraised at $5.5 million.

5.      Unbeknownst to the Willners, WMBFA did not have the legal capacity or authority to consummate the Loan Transaction. "WMBFA" was merely a tradename used by the infamous Washington Mutual Bank ("**WMB**") to generate an illegal origination fee.

6.      WMB also failed to disclose material information that, if known to the Willners, would have caused them to refuse to enter into the Loan Transaction.

7.      Instead, they would have sold the Property and monetized almost $3 million in equity.

8.      By October 25, 2006, WMB, through its non-bank affiliate, WaMu Asset Acceptance Corp. ("**WAAC**"), had irrevocably sold the Note, without recourse, to the 2006-AR15 Trust, which was created by WMB to transfer the risk of default of mortgage loans it had originated.

9.      WMB retained the right to service the Note.

10.     WMB never owned the 2006-AR15 Trust - it is a separate legal entity owned by its certificate holders and governed by a Pooling and Servicing Agreement ("**PSA**").

11.     USBank is the current trustee of the 2006-AR15 Trust.

12.     On Sept. 25, 2008 (the "**Receivership Date**"), the Office of Thrift Supervision closed WMB and appointed the FDIC as receiver ("**FDIC**").

13.     That same day, the FDIC sold substantially all WMB's assets and liabilities to Chase pursuant to a Purchase and Assumption Agreement ("**PAA**"), including the right to service the Note.

14.     WMB did not own the Note, First Trust, or the 2006-AR15 Trust on the Receivership Date.

15.     The Note, First Trust, and the 2006-AR15 Trust did not pass through the FDIC receivership and were not sold to Chase via the PAA.

16.     There are three interrelated, yet distinct, reasons why USBank has no right to enforce the Note or First Trust:

a.     The Note and First Trust (the "**Loan Documents**") are the products of fraud committed by WMB, and LaSalle Bank, N.A., the initial Trustee for the 2006-AR15 Trust; the Loan Documents are, therefore, voidable and cannot be enforced by their successors/assignees, the 2006-AR15 Trust and USBank.

b.     The Loan Documents are void *ab initio* because WMBFA, the putative "lender" and "beneficiary" identified on the Note and First Trust, respectively, had no legal existence in Sept. 2006.  WMBFA lacked the legal

capacity and authority to contract. In addition, WMB was not "doing business as" WMBFA in the Loan Transaction.

      c.    The First Trust, by its plain and unambiguous terms, does not identify the Note. This renders the Note unsecured and the First Trust unenforceable.

17.    Despite having actual knowledge that the Willners disputed the validity, enforceability, and amount of USBank's claims, USBank, Chase, and their agents initiated the nonjudicial foreclosure process, without first seeking the aid and direction of a court as required by Virginia law.

18.    In December 2012, Mr. Willner, but not Mrs. Willner, filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code, which stayed the illegal nonjudicial foreclosure sale of the Property which Defendants had scheduled to take place a few days before Christmas.

19.    In September 2014 USBank filed a proof of claim in Mr. Willner's bankruptcy case, erroneously claiming it had the right to foreclose under the First Trust.

20.    In December 2014, in lieu of objecting to USBank's proof of claim in Mr. Willner's bankruptcy case, the Willners chose to defend against USBank's claims by filing a complaint against Defendants in the U.S.

District Court for the Eastern District of Virginia ("**EDVa**") where they invoked their right to a jury trial.

21.    The Willners asserted, among other causes of action, claims in recoupment against the Note and a declaratory judgment that the Note and First Trust are void or voidable and unenforceable. (*Willner v. Dimon*, C.A. No. 1:14-cv-01708) (the "**EDVa Case**").

22.    In May 2015, the district court ruled that it lacked subject matter jurisdiction over the Willners' claims relating to the enforceability of the Note and First Trust because the Willners had not exhausted the administrative claims process established by the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA").

23.    Consequently, the Willners each filed a proof of claim with the FDIC, both of which were ultimately disallowed.

24.    Having exhausted the administrative claims process, the Willners now respectfully submit this complaint to this Court pursuant to FIRREA.

## II.    THE PARTIES

### A.    Plaintiffs

25.    Plaintiffs Michael A. Willner and Marguerite Evans Willner reside at 11521 Potomac Road, Lorton, VA 22079, in Fairfax County, VA (the Property).

26.     Michael Willner is a serial entrepreneur and inventor.  He started two companies which he sold to Dow Jones & Co. and NBCi (formerly a subsidiary of NBC, a subsidiary of General Electric).  Accordingly, his income was erratic (low while building his companies, high in the years he sold them).  Mr. Willner's most consistent source of income was the director's fees he earned serving as Chairman of the Board of a family of mutual funds, a position he held for 14 years.  Mr. Willner is now self-employed as a consultant.  He received his J.D. in 1983 and is a member of the District of Columbia Bar, but he has never practiced law professionally.

27.     Mr. Willner filed a voluntary petition for reorganization under chapter 11 of the Bankruptcy Code on Dec. 13, 2012 (*In re Willner*, Case No. 12-17322-BFK, US Bankr. ED Va) primarily to prevent USBank and Chase from effectuating the illegal foreclosure sale scheduled for Dec. 18, 2012. At that time, Mr. Willner was current on paying all other debts and the Property was listed for sale. If USBank were allowed to foreclose, which would extinguish the Willners' equity, Mr. Willner would have no way of paying his lawful debts in full – which has always been his intention.

28.     Mr. Willner currently administers his bankruptcy estate as "debtor in possession" pursuant to 11 U.S.C. § 1107(a). Accordingly, he has the right

and obligation to prosecute all causes of action belonging to his bankruptcy estate for the benefit of his lawful creditors.

29.     Marguerite Willner has been married to Mr. Willner for over 27 years. Mrs. Willner is a recognized expert on federal vaccine policy.  She was appointed by the Secretary of Health and Human Services ("**HHS**") to serve as the only consumer representative on a federal advisory commission responsible for advising the Secretary on matters relating to the administration of the Vaccine Injury Compensation Program and its $3 billion trust fund.  Mrs. Willner was elected Vice Chairman of the commission and worked closely with the judiciary of the U.S. Federal Court of Claims, the Department of Justice, and HHS medical staff to improve the Program.  She wrote an amicus brief which was accepted by the United States Supreme Court in *Bruesewitz v. Wyeth LLC,* 562 U.S. 223 (U.S. 2011).

## B.   Defendants

### 1.     James Dimon

30.     Defendant James Dimon (aka "Jamie Dimon") is the CEO and President of Defendant Chase.  In these leadership positions, Dimon is responsible for overseeing executive officers and other employees to ensure their compliance with the company's code of conduct, all court and

regulatory consent orders, and other laws and regulations.  Dimon is a

citizen of Illinois and can be served at his principal place of business at

JPMorgan Chase Bank, N.A., 270 Park Ave., NY, NY  10017.  Dimon is

sued individually in his capacity as a corporate officer of Chase.

31.    Dimon is primarily responsible for establishing a company-wide

policy aimed at maximizing profits by encouraging Chase employees and

agents to ignore legal obligations and pay fines, penalties or damages if

necessary.

### 2.    JPMorgan Chase Bank, N.A.

32.    Defendant JPMorgan Chase Bank, N.A. is a national banking

association headquartered in Columbus, Ohio.  Chase is sued in its own

capacity and as the servicer and attorney in fact for Defendant USBank.

### 3.    U.S. Bank N.A., as Trustee, Successor in Interest to Bank of America, N.A. as Trustee, successor by merger to LaSalle Bank, N.A. as Trustee for WaMu Mortgage Pass-Through Certificates Series 2006-AR15 Trust, a Delaware statutory trust

33.    Defendant U.S. Bank N.A. is a national banking association with

principal offices in Minnesota.  USBank is sued as successor trustee and

legal representataive of the 2006-AR15 Trust, which was created by a the

PSA dated Oct. 1, 2006 by and among WMB (Sponsor and Servicer),

WAAC (Depositor), LaSalle Bank, NA (the Initial Trustee, and predecessor

to USBank), and Chritiana Bank & Trust Co.  (Delaware Trustee).  The

2006-AR15 Trust is a Delaware statutory trust, which is a distinct, separate

legal entity from its predecessors in interest (WMBFA, WMB, and WAAC).

The 2006-AR15 Trust is owned by its certificate holders, who were not

parties to the PSA.  The 2006-AR15 Trust has owned the Note since Oct. 25,

2006 (the "**Closing Date**").

### 4.    Select Portfolio Servicing, Inc.

34.    Defendant Select Portfolio Servicing, Inc. ("**SPS**") is a Utah

corporation that specializes in servicing residential mortgage loans in

default.  SPS, as the current loan servicer, is the successor to and agent of

Chase.

### 5.    Other Defendants

35.    DOES (1-19) including, but not limited to, assignees and or holders of

the Note or First Trust, securitization trustees, Defendants' employees or

agents, government agencies, such as the FDIC, and one or more relevant

non-parties according to evidence obtained through discovery.

## III.    JURISDICTION AND VENUE

36.    This action arises under the FDI Act, 12 U.S.C. § 1811 *et seq.*, as

amended. The claims raised herein include, without limitation, an appeal

from the FDIC's final determination and disallowance of Mr. Willner's

Proof of Claim, ID - NS1001515320, and Mrs. Willner's Proof Claim, ID - NS1001515321. (the "**Disallowance**")

37.     The FDIC sent each of the Willners a letter dated Sept. 2, 2015, notifying them that their claims had been disallowed.

38.     The statutorily-prescribed proper forum for jurisdiction and venue for judicial review of the Willners' claims within 60 days of the FDIC's disallowance, expressly includes the U.S. District Court for the District of Columbia pursuant to 12 U.S.C. §1821(d)(6).

39.     This Court has jurisdiction and venue pursuant to 12 U.S.C. § 1819(b)(2)(A), §§ 1821(d)(3) – (13), and 28 U.S.C. §§ 1331 and 1391.

40.     The Willners invoke the expanded service of process provisions of 18 U.S.C. § 1965.

## IV.    FACTUAL ALLEGATIONS

41.     In 1989 the Willners purchased 11+ acres for approximately $477,000 cash by "Deed of Bargain and Sale" to "Michael A. Willner and Marguerite Evans Willner, husband and wife, as tenants by the entirety with the common law right of survivorship," which was recorded among the land records of Fairfax County, Virginia, on October 19, 1989, in Deed Book 7451, Page 0357, No. 89 146730, (hereinafter the "Record Deed").

42.    The Willners invested two years and approximately $2 million to build a custom home and make other improvements to the Property.  Since 1992 they have also paid approximately $2.4 million in property taxes, insurance, and mortgage interest.

43.    From 1996 to the present, the Willners' annual income ranged between $35,000 and $75,000, except for 1998 when Mr. Willner earned $1.2 million before taxes.

**The 2006 Refinancing**

44.    In 2006 the Willners received two marketing solicitations from Washington Mutual Home Loans, Inc., a WMB affiliate, enticing them to refinance the Property.

45.    On or about August 10, 2006, Mrs. Willner responded by calling the telephone number on one of the ads.  She spoke with Phillip Howell, a loan officer who was an employee and/or agent of WMBFA or WMB, with whom she and Mr. Willner had established a good working relationship during two previous refinancings with WMBFA. The Willners trusted Howell's advice.

46.    Mrs. Willner explained to Howell that she and her husband were prepared to sell the Property and monetize their equity, however they might consider refinancing if the bank would approve a "cash-out" refi, as they had

done in the past, the proceeds of which they would primarily use to make their mortgage payments.

47.     After speaking with Howell, it was the Willners' understanding that they should refinance rather than sell their rapidly-appreciating waterfront property because, according to Howell, they would be hard-pressed to find a better investment.

48.     Mrs. Willner informed Howell that she would not be co-applying for the refinancing and would not sign a promissory note, as she had always done in the past.

49.     Mr. Willner believed that Howell was providing mortgage brokerage services and that he would find Mr. Willner the best loan on the best terms available under the circumstances.

50.     On or about August 11, 2006, Howell assured the Willners that Mr. Willner's modest compensation was irrelevant to qualifying for the mortgage loan because of the significant equity the couple had built up in the Property.[1]

51.     Howell instructed Mr. Willner to call Sanjay Babbar, a WMB employee and/or agent, who would fill out Mr. Willner's Loan Application

---

[1] In November 2011, Howell was found guilty by the Maryland Commission of Financial Regulation of defrauding residential borrowers and operating without a license; he was fined and ordered to Cease and Desist from conducting credit services business activities with Maryland consumers.

over the telephone.

52.     On or about August 11, 2006, Mr. Willner spoke with Babbar on the telephone, who asked Mr. Willner questions for the purpose of filling out the Loan Application.

53.     Mr. Willner truthfully answered each of Babbar's questions. When asked to estimate his annual income for 2006, Mr. Willner told Babbar that he expected to earn close to $52,000.

54.     Mr. Willner provided WMB the couple's joint federal tax returns for the two prior years as well as their two most recent bank and brokerage statements. The tax returns showed that the Willners' total adjusted gross income plus benefits was $56,596 in 2004 and $53,377 in 2005.

55.     The Willners also signed Form 4506-T, which authorized WMB to obtain their tax returns directly from the IRS.

56.     On August 23, 2006, Howell sent the Willners an email titled "loan details" which indicated that, with the Property worth "5,000,000++," and a loan amount of $3 million, the loan met the bank's guidelines of a 60% LTV (loan-to-value). Nothing in the email indicated that Mr. Willner's income was relevant.

57. Howell's email indicated that the principal on the Loan could increase to $3.3 million if Mr. Willner chose to make interest-only payments, but that it could be repaid when Mr. Willner refinanced again.

58. Howell knew, but did not disclose to the Willners, that Mr. Willner would not, in fact, be able to refinance again and would, therefore, likely default on repaying the loan if his income remained the same – because potential lenders would likely consider Mr. Willner's income relevant to loan approval and not just his equity in the Property.

59. On or about August 24, 2006, Howell told the Willners that the appraisal report ordered by WMB valued the Property at $5.2 million.

60. Given that the Willners' existing WMBFA mortgage loan was $2.4 million, they would have monetized $2.8 million of equity, if they had sold the Property at the $5.2 million appraised value, instead of refinancing it.

61. The Willners believed that the $5.2 million appraisal accurately reflected the market value of the Property and was proof that it continued to substantially appreciate in value year after year. This belief was material to, and a substantial factor in, Mr. Willner's decision to refinance the Property.

62. It did not even dawn on the Willners that WMB might have ordered another appraisal which it did not disclose to them.

## The Loan Closing

63.     At the loan closing on September 5, 2006 (the "**Closing**"), the Willners entered into a loan transaction (the "**Loan Transaction**") by which Mr. Willner, but not Mrs. Willner, purportedly borrowed $3 million from WMBFA evidenced by the Note, and obtained a $250,000 home equity line of credit from WMB (the "**HELOC**"). Both spouses signed a deed of trust for each loan.

64.     At the Closing, Mr. Willner reasonably relied on the settlement attorney, Robert Malico, to show him all the pages containing important information.

65.     Mr. Willner also reasonably relied on WMBFA or WMB to ensure Malico was aware of all the pages that contained important information for Mr. Willner to review and sign or initial.

66.     Mr. Willner signed or initialed all pages of the closing documents that Malico showed him and Mr. Willner believed that all the pages that he was not asked to review, sign, or initial, contained boilerplate or legalese that was relatively inconsequential.

67.     Mrs. Willner was not shown and did not sign many of the closing documents.

68.    At the Closing, when, contrary to her understanding with Howell, Mrs. Willner was asked to sign a promissory note requiring her signature, Mrs. Willner flatly refused and demanded that her name be removed from the signature line.

69.    She explained that the Willners did not want to give the bank the right to foreclose on the Property, nor did she want to put her ownership interest in the Property at risk.

70.    WMB immediately removed Mrs. Willner's name from the note as instructed, and she did not sign or initial it.

71.    Only Mr. Willner signed the Note.

72.    WMB drafted the First Trust.

73.    After removing Mrs. Willner's name from the Note and understanding her intent not to encumber her ownership interest in the Property, WMB did not modify the First Trust to identify, and hence secure, the Note.

74.    The First Trust, by its plain, clear, and unambiguous terms, identifies, and hence only secures, a note signed by "Borrower" which is defined in the First Trust as "Michael A. Willner & Marguerite Evans Willner."

75.    "Michael A. Willner & Marguerite Evans Willner" did not sign the Note.

76. The First Trust does not identify the Note, which was only signed by Mr. Willner.

77. The First Trust does not secure the Note.

78. The First Trust is unambiguous.

79. The First Trust, according to its plain, clear, and unambiguous language, did/does not give WMBFA or its successors/assigns/alter-egos the right to foreclose on the Property based on a default on the Note.

80. The First Trust gives "Borrower" the contractual right to "bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale."

81. WMBFA was identified as the "Lender" on the Note.

82. The "beneficiary" of the First Trust is identified as "Washington Mutual Bank, FA, a federal savings bank existing under the laws of the United States of America."

83. Mrs. Willner was led to believe that her signature on the First Trust would enable the bank to have a lien on Mr. Willner's one-half share of the proceeds from any sale of the Property.

84. Mr. and Mrs. Willner signed the First Trust because they believed it reflected their understanding -- that only Mr. Willner's ownership interest in

the Property secured the Note, not Mrs. Willner's, and that the lender would not have the right to foreclose.

85.    As part of the Loan Transaction, Mr. Willner - but not Mrs. Willner - entered into a $250,000 home equity line of credit, the HELOC, with WMB, not WMBFA.

86.    The HELOC loan transaction is not challenged in this lawsuit because Chase notified Mr. Willner in December 2014 that the HELOC had been satisfied as part of Chase's settlement with the states attorneys general (National Mortgage Settlement) relating to Chase's foreclosure servicing abuse.

87.    At the Closing, WMB required Mr. Willner to sign an "Affiliated Business Arrangement Disclosure Statement Notice" (the "**Affiliated Business Disclosure**") which falsely represented that WMBFA and WMB existed concurrently as separate and distinct entities (as banks and affiliates) and that each was in a position to provide settlement services to the other for a fee, including a 1-4% loan origination fee based on the loan amount.

88.    The HUD-1 Settlement Statement for the Loan Transaction indicated that WMBFA received a $30,000 loan origination fee, thus representing that WMBFA and WMB were involved in the Loan Transaction as two

conconcurrently existing, distinct and separate entities, despite the fact that this was not legally possible.

### The 2006-AR15 Trust Purchased and Securitized the Note

89.     Within two months of the Closing, WMBFA or WMB sold the Note to an affiliate, WaMu Asset Acceptance Corporation ("**WAAC**").

90.     WAAC then sold the Note to the 2006-AR15 Trust, a real estate trust which was created for the purpose of transfering the risk of default of mortgage loans originated or acquired by WMB to the eventual certificate holders of the 2006-AR15 Trust.

91.     WMB, along with its affiliates, including WAAC, performed every function necessary to create and register the 2006-AR15 Trust with the SEC and effectively controlled the 2006-AR15 Trust at the time it acquired the Note.

92.     WMB retained the servicing rights to the Note, but no ownership interest.

93.     A Pooling and Servicing Agreement ("**PSA**"), dated October 1, 2006, is the governing instrument of the Trust. (PSA at 2.01: *Creation of the Trust*).  The parties to the PSA were WAAC (as Depositor), WMB (as Servicer), LaSalle Bank National Association (as Trustee), and Christiana Bank & Trust Company (as Delaware Trustee).

94.     The 2006-AR15 Trust is a legal entity separate and distinct from any other individual or artificial person, whether or not a legal entity. (PSA at 2.03: *Separateness Requirement*)

95.     The 2006-AR15 Trust was created pursuant to Certificate of Trust filed pursuant to the Delaware Statutory Trust Statute.

96.     The PSA is construed in accordance with the laws of the state of Delaware.  (PSA at 10.05:  *Governing Law*)

97.     The 2006-AR15 Trust is a real estate mortgage investment conduit ("**REMIC**"), as defined in the Internal Revenue Code ("**Code**") Sections 860A through 860G, and related Code provisions and regulations promulgated thereunder. (PSA at pp. 62-63)

98.     The PSA states that WAAC is a corporation duly organized and existing under and by virtue of the laws of the State of Delaware.

99.     WAAC is not a bank, FDIC-insured or otherwise.

100.   WAAC created the 2006-AR15 Trust.

101.   According to the PSA, the assets of the 2006-AR15 Trust shall remain in the custody of the Trustee or the Custodian, on behalf of the Trust, and are owned by the Trust.  (PSA at 2.01)

102.    According to the PSA, WAAC did "irrevocably sell, transfer, assign, set over and otherwise convey to the Trust, without recourse, all the

[WAAC's] right, title and interest in and to the Mortgage Pool Assets. … It is the express intent of the parties hereto that the conveyance of the Mortgage Pool Assets to the Trust by [WAAC]…be construed as, an absolute sale of the Mortgage Pool Assets." (PSA at 2.04:  *Conveyance of Mortgage Pool Assets…*)

103.   On October 25, 2006, WAAC delivered to and deposited with LaSalle Bank as Trustee the mortgage files, which were to be identified in the records of the Trustee as being held by or on behalf of the Trust.  (PSA at 2.05: *Delivery of Mortgage Files*)

104.   Pursuant to the PSA, the Trustee appointed Washington Mutual Bank, FSB, ("**FSB**") which was an affiliate of WMB, as Custodian, which has the authority to provide for the safekeeping of the mortgage files as agent on behalf of the Trustee.

105.   All of the assets of the 2006-AR15 Trust, including the Note and First Trust, were held by the Custodian for the benefit of the Trust.

106.   La Salle Bank as Trustee and/or FSB were required to review each mortgage file, including Mr. Willner's. Thus, they had actual knowledge that the Loan Documents were defective on their face and due to WMB's fraudulent conduct in the origination.

107.   WAAC represented and warranted to the 2006-AR15 Trust that, immediately upon the sale, transfer and assignment of the mortgage loans, including the Note, the Trust would have good title to and would be the sole legal owner of, each mortgage loan.

108.   Since purchasing the Note, the 2006-AR15 Trust has been the legal **"Note Holder,"** as that term is defined in the Note.

109.   The certificate holders are the investors in, and owners of, the 2006-AR15 Trust.

110.   Pursuant to Virginia Code § 6.2-2401, WMB and WAAC relinquished all assets or rights that were transferred to the 2006-AR15 Trust, including the Note, and, therefore, WMB and WAAC are deemed to no longer have an ownership interest in the Note.

111.   In addition, WMB and WAAC have no rights, legal or equitable, whatsoever to reacquire, reclaim, recover, repudiate, disaffirm, redeem, or recharacterize the Note as their property.

112.   In its Motion for Relief from Stay ("Motion for Relief"), filed in Mr. Willner's bankruptcy case on September 15, 2014 (Docket No. 59), USBank admitted it is a successor in interest to, or assignee of, WMB and/or WMBFA, the purported lender to Mr. Willner under the Note.

113.    In filings in the EDVa Case, USBank admitted that WAAC sold the Note to the 2006-AR15 Trust.

114.    WMB's employees and/or agents knew and, therefore, WMB was deemed to know, that the Note was a product of fraud.

115.    At the time it acquired the Note, WMB exercised specific, financial, and, as attorney-in-fact for the trustee, legal control over the operations of the 2006-AR15 Trust.

116.    The 2006-AR15 Trust and La Salle Bank as Trustee were deemed to know that the Note was a product of fraud.

117.    As set forth in Section 8.08 of the PSA, the duties of the original trustee pass to any successor trustee:

> Any successor trustee appointed . . . shall become fully vested with all the rights, powers, duties and obligations of its predecessor hereunder, with like effect as if originally named as Trustee or Delaware Trustee herein.  The predecessor shall deliver to the successor trustee all Mortgage Files, related documents, statements and all other property held by it hereunder, and the Servicer and the predecessor trustee shall execute and deliver such instruments and do such other things as may reasonably be required for more fully and certainly vesting and confirming in the successor trustee all such rights, powers, duties and obligations.

118.    As La Salle Bank's successor in interest, USBank is deemed know that the Note was a product of fraud.

119. "Note Holder" is defined in the Note as: "The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note..."

120. The 2006-AR15 Trust is not a holder in due course of the Note.

## WMB is Closed and Placed in Receivership

121. On September 25, 2008, (the "**Receivership Date**") the Office of Thrift Supervision closed WMB and appointed the FDIC as receiver ("**FDIC**").

122. That same day, the FDIC sold substantially all of WMB's assets and liabilities to Chase for 1.5 cents on the dollar via the Purchase and Assumption Agreement (the PAA).

123. Chase purchased WMB's loan servicing rights and obligations, which included the right to service the Note on behalf of the 2006-AR15 Trust.

124. The Note and First Trust were not owned by WMB on the Receivership Date, as they were purchased by the 2006-AR15 Trust almost two years before WMB failed and went into receivership and remained part of the res of the trust.

125. Thus, Chase did not purchase the 2006-AR15 Trust itself, nor the Note or First Trust, from the FDIC via the PAA, or otherwise.

126.   The 2006-AR15 Trust did not pass through the FDIC receivership and was not sold to Chase via the PAA.

127.   The PAA relevance to this suit is limited to explaining how Chase came to service the Note.

128.   In October 2008 Chase notified Mr. Willner that it had acquired the right to service the Loan from the FDIC.

129.   Mrs. Willner received no such notice.

130.   Chase did not state that it had acquired any ownership interest in the Note.

131.   Neither of the Willners received any notice from the FDIC, Chase, or anyone else that any claims that had accrued, or may accrue in the future, against WMBFA or WMB, or against an entity that acquired assets from WMBFA or WMB two years before the Receivership Date, such as the 2006-AR15 Trust, would be subject to a bar date, December 30, 2008, set by the FDIC (the "**Claims Bar Date**") or that the Willners would be subject to FIRREA adminstrative claims exhausation requirements.

132.   Even if the Willners had received notice of the Claims Bar Date or FIRREA requirements, their claims against USBank and its agents did not accrue until years after the Claims Bar Date.

**Mr. Willner is Unable to Refinance the Note**

133.   From 2009-2010, the worsening economy, contraction of credit, and the tightening of lending standards, all took a toll on Mr. Willner's business prospects.  And despite still having well over $1 million of equity in the Property, Mr. Willner was unable to refinance the Note.

134.   In May 2011, after having exhausted all other options and despite having a stellar 30-year credit history, Mr. Willner was unable to make his monthly payment on the Note.

135.   By this time, Mr. Willner had faithfully made almost $600,000 in monthly mortgage payments over almost five years.

136.   The Willners had also increased their investment in the Property for a total investment exceeding $2 million.

137.   Mr. Willner asked Chase, the loan servicer, to agree to a 90-day forbearance from foreclosing on the Property so he could hire a private auction company to sell the Property and pay off the Note in full while salvaging some of his and Mrs. Willner's equity. Chase ignored his request.

**The Willners Discover WMB's Fraudulent Conduct**

138.   On or about March 23, 2012, in response to a QWR, Chase sent Mr. Willner a package of information concerning the Loan Transaction, including copy of a second appraisal, which WMB had ordered prior to the

28

Closing in 2006, but concealed from the Willners.  The appraisal valued the Property at $4 million – over a million dollars less than the $5.2 million appraisal shown the Willners.  No WMB employee or agent had informed the Willners of the material fact that WMB had ordered and received a second appraisal that valued the Property significantly below the appraisal that WMBFA or WMB used to induce the Willners to enter into the Loan Transaction.

139.   Prior to the Closing in 2006, the Willners reasonably believed that the $5.2 million appraisal accurately reflected the Property's value and that it was the only appraisal that WMB had ordered.

140.   According to the "Addendum to Loan Application, Disclosure of Right to Receive a Copy of an Appraisal" signed by Mr. Willner at the Closing, he had "the right to a copy of any appraisal or other property valuation used in connection with [his] application…."

141.   Had WMB disclosed the $4 million appraisal to the Willners, Mr. Willner would not have refinanced the Property because he would not have wanted to invest in a potentially depreciating asset and risk being unable to refinance again if necessary.  Instead, the Willners would have sold the Property and monetized $2.8 million in equity.

142.   WMB concealed the $4 million appraisal from the Willners because it did not want to risk losing the deal.

143.   On or about March 23, 2012, Mr. Willner, while reviewing filings with the U.S. Securities and Exchange Commission ("SEC") by WMB and its parent, Washington Mutual, Inc., discovered that effective April 4, 2005 the WMBFA Board of Directors changed the full corporate title on the federal bank charter from WMBFA to WMB.

144.   There is only one name designated per bank charter.

145.   Therefore, as of April 4, 2005, only WMB existed as a federally-chartered bank and WMBFA was divested of the attributes, powers, and benefits of a federal bank charter and ceased to exist as a going concern.

146.   WMBFA was not the name of a federal bank on September 5, 2006.

147.   WMBFA was not the name of a legal entity on September 5, 2006.

148.   WMB was not "doing business as" WMBFA on September 5, 2006, in the Loan Transaction.

149.   A federal bank is required by law to use its full legal name in legal documents.

150.   WMB did not use its full legal name in the Note or First Trust.

151.   WMBFA was not authorized to be the lender or beneficiary under Note or First Trust.

152.   WMBFA was not registered or licensed as a mortgage bank or mortgage broker or any other legal entity authorized to do business in Virginia on September 5, 2006.

153.   WMBFA was not registered as a fictitious or assumed name in Virginia on September 5, 2006.

154.   WMBFA was merely a trade name that did not have the legal authority or capacity to lend Mr. Willner $3 million on September 5, 2006 while masquerading as a separate and distinct entity from WMB in the same transaction.

155.   By making it appear that WMBFA was providing mortgage brokerage services to Mr. Willner as a WMB affiliate (as opposed to WMB "doing business" under the name of WMBFA), WMB justified paying WMBFA a $30,000 loan origination fee, when, in reality, it was illegally paying itself for referring Mr. Willner to itself.

156.   When faced with a similar fact pattern, where Wells Fargo used an affiliated entity as a vehicle to create a false pretense for obtaining money so that Wells Fargo could earn undisclosed profits, the U.S. District Court for the Northern District of California found that Wells Fargo's conduct, was "plausibly immoral, unethical, oppressive, unscrupulous, or substantially

injurious to consumers." *See Bias v. Wells Fargo & Co.*, 2013 U.S. Dist. LEXIS 59530 (N.D. Cal. Apr. 25, 2013)

157.  Had the Willners known that WMBFA lacked the legal capacity to sue and be sued or enter into a binding contract, neither spouse would have signed the Note or First Trust.

158.  Had the Willners known that it was illegal and predatory per se, according to the Truth in Lending Act ("**TILA**"), for WMB to fail to disclose the identity of the entity that funded the Loan, neither spouse would have signed the Note and/or First Trust.

## USBank's Servicing Agent, Chase, Attempts to Extort Mr. Willner to Force Him to Drop his Claim of Recoupment Against the Note

159.  Mr. Willner wanted to discuss his unique circumstances directly with the real party in interest to try to reach a settlement and avoid foreclosure and litigation, but Chase, as USBank's agent, made contradictory claims in numerous letters naming at least five different entities as the "investor" in the Note. Despite Chase's legal obligation to accurately respond to Mr. Willner's QWRs, Chase failed to confirm which of the five identities was the actual real party in interest.

160.  Mrs. Willner informed Chase's foreclosure law firm that she owned the Property as a tenant by the entirety and that Mr. Willner had a claim of

recoupment against the Note which was a product of fraud. Chase, therefore, had no right to foreclose on behalf of the Note Holder.

161.   Chase ignored her pleas and instead threatened in writing to file baseless criminal charges against Mr. Willner.

162.   Mr. Willner demanded that Chase explain how he violated any criminal law, but Chase did not respond.

163.   Chase was attempting to extort Mr. Willner to coerce him to drop his claim of recoupment.

## Chase Attempts to Illegally Foreclose on the Property – Mr. Willner Stays Foreclosure with Bankruptcy Filing

164.   On November 8, 2012, Chase, as the attorney-in-fact for USBank, purported to appoint a substitute trustee under the First Trust.

165.   On November 30, 2012, the substitute trustee scheduled a foreclosure sale of the Property for December 18, 2012, despite the fact that Chase knew that Virginia law required the substitute trustee to seek the aid and direction of a court of equity before it could foreclose on the Property because Mr. Willner had a claim of recoupment against the Note.

166.   On December 13, 2012, Mr. Willner filed a Chapter 11 bankruptcy petition (Case No. 12-17322-BFK) in the U.S. Bankruptcy Court, Eastern District of Virginia (the "Bankruptcy Court"), which stayed the foreclosure

sale and tolled the statute of limitations on any claims the Willners had against USBank and its Agents.

167.   On February 26, 2013, USBank filed a proof of claim with the Bankruptcy Court in the amount of $3,441,397 (the "**BPOC**"), in which it claimed a right to foreclose on the Property pursuant to the terms of the Note and First Trust.

168.   On November 20, 2014, USBank filed an objection to Mr. Willner's bankruptcy plan of reorganization (Doc. 81), in which it stated that it was willing to purchase the Property via a credit bid for the total amount of its purported claim. Such purchase would extinguish whatever equity the Willners own in the Property.

169.   On December 12, 2014, Mr. Willner as debtor in possession, and Mrs. Willner, individually, filed a complaint against USBank, and its agents in the EDVa (C.A. No. 1:14-CV-1708, the "**EDVa Complaint**"). The crux of the EDVa Complaint was that the Note and the First Trust are void and/or voidable and that the First Trust does not secure the Note.

170.   The EDVa Complaint's causes of action were in the nature of defenses, affirmative defenses, and counterclaims to the BPOC. The reason the Willners filed their claims as causes of action in the EDVa, instead of the Bankruptcy Court, was because they wanted a jury trial.

171.   On March 31, 2015, the Bankruptcy Court conditionally granted a

motion for relief of stay filed by USBank, and ruled that Mr. Willner had

until September 30, 2015 to sell the Property, otherwise the stay would be

lifted (Doc. 124) and USBank would retain its right to a credit bid.

172.   In order to promote its sale, the Property is currently listed at $4.95

million, more than $500,000 less than its appraised value.

173.   On May 11, 2015, the EDVa entered an Order which held that the

court lacked subject matter jurisdiction to hear the Willners' claims relating

to the enforceability of the Note and First Trust because the Willners had not

exhausted the FDIC's administrative claims process.

174.   Though they disagreed with the EDVa's decision[2] and appealed to the

U.S. Court of Appeals for the Fourth Circuit (No. 15-1678), the Willners

contacted the FDIC and informed them that according to the EDVa, they

were required to exhaust their administrative remedies with the FDIC.

175.   In letters dated May 13, 2015, addressed to each of the Willners, the

FDIC notified them to present their proof of claims. It stated in relevant part,

"[b]ecause the Claims Bar Date has passed in this case you must prove to the

---

[2] The Willners argue that their defenses and affirmative defenses to the Proof of Claim
filed by USBank in the bankruptcy court and claims that stem from the same transaction,
are not resolvable by the FDIC because USBank acquired the Note two years before
WMB went into receivership and, therefore, it was never an FDIC asset. Furthermore, the
FDIC does not have jurisdiction to enjoin a third-party, such as USBank, from
foreclosing on the Property, given that the FDIC has no ownership interest in the Note.

Receiver's satisfaction that you did not receive notice of the appointment of the Receiver in time to file a claim before the Claims Bar Date."

176.    In August 2015, the Willners each timely filed a proof of claim with the FDIC, including evidence that their claims against USBank and its agents had not accrued until after the Claims Bar Date.

177.    According to the FDIC's interpretation of FIRREA as it relates to claims that accrued post-bar date, the Willners could not have received notice of the appointment of the Receiver in time to file their claims before the Claims Bar Date. Thus, their claims fit within the exception to FIRREA's pre-bar date filing requirement pursuant to 12 U.S.C. § 1821(d)(5)(C)(ii). *See Freeman v. FDIC, 56 F.3d 1394 (D.C. Cir. 1995)* citing *Heno v. FDIC, 20 F.3d 1204* (1st Cir. Mass. 1994) (affirming as reasonable FDIC's construction of § 1821(d)(5)(C) to authorize it to process a late-filed claim if the claim itself does not accrue until after the bar date).

178.    In letters dated September 2, 2015, addressed to each of the Willners, the FDIC notified them that it had disallowed their claims as untimely filed stating in relevant part that "[t]he FDIC will not consent to any **further administrative review** of this claim determination." (emphasis added)

179.    If the Willners' claims had not qualified as exceptions to the Claims Bar Date, the FDIC's notices of disallowance would have included the

clause, "your failure to timely file a claim by the Bar Date precludes any further proceedings, rights or remedies on your claim." Their notices of disallowance did not include this clause.

180.   In addition, the FDIC claims agent who reviewed the Willners' claims indicated that he believed the Willners had exhausted the administrative claims process and the courts now had jurisdiction to hear their claims.

181.   The Willners subsequently filed this Complaint in this Court pursuant to 12 U.S.C. §1821(d)(6)(A)(ii).

## V.   CLAIMS FOR RELIEF

### COUNT ONE

**FRAUDULENT CONCEALMENT**

*Claim in Recoupment – Right of Rescission – Damages – Injunction*

182.   The Willners repeat, reallege, and/or incorporate by reference each and every allegation set forth above and below, as though fully set forth herein.

183.   The concealment or omission of a material fact by one who knows that the other party is acting upon the assumption that the fact does not exist constitutes actionable fraud.

184.   USBank's predecessor(s) in interest, WMB and/or WMBFA, knew that the Willners entered into the Loan Transaction because they reasonably

37

assumed that WMB and/or WMBFA would disclose important information relating to the Loan Transaction including the following material facts which WMB and/or WMBFA concealed from them:

      a.      one or more of their agents grossly inflated the income on Mr. Willner's Loan Application or allowed the grossly inflated income to stand uncorrected;

      b.      one of their agents had commissioned an appraisal on the Property that came in $1.2 million lower than the $5.2 million appraisal their agent disclosed to the Willners, which induced the Willners to enter into the Loan Transaction;

      c.      the Loan Transaction would not be consummated if Mr. Willner's Loan Application contained his true 2006 estimated annual income of $52,000;

      d.      WMBFA could not engage in business as a separate and distinct affiliate of WMB in the Loan Transaction and, therefore, could not be the Lender and Beneficiary under the Note and First Trust.

185.   But for the fact that WMB and/or WMBFA did not disclose these material facts, the Willners would not have entered into the Loan Transaction. Instead, the Willners would have sold the Property and monetized the $2.8 million of equity they owned therein.

186. The Willners' claim for fraudulent concealment is valid regardless of whether the concealment of material facts by WMB and/or WMBFA was intentional, reckless or innocent.

187. The Willners' claim of fraudulent concealment against USBank as successor in interest to WMB and/or WMBFA and/or La Salle Bank as Trustee for the 2006-AR15 Trust for damages, recoupment, and/or rescission of the Note and the First Trust, and for a declaratory judgment that the Note and the First Trust are voidable and hereby declared void and unenforceable, did not accrue until the Willners were injured when USBank forced Mr. Willner to file for bankruptcy to stop the illegal foreclosure instigated by USBank and its agents or when USBank filed a proof of claim in the Bankrupcty Court.

188. Mr. Willner has a right of recoupment against the Note, *i.e.*, the right to have USBank's monetary claim against him reduced by reason of his claim against USBank arising out of an issue common to both claims, the enforceability of the Note.

189. The Willners have the right to rescind the First Trust, *i.e.*, the right to disavow it due to its voidability, which was the result of the fraudulent conduct of USBank's predecessors in interest.

190.   WMB's concealment of material facts that the Willners reasonably expected would have been disclosed, which constituted an inducement to the Willners to enter into the Loan Transaction, is grounds for rescission of the Note and First Trust by a court of equity or an action for damages in a court of law.

191.   The Willners suffered damages as a result of the fraudulent conduct of USBank's predecessors in interest.

192.   But for USBank's attempt to illegally foreclose on the Property, the Willners would not now face losing valuable equity by foreclosure and/or by forcing Mr. Willner to declare bankruptcy.

193.   The Willners suffered damages when Mr. Willner's business reputation and earnings potential were impaired when he filed for bankruptcy on December 13, 2012 in order to stay the illegal foreclosure proceedings initiated by USBank.

194.   The EDVa ruled that Mr. Willner's bankruptcy filing tolled the statute of limitations on the Willners' claims.

195.   Mr. Willner's claim in recoupment against USBank accrued in December 2012 when USBank forced Mr. Willner to file for bankruptcy.

196.   The Willners suffered damages when Mr. Willner's business reputation and earnings potential were impaired, thereby reducing the value

of their ownership interests in a company of which Mr. Willner is president, when Mr. Willner declared bankruptcy on December 13, 2012 in order to stay the illegal foreclosure proceedings initiated by USBank.

197.   The Willners will also suffer damages if and when USBank sells the Property pursuant to a foreclosure sale, if the proceeds available to the Willners after such sale are less than the amount they could have monetized if they had sold the Property instead of refinancing it in 2006.

198.   The Willners, who each own a 100% undivided interest in the Property as a tenant by the entirety, will also suffer damages if and when USBank sells the Property pursuant to the terms of the Note and First Trust that are voidable and unenforceable.

199.   Mrs. Willner's claim against USBank to prevent foreclosure of the Property under the First Trust and her right to rescind the First Trust, accrued on December 13, 2012 when Mr. Willner filed for bankruptcy to stay USBank's illegal foreclosure.

## COUNT TWO

## DECLARATORY JUDGMENT

### *The Note and the First Trust are Void and Unenforceable*
*WMBFA Lacked the Legal Capacity to Enter into the Loan Transaction as a distinct and separate entity from WMB*

200.   The Willners repeat, reallege, and/or incorporate by reference each and every allegation set forth above and below, as though fully set forth herein.

201.   At the Closing, when Mr. Willner purportedly entered into contracts with WMBFA by signing the Note and, along with Mrs. Willner, the First Trust, and WMBFA was designated as the Lender under the Note and the Lender and Beneficiary under the First Trust, WMBFA had no corporate existence and was not legally registered to transact business in Virginia -- it was merely an unincorporated trade name masquerading as an affiliate of WMB.

202.   In order to generate illicit profits, WMB, by and through its employees and/or agents, created the illusion that WMBFA was a distinct entity, separate and apart from WMB.

203.   Where WMBFA did not have the legal capacity or authority to enter into the Loan Transaction, it violated Virginia Code § 6.2-398.A., "Every person who trades or deals as a bank, or carries on banking, without authority of law, and their officers and agents, is guilty of a Class 6 felony."

204.   The Note and the First Trust are void *ab initio* because WMBFA had no corporate existence and lacked the legal capacity to enter into a contract

as a separate and distinct entity from WMB, and entering into such contract was illegal and contrary to public policy.

205.   Consequently, WMBFA could not convey any enforceable right to its successor, USBank, which, therefore, has no right to enforce the Note or foreclose under the First Trust.

206.   In the alternative, and without waiver of the foregoing, the Note and the First Trust are illegal and contrary to public policy because WMB did not register to do business as WMBFA with the Virginia state government under an assumed name certificate pursuant to Va. Code § 59.1-69.

207.   In addition, WMB did not give substantial performance under the terms of the Note and the First Trust in good faith and without actual knowledge that a license or certificate was required.

208.   More specifically, in order to receive an illegal $30,000 origination fee, WMB claimed in writing to be participating in the same loan transaction with WMBFA as its affiliate, not as one and the same entity doing business as WMBFA.

209.   At the Closing WMB presented Mr. Willner with an Affiliated Business Disclosure which indicated that WMBFA and WMB existed concurrently as separate and distinct entities (as banks and affiliates) and

that each was in a position to provide settlement services to the other - for a

fee, including a 1-4% loan origination fee based on the loan amount

210.   The HUD-1 Settlement Statement for the Note indicated that

WMBFA did in fact receive a $30,000 loan origination fee.

211.   On April 4, 2005, the WMBFA Board of Directors changed the full

corporate title on the federal bank charter from WMBFA to WMB. There is

only one name designated per charter. Therefore, as of April 4, 2005, only

WMB existed as a federally-chartered bank and WMBFA was divested of

the attributes, powers, and benefits of a federal bank charter and ceased to

exist as a bank.

212.   The Note and the First Trust are void *ab initio* because WMBFA had

no corporate existence or legal authority to enter into a contract or to be the

beneficiary of the First Trust as a separate and distinct affiliate of WMB.

213.   Even if WMB were doing business ("dba") as WMBFA (which it was

not), it had no legal authority to do so because WMB was not registered to

do business as WMBFA with the Virginia government under an assumed

name certificate as required by Va. Code § 59.1-69.

214.   Based on the foregoing, the Note and First Trust under which

WMBFA is the purported lender and beneficiary are void *ab initio* and,

therefore, USBank and its agents have no right to enforce the Note or foreclose on the Property under the First Trust.

## COUNT THREE

## DECLARATORY JUDGMENT

### *No Right to Foreclose Under the First Trust*

215.   The Willners repeat, reallege, and/or incorporate by reference each and every allegation set forth above and below, as though fully set forth herein.

216.   As servicer of the Note, Chase assigned its purported beneficial interest in the First Trust to USBank and then, as USBank's attorney-in-fact, appointed a substitute trustee to notice a foreclosure sale of the Property based on the purported default of the Note.

217.   The First Trust, however, does not secure the Note and, therefore, USBank has no right to foreclose on the Property.

218.   A deed of trust is construed as a contract under Virginia law. Thus, the First Trust must be construed as a contract.

219.   Under Virginia law, a court must only consider the words of a contract within the four corners of the instrument itself. It must be construed as written, without adding terms that were not included by the parties. When

the terms in a contract are clear and unambiguous, the contract is construed according to its plain meaning.

220.   The terms of the First Trust are clear and unambiguous and, according to its plain meaning, it does not secure the Note.

221.   The First Trust gives the Trustee the right to foreclose on the Property only if a note signed by "Borrower" goes into default.

222.   Paragraph (E) of the section entitled, "DEFINITIONS" on page 2 of the First Trust states in relevant part, "'Note* means the promissory note signed by Borrower..."

223.   The First Trust clearly and unambiguously defines the term "Borrower" as "MICHAEL A. WILLNER & MARGUERITE EVANS WILLNER".

224.   Thus, the term "Borrower" is a defined term with a particular meaning in the First Trust that overrides any generally understood definition of the generic word "borrower."

225.   The parties to the First Trust were free to select a defined term and to ascribe to it the meaning they chose; once they did so, the meaning of the defined term, *i.e.,* "Borrower," overrode the definition established by the dictionary or other common usage.

226. It is generally accepted as a matter of contract interpretation that where a term is defined in a contract, the term will be accorded that meaning wherever it appears.

227. "Borrower," as defined by the First Trust, did not sign the Note. Only Mr. Willner signed the Note. Thus, a default of the Note did not trigger the First Trust's foreclosure provisions because, according to the First Trust's clear and unambiguous language, the First Trust does not identify the Note as the note secured by the First Trust -- it identifies a note signed by Borrower, and a note signed by Borrower is not in default.

228. Where a written contract is clear and unambiguous on its face it is the duty of the court to construe it.

229. Under Virginia law, which provides practically no deviation from the actual language of the instrument, a stringent standard of contract interpretation must be applied to the First Trust. Where the First Trust contains no ambiguities, the intention of the parties as expressed by the terms of the document must govern.

230. In the alternative, without waiver of the foregoing, USBank cannot use parol evidence against Mr. Willner, as debtor in possession, to add to his bankruptcy estate's debts. Thus, USBank cannot rely on parol evidence in an attempt to prove that the First Trust secures the Note, which was not signed

by Borrower, because such an interpretation would add to the debts of Mr.

Willner's bankruptcy estate.

231.   Additionally, where the First Trust does not identity the Note, the

Property, which is part of Mr. Willner's bankruptcy estate, cannot secure the

Note. Where parol evidence cannot be used to correct even a seemingly

minor clerical error in the security agreement, it certainly cannot be used in

the present case where the First Trust, by design, does not identify the Note.

In the context of a bankruptcy, a court must hew to the necessary

technicalities inherent in any law governing commercial transactions, even

when the result is harsh, though in this case it is justified.

232.   In the alternative, without waiver of the foregoing, even if the terms of

the First Trust were ambiguous, it still could not be construed to secure the

Note because USBank's predecessor in interest, WMB, drafted the

document and Virginia law requires ambiguous terms to be construed

against the drafter.

233.   In addition, even if a court sought to determine the intent of the

parties, courts are bound to say that the parties intended what the written

instrument plainly declares.

234.   Moreover, the parties did, in fact, intend to ensure that WMBFA

would not have a right to foreclose on the Property under the First Trust if

Mr. Willner defaulted on a note that Mrs. Willner refused to sign.

235.   The First Trust plainly declares that it secures a note signed by

Borrower. The Note is not signed by Borrower, as defined in the First Trust.

Consequently, the First Trust does not identify and, therefore, does not

secure the Note.

236.   In addition, no note signed by Borrower is in default. Thus, USBank

has no right to foreclose on the Property.

## COUNT FOUR

## QUIET TITLE

### *No Valid Liens on the Property*

237.   The Willners repeat, reallege, and/or incorporate by reference each

and every allegation set forth above and below, as though fully set forth

herein.

238.   The Willners are the legal titleholders to the Property pursuant to a

Deed of Bargain and Sale to "Michael A. Willner and Marguerite Evans

Willner, husband and wife, as tenants by the entirety", which was recorded

among the land records of Fairfax County, Virginia, on October 19, 1989, in

Deed Book 7451, Page 0357, No. 89 146730.

239.   The First Trust is void or voidable and unenforceable as argued herein.

240.   Thus, "Michael A. Willner and Marguerite Evans Willner, husband and wife, as tenants by the entirety with the common law right of survivorship", have no legal obligations to USBank or the Willners have fully satisfied all legal obligations to USBank.

241.   In Virginia an action for quiet title is based on the premise that a person with good title to certain real or personal property should not be subjected to various future claims against the title.

242.   Consequently, where Mr. Willner does not owe any money under the Note which is void or voidable, and against which he has a claim of recoupment, and/or where the First Trust does not secure the Note, the Willners have the right to quiet title in the Property.

## COUNT FIVE

### UNJUST ENRICHMENT

### *No Right to Enforce Note or Foreclose on Property*

243.   The Willners repeat, reallege, and/or incorporate by reference each and every allegation set forth above and below, as though fully set forth herein.

244.    The elements of unjust enrichment are: 1) there must be some benefit conferred on the defendant; 2) the defendant must have knowledge of the benefit; and 3) the defendant must have accepted or retained the benefit without paying for its value.

245.    Mr. Willner conferred payments, including fees, principal and interest, penalties, and other charges, benefits that were non-gratuitous, upon USBank, without knowledge of the unlawful and deceptive pattern and practice in which USBank and its predecessors in interest had engaged. These benefits are beyond that to which USBank is entitled.

246.    USBank accepted or retained the non-gratuitous benefits conferred by Mr. Willner even though it and/or its predecessor in interest did not provide the quality of, or fairness in, home loan origination and servicing, that had been represented by its predecessors in interest, WMBFA and/or WMB, or that reasonable borrowers would have expected.

247.    In addition, if USBank were allowed to unjustly foreclose on the Property, USBank would unlawfully acquire the Property and the Willners' significant equity therein.

248.    Moreover, the Note is void or voidable, and unenforceable. Consequently, Mr. Willner had no legal obligation to pay interest to USBank or its predecessors in interest.

249.   Retaining the non-gratuitous benefits conferred upon USBank and its predecessors in interest by Mr. Willner and allowing USBank to abscond with the Property and the Willners' equity therein under these circumstances would result in the unjust enrichment of USBank.

250.   Accordingly, Mr. Willner is entitled to, and hereby seeks, disgorgement and restitution from USBank for wrongful profits, revenue, and benefits, in a manner established by this Court and available under applicable law.

251.   Mr. Willner is entitled to the imposition of a constructive trust upon USBank such that its enrichment, benefits, and ill-gotten gains may be allocated and distributed equitably by this Court to and/or for the benefit of Mrs. Willner and Mr. Willner's bankruptcy estate.

252.   In addition, USBank is estopped from pursuing any further foreclosure proceedings, the result of which would inure to its inequitable benefit and additional unjust enrichment.

## COUNT SIX

**CONSPIRACY TO COMMIT FRAUDULENT CONCEALMENT**

***Against USBank, Chase, SPS, and Dimon***

253. The Willners repeat, reallege, and/or incorporate by reference each and every allegation set forth above and below, as though fully set forth herein.

254. A common law conspiracy consists of two or more persons combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means.

255. USBank and its agents, Defendants Chase, Dimon, and SPS, (the "Agents") combined with and acted in concert along with their predecessors in interest, assigns, and/or agents for the purpose of accomplishing a fraudulent scheme to refinance the Property and subsequently initiate foreclosure proceedings, by unlawful means, including, but not limited to, engaging in fraudulent concealment as described herein, which induced the Willners to enter into the Loan Transaction. USBank and its Agents then attempted to foreclose on the Property without first seeking the aid and direction of a court of equity as required by Virginia law, despite their knowledge:

     a.    of the fraudulent conduct of their predecessors in interest;

     b.    of Mr. Willner's claim of recoupment;

     c.    that the First Trust, on its face, does not secure the Note;

d.      that WMBFA had no legal capacity to enter into the loan transaction and, therefore, the Note and the First Trust are void; and

e.      of the legal requirement to first seek the aid and direction of a court of equity before initiating foreclosure proceedings against the Property where Mr. Willner has a claim of recoupment against the Note.

256.   USBank and its Agents are liable for the damages sustained by or expected to be sustained by the Willners resulting from the conduct of USBank and its Agents and/or that of their predecessors in interest as co-conspirators, in a scheme to fraudulently conceal material information from the Willners and attempting to illegally foreclose on the Property, thus consummating the fraudulent scheme to rob the Willners of their equity in the Property.

257.   Dimon is liable for Chase's conduct in this matter.

258.   Dimon is responsible for overseeing executive officers and other employees to ensure their compliance with the company's code of conduct, all court and regulatory consent orders, and other laws and regulations.

259.   Dimon is responsible for Chase's tortious conduct in this matter which stemmed from Dimon's overarching strategy to maximize Chase's profits regardless of its legal obligations. The Willners ask this Court to take judicial notice of Senator Elizabeth Warren's account of a meeting with

Dimon as reported by the Huffington Post. When Senator Elizabeth Warren

told Dimon she thought Chase was breaking the law, his response was, ***"So***

***hit me with a fine. We can afford it."*** (Samantha Lachman, Huffington Post,

3/31/2015, *"Guess What Happened When JPMorgan's CEO Visited*

*Elizabeth Warren's Office"* available at

http://www.huffingtonpost.com/2015/03/31/elizabeth-warren-jamie-

dimon_n_6972182.html?ncid=txtlnkusaolp00000592.

260.   Judicial notice can be taken of a press release.  In addition, out-of-

court statements which tend to prove a plan, design, or intention of the

declarant are admissible, subject to the usual limitations.  Rule 801(d)(2) of

the Federal Rules of Evidence expressly acknowledges that an admission by

a party-opponent is not hearsay if the statement is offered against the party

and was actually made by him in either his individual or representative

capacity.

261.   As a result of Chase's egregious conduct relating to its mortgage

business, Dimon signed a Consent Cease and Desist Order which states in

relevant part that the Office of the Comptroller of the Currency ("OCC"):

> … has identified certain deficiencies and unsafe or unsound
> practices in residential mortgage servicing and in the Bank's
> [Chase's] initiation and handling of foreclosure
> proceedings... The Bank has committed to taking all
> necessary and appropriate steps to remedy the deficiencies
> and unsafe or unsound practices identified by the OCC, and

to enhance the Bank's residential mortgage servicing and foreclosure processes.

*In the Matter of JPMorgan Chase Bank, N.A.,* Office of the Comptroller of the Currency ("OCC"), Consent Order, April 13, 2011 ("2011 Consent Order"), p. 1, http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47e.pdf.

262.  The OCC found that, in connection with its foreclosure operations, Chase filed fraudulent affidavits in state and federal courts, initiated nonjudicial foreclosure proceedings without proper documentation, failed to sufficiently oversee outside counsel and other third-party providers handling foreclosure-related services, and otherwise engaged in unsafe or unsound banking practices. *Id.* at pp. 2-3.

263.  Chase, under Dimon's profit-maximizing mandate, engaged in this very same conduct in the present case despite consenting, under Dimon's signature, to cease and desist from these activities.

264.  Dimon also consented to implement measures to ensure, among other things, that Chase had documentation sufficient to establish its right to foreclose. *Id.* at 11, Article V(1)(c).

265.  The OCC held that "...the Board [of which Dimon was the chairman] has the ultimate responsibility for proper and sound management of the Bank...[and] the Board shall follow-up on any material non-compliance

with … its obligations and undertakings under the terms of this Order. " *Id.*
at 25, Article XIII(1).

266.  Dimon shirked his obligations under the Consent Order and on
February 9, 2012, the OCC fined Chase $113 million in connection with the
unsafe and unsound mortgage servicing and foreclosure practices that were
the subject of the Order (available at: http://www.occ.gov/news-
issuances/news-releases/2012/nr-occ-2012-20.html).

267.  Thus, in the present case, Dimon, is ultimately responsible for Chase's
disregard of its obligations under the Consent Order, among other legal
obligations, including, but not limited to:

a.  Engaging in extortion by threatening to file baseless criminal
charges against Mr. Willner in order to coerce him to drop his demand that
Chase cause the substitute trustee to forbear from initiating foreclosure
proceedings and instead seek the aid and direction of a court of equity as
required by law.

b.  Causing U.S. Bank, as its attorney in fact, to initiate a
nonjudicial foreclosure: a) pursuant to the First Trust, which, on its face, did
not secure the Note; b) pursuant to the Note and the First Trust which are
void *ab initio* or voidable and unenforceable; and c) without causing the
substitute trustee to seek the aid and direction of a court as required by

Virginia law where Mr. Willner had a claim of recoupment against the Note, based on documentary evidence provided by Chase; and

     c.     Actively, intentionally, and illegally implementing a strategy to strip the Willners of their equity in the Property while Dimon shamelessly complained to the press that federal government agencies were unfairly blaming his company for the conduct of its predecessor in interest, WMB.

268.   An officer of a corporation cannot avoid criminal responsibility for an illegal act on the ground that it was done in his official capacity or through the instrumentality of the corporation which he controls and dominates. This doctrine applies in both the criminal and civil contexts. A contrary rule would in many instances afford immunity to the chief offenders, the officers of the corporation, without whose assistance it would be impossible for the corporation to engage in the prohibited business. Dimon should be held personally liable for the deceptive acts of his company because he caused it to do the deceptive acts or knowingly approved of the actions.

269.   Dimon's personal liability in this matter does not require that he participated in every day-to-day decision to maximize Chase's profits by stripping the Willners of their equity in the Property through illegal means. It is sufficientthat Dimon was aware, and knowingly approved, of the actions of Chase and its agents to maximize profits by ignoring the law.

270.   Where Dimon knowingly approved of Chase's strategy to maximize profits regardless of the company's legal obligations, he is individually liable for the Willners' damages.

## VI.   **DAMAGES**

271.   The Willners suffered damages of at least $12,750,000 according to proof, including, but not limited to, the following:

a.   the lost opportunity to sell the Property in 2006 into a strong real estate market, and monetize $2.8 million of equity in the Property plus interest;

b.   the interest Mr. Willner paid on the Note to USBank and its predecessors;

c.   the value of the Willners' time, energy, and expense, and of preparing to assert their legal rights in litigation against Defendants, including, but not limited to, attorney's fees and court costs;

d.   the non-pecuniary damages suffered from the severe emotional distress caused by USBank and its agents attempting to illegally foreclose on the Property;

e.   forcing Mr. Willner into bankruptcy, which severely damaged his reputation, defamed his character, and resulted in a loss of trade, business, and profits and the diminution of his capacity to generate earnings;

      f.     significantly reducing the time Mr. Willner has been able to spend on his businesses, thus reducing the earnings he could have generated and the value of his and Mrs. Willner's holdings therein;

      g.     severely damaging the Willners' credit ratings, which dimished their purchasing power while increasing their cost of credit, impaired their ability to obtain credit at a more favorable rate than before the decrease in credit rating, reduced availability of goods and services tied to credit ratings, and increased costs of those goods and services; and

      h.     other financial losses according to proof.

## VII.  **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully seek the following relief:

      a.     a **Declaratory Judgment** that the Note and First Trust, the Loan Documents, are, each and/or every one of them, void and unenforceable;

      b.     in the alternative, and without waiver of the foregoing, a **Declaratory Judgment** that each and/or every one of the Loan Documents are voidable and hereby voided and unenforceable;

      c.     a **Declaratory Judgment** that the trustee or substitute trustee under the First Trust does not have the authority to foreclose on the Property;

d.      an **Order** rescinding each and/or every one of the Loan Documents that are voidable and restitution and disgorgement of wrongful profits, revenue, benefits, and all monies paid to Defendants by, or accrued by Defendants against, Mr. Willner;

e.      an **Order** establishing a constructive trust upon USBank and/or Chase such that their enrichment, benefit and ill-gotten gains may be allocated and distributed equitably by the Court to and/or for the benefit of Mr. Willner;

f.      an **Order** rescinding the Notice of Default;

g.      an **Order** rescinding the Substitution of Trustee;

h.      an **Award** in favor of the Willners against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount according to proof;

i.      an **Award** of recoupment according to proof against any valid claim of payment or repayment Defendants may have;

j.      an **Award** of actual, statutory, compensatory, and consequential damages in an amount delineated herein and as allowed under applicable law to be determined at trial;

k.      an **Award** of interest on the monies wrongfully obtained or on the estimated proceeds that could have been generated from the sale of the

Property from the date of closing through the date of entry of judgment in this action;

l.      an **Award** of Punitive damages and/or exemplary damages as provided by applicable law;

m.      a **Declaratory Judgment** that the First Trust is not enforceable against the Willners or their interest in the Property or in the proceeds of any sale of the Property; or, in the alternative, and without waiver of the foregoing, not enforceable against Mrs. Willner or her interest in the Property or any proceeds from the sale of the Property in which she has an ownership interest;

n.      an **Injunction** enjoining Defendants to cease all foreclosure activity and remove all deeds of trust and recorded liens relating to the Property from the county land records;

o.      an **Order** quieting title to the Property in "Michael A. Willner and Marguerite Evans Willner, husband and wife, as tenants by the entirety with the common law right of survivorship";

p.      an **Award** of attorneys' fees, expenses, and recoverable costs reasonably incurred in connection with the preparation for, commencement and prosecution of, this action;

q.      an **Award** of prejudgment interest at the maximum legal rate;

and

r.      such other, further, and different relief as the nature of the case

may require or as may be determined to be just, equitable, and proper by this

Court.

## VIII.  <u>LEAVE TO AMEND</u>

If this Court finds any deficiencies in this Complaint, the Willners

hereby request leave to amend.

## X.   <u>JURY TRIAL DEMAND</u>

The Willners demand a jury trial on all issues triable herein by a jury.

DATED this 29th day of October, 2015.

By: _____

Michael A. Willner, pro se
11521 Potomac Road
Lorton, VA 22079
703-550-2791

Marguerite Evans Willner, pro se
11521 Potomac Road
Lorton, VA, 22079
703-550-2791