IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHAEL A. WILLNER and )
MARGUERITE EVANS WILNER, )
                    Plaintiffs, )
 )
    vs. )          Case No. 1:15-CV-01840-CRC
 )
JAMES DIMON, et al., )
                    Defendants )
 )

## DECLARATION OF DONALD G. GRIESER IN SUPPORT OF FDIC-RECEIVER'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

I, DONALD G. GRIESER, state and declare pursuant to the provisions of 28 U.S.C. § 1746(2) as follows:

1. I am employed by the Federal Deposit Insurance Corporation ("FDIC") as a Resolutions and Receiverships Specialist in the FDIC's office located at 1601 Bryan Street, Dallas, Texas. I have personal knowledge of the facts set forth herein, and if called upon as a witness to testify thereto, I could competently and truthfully do so.

2. I am generally familiar with the receivership of Washington Mutual Bank ("WMB") and am one of the persons responsible for monitoring creditor claims filed in the FDIC's non-deposit claims system with respect to the Failed Bank receivership.

3. The former Office of Thrift Supervision appointed the FDIC as receiver for WMB ("FDIC-Receiver") on September 25, 2008. A copy of the Office of Thrift Supervision's Order No. 2008-36 appointing the FDIC-Receiver and the FDIC-Receiver's letter accepting such appointment are attached as Exhibit "A" hereto and incorporated by this reference.

1

Also on September 25, 2008, the FDIC and the FDIC-Receiver entered into a

Purchase and Assumption Agreement with J.P. Morgan Chase Bank, N.A.  A copy of

the Purchase and Assumption Agreement is available on the FDIC's website at

https://www.fdic.gov/bank/individual/failed/wamu.html.

4.  Although the Office of Thrift Supervision identifies WMB as "Washington Mutual

Bank, Henderson, Nevada," WMB's principal place of business was in Seattle,

Washington.

5.  The FDIC-Receiver set December 30, 2008, as the bar date for filing administrative

claims against WMB receivership ("Claims Bar Date").  A notice to creditors and

depositors of WMB reflecting the Claims Bar Date was published in *The Wall Street

Journal* on October 1, 2008, and October 31, 2008; and in *The Seattle Times* on

October 1, 2008, October 30, 2008, and December 1, 2008; and in the *Las Vegas

Review Journal* on October 1, 2008, October 31, 2008, and December 1, 2008.

Attached hereto collectively marked as Exhibit "B," are true and correct copies of

affidavits and notices from the publishers of those newspapers reflecting the

publications of the notice.

6.  On July 20, 2017, I conducted a search of the FDIC's non-deposit claims system to

determine whether the plaintiffs in this action, Michael A. Willner and Marguerite

Evans Willner, had filed administrative claims against the WMB receivership.  My

search revealed that neither of the plaintiffs in this action had filed an administrative

claim with the FDIC-Receiver prior to the December 30, 2008, Claims Bar Date.

However, Mr. Willner filed an administrative claim with the FDIC-Receiver on

August 7, 2015, and Mrs. Willner filed an administrative claim with the FDIC-

Receiver on August 11, 2015.  True copies of the plaintiffs' administrative claims with portions of the exhibits attached thereto, redacted to protect personal information, are attached hereto as "Exhibit C" and incorporated by this reference. Only those exhibits referenced in the FDIC-Receiver's moving papers are attached due to the voluminous nature of the exhibits to each of the administrative claims.

7.  On May 13, 2015, the FDIC-Receiver sent letters to Michael Willner and Marguerite Willner titled "NOTICE TO DISCOVERED CLAIMANT TO PRESENT PROOF OF CLAIM." True copies of the letters sent to the plaintiffs are attached hereto as "Exhibit D" and incorporated by this reference.

8.  On September 2, 2015, the FDIC-Receiver sent each plaintiff a written notice stating that their administrative claim was being disallowed as untimely.  A copy of such notice is attached as Exhibit "E" hereto and incorporated by this reference.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 25th day of July, 2017 in Dallas, Texas.

_Donald G. Grieser_
Donald G. Grieser

# EXHIBIT A

# Office of Thrift Supervision
### Department of the Treasury



I certify that annexed hereto is a true copy of the
document described below made from records of the Office of
Thrift Supervision, Department of the Treasury.

Copy of the Office of Thrift Supervision
Order Number 2008-36, executed on September
25, 2008, appointing a receiver for Washington
Mutual Bank, Henderson, Nevada, consisting of
three (3) pages.

Signed this 25th day of September, 2008

*Darrel W. Dochow*

**Darrel W. Dochow**
**Regional Director**
**West Region**

### OFFICE OF THRIFT SUPERVISION

#### Receivership Of A Federal Savings Association

|        |                    |
|--------|--------------------|
| Date:      | September 25, 2008 |
| Order No.: | 2008-36            |
| OTS No.:   | 08551              |

The Director of the Office of Thrift Supervision (OTS), or his designee, in cooperation with the Federal Deposit Insurance Corporation (FDIC), has determined to appoint the FDIC as receiver of Washington Mutual Bank, Henderson, Nevada (Savings Bank).

### GROUNDS FOR APPOINTMENT OF FDIC AS RECEIVER FOR THE SAVINGS BANK

The Director, or his designee, based upon the administrative record finds and determines the following:

    (i)  The Savings Bank is likely to be unable to pay its obligations or meet its depositors' demands in the normal course of business; and

    (ii) The Institution is in an unsafe or unsound condition to transact business.

The Savings Bank is a Federally chartered savings bank, the accounts of which are insured by the Deposit Insurance Fund (DIF). The Savings Bank has its home office in Henderson, Nevada. As of June 30, 2008, the Savings Bank reported total assets of $307 billion.

### DISCUSSION OF GROUNDS FOR APPOINTMENT OF A RECEIVER FOR THE SAVINGS BANK

Section 5(d)(2)(A) of the Home Owners' Loan Act (HOLA), 12 U.S.C. § 1464(d)(2)(A), provides that the Director may appoint a receiver for any insured savings association if the Director determines that one or more grounds specified in section 11(c)(5) of the Federal Deposit Insurance Act (FDIA), 12 U.S.C. § 1821(c)(5), exist.

Under section 11(c)(5)(F) of the FDIA, the Director may appoint a receiver if a savings association is likely to be unable to pay its obligations or meet its depositors' demands in the normal course of business because it does not have sufficient liquid assets to fund expected withdrawals. The Savings Bank has insufficient cash and liquid assets convertible to cash necessary to pay its obligations and the expected withdrawal demands of its depositors. The Savings Bank has suffered significant cash outflows, exceeding

Order No.: 2008-36
Page: 2

$22 billion since July 2008, in part because of adverse publicity. The Savings Bank has limited and diminishing liquidity sources available to it and the current rate of outflow will deplete the Savings Bank's cash resources and liquidity within a short period of time.

Therefore, the Director concludes that the Savings Bank is likely to be unable to pay its obligations or meet its depositors' demands in the normal course of business because it does not have sufficient liquid assets to pay those obligations and fund the expected withdrawals.

Under section 11(c)(5)(C) of the FDIA, the Director may appoint a receiver if a savings association is in an unsafe or unsound condition to transact business. The Savings Bank is in an unsafe and unsound condition as a result of its severe liquidity strain, deteriorating asset quality, and continuing significant negative operating earnings with no realistic prospects for raising capital to ensure that it can repay all of its liabilities, including deposits.

The Director, or his designee, therefore, has determined that grounds for the appointment for a receiver for the Savings Bank exist under section 5(d)(2) of the HOLA, and sections 11(c)(5)(C) and (F) of the FDIA, 12 U.S.C. §§ 1821(o)(5)(C) and (F).

### ACTIONS ORDERED OR APPROVED

**Appointment of a Receiver**

The Director, or his designee, hereby appoints the FDIC as receiver for the Savings Bank, for the purpose of liquidation, pursuant to section 5(d)(2) of the HOLA, and section 11(c)(6)(B) of the FDIA, 12 U.S.C. § 1821(c)(6)(B).

**Delegation of Authority to Act for OTS**

The Director, or his designee, hereby authorizes the OTS West Regional Director, or his designee, and the Deputy Chief Counsel for the Business Transactions Division of the Chief Counsel's office, or his designee, to: (i) certify orders; (ii) sign, execute, attest, or certify other documents of OTS issued or authorized by this Order; (iii) designate the persons or entity that will give notice of the appointment of a receiver for the Savings Bank and serve the Savings Bank with a copy of this Order pursuant to 12 C.F.R. § 558.2; and (iv) perform such other functions of OTS necessary or appropriate for implementation of this Order. All documents to be issued under the authority of this Order must be first approved, in form and content, by the Chief Counsel's Office. In addition, the Director, or his designee, hereby authorizes the Deputy Chief Counsel for the Business Transactions Division of the Chief Counsel's office, or his designee, to

Order No.: 2008-36
Page: 3

make any subsequent technical corrections, that might be necessary, to this Order, or any documents issued under the authority of this Order.

By Order of the Director of OTS, effective September 25, 2008.

John M. Reich
Director



**Office of Thrift Supervision**
Department of the Treasury                                                                                       *West Region*

Pacific Plaza, 2001 Junipero Serra Boulevard, Suite 650, Daly City, CA 94014-1976
P.O. Box 7165, San Francisco, CA 94120-7165 • Telephone: (650) 746-7000 • Fax: (650) 746-7001

Hand Delivered

September 25, 2008

OTS No. 08551

Washington Mutual Bank
1301 Second Avenue
Seattle, Washington 98101

Re:   Appointment of a Receiver

Dear Sirs/Madam:

This is to notify you that the Director, Office of Thrift Supervision, by Order Number 2008-36, dated September 25, 2008, appointed the Federal Deposit Insurance Corporation as receiver (Receiver) for Washington Mutual Bank, Henderson, Nevada (Bank), and authorized the undersigned to deliver notice of such appointment.

The Receiver is now taking possession of the Bank pursuant to the terms of its appointment as set forth in Order No. 2008-36, a copy of which is attached. In connection with the appointment of the Receiver, we respectfully call your attention to Section 5(d)(4) of the Home Owners' Loan Act of 1933, 12 U.S.C. § 1464(d)(4), which establishes criminal penalties for refusal to comply with the Receiver's demand for possession of the property, business and assets of an association in receivership.

Please countersign a copy of this letter and indicate the time and date of your receipt of the letter and attachment in the space provided on the following page and return such copy to me.

Sincerely,

Darrel W. Dochow
Regional Director

**Notice of Appointment of a Receiver**
**Washington Mutual Bank, Henderson, NV**
**September 25, 2008**
**Page 2**

Attachment

Received by: _Stephen E. Frank   Chairman_
                    Print Name and Title

At ___6:15___, P.M., P.D.T., on Thursday, September 25, 2008

Signature: _S. E. Frank_


Accepting Appointment of FDIC as Receiver for Washington Mutual Bank, Henderson, NV:

_____   _ROBERT SCHOPPE_
           Print Name and Title _ATTORNEY - IN - FACT_

At ___6:15___, P.M., P.D.T., on Thursday, September 25, 2008


Signature: _____



**FDIC**
Division of Resolutions and Receiverships
Dallas Regional Office
1601 Bryan Street
Dallas, Texas 75201

Telephone (214) 754-0098

September 26, 2008

Office of Thrift Supervision
Washington, D.C.

Subject:     **Washington Mutual Bank**
             **Henderson, NV -- In Receivership**
             **Acceptance of Appointment as Receiver**

Dear Sir or Madam:

Please be advised that the Federal Deposit Insurance Corporation accepts its appointment as Receiver of the captioned depository institution, in accordance with the Federal Deposit Insurance Act, as amended.

Sincerely,

By: _____
             Attorney-in Fact

Printed Name: Robert Schoppe

# EXHIBIT B



## AFFIDAVIT

STATE OF TEXAS         )
                          ) ss:
CITY AND COUNTY OF DALLAS)

I, Erin Ostenson, being duly sworn, depose and say that I am the Advertising Clerk of the

Publisher of THE WALL STREET JOURNAL, a daily national newspaper of general

circulation throughout the United States, and that the Notice attached to this Affidavit has

been regularly published in THE WALL STREET JOURNAL for national distribution

for one insertion(s) on the following date(s): 10/1/08; advertiser: FDIC; and that the

foregoing statements are true and correct to the best of my knowledge.

*E. Ostenson*

Sworn to before me this
2nd day of Oct. '08

*Mitchell E. Glasko*
Notary Public

**STATE OF TEXAS**  )
                     ) ss:
**CITY AND COUNTY OF DALLAS)**

I, Erin Ostenson, being duly sworn, depose

Publisher of THE WALL STREET JOURN

circulation throughout the United States, an

been regularly published in THE WALL ST

for <u>one</u> insertion(s) on the following date(s)

foregoing statements are true and correct to

Sworn to before me this
<u>2nd</u> day of <u>Oct</u> '08

_____
Notary Public

**NOTICE TO CREDITORS
AND DEPOSITORS OF
WASHINGTON MUTUAL BANK
HENDERSON, NV.**

**TO THE CREDITORS OF THE FAILED INSTITUTION**

**TO THE DEPOSITORS OF THE INSTITUTION**

**AFFIDAVIT**

STATE OF TEXAS        )
                     ) ss:
CITY AND COUNTY OF DALLAS)

I, Erin Ostenson, being duly sworn, depose and say that I am the Advertising Clerk of the

Publisher of THE WALL STREET JOURNAL, a daily national newspaper of general

circulation throughout the United States, and that the Notice attached to this Affidavit has

been regularly published in THE WALL STREET JOURNAL for national distribution

for <u>one</u> insertion(s) on the following date(s): <u>10/31/08</u>; advertiser: <u>FDIC</u>; and that the

foregoing statements are true and correct to the best of my knowledge.

_E. Ostenson_

Sworn to before me this
_31st_ day of _Oct._ '08

_Mitchell E. Cheatham_
Notary Public

AFF

**STATE OF TEXAS** )
                   ) SS:
**CITY AND COUNTY OF DALLAS**)

I, Erin Ostenson, being duly sworn, depose

Publisher of THE WALL STREET JOURN

circulation throughout the United States, and

been regularly published in THE WALL ST

for __one__ insertion(s) on the following date(s):

foregoing statements are true and correct to t

Sworn to before me this
31 day of Oct '08

_(signature)_

Notary Public

---

**FDIC**

**NOTICE TO CREDITORS
AND DEPOSITORS OF
WASHINGTON MUTUAL BANK
HENDERSON, NV**

On September 25, 2008 (the "Closing Date"), the Office of Thrift Supervision closed Washington Mutual Bank, Henderson, NV 89014 (the "Failed Institution") and appointed the Federal Deposit Insurance Corporation as Receiver (the "Receiver") to handle all matters relating to the Failed Institution.

**TO THE CREDITORS OF THE FAILED INSTITUTION**

All creditors having claims against the Failed Institution must submit their claims in writing, together with proof of the claims, to the Receiver by December 30, 2008 (the "Bar Date"), at the following address:

FDIC as Receiver of Washington Mutual Bank
1601 Bryan Street, Dallas, TX 75201
Attention: George Fritz

Under federal law, with certain limited exceptions, failure to file such claims by the Bar Date will result in disallowance by the Receiver, the disallowance will be final, and further rights or remedies with regard to the claims will be barred. 12 U.S.C. Section 1821(d)(5)(C), (d)(6).

**TO THE DEPOSITORS OF THE INSTITUTION**

The Federal Deposit Insurance Corporation, in its corporate capacity, which insures your deposits at the Failed Institution, has arranged for the transfer of the deposit(s) at the Failed Institution to another insured depository institution, JPMORGAN CHASE BANK NATIONAL ASSOCIATION, Columbus, OH, 43240 ("the New Institution"). This arrangement should minimize the inconvenience the closing of the Failed Institution causes you. You may leave your deposits in the New Institution, but you must take action to claim ownership of your deposits.

Federal law 12 U.S.C. Section 1822(e), requires you to claim ownership of ("claim") your deposits at the New Institution within eighteen (18) months from the Closing Date. If you do not claim your deposits at the New Institution by March 25, 2010, the funds in your account(s) will be transferred back to the FDIC, and you will no longer have access to your deposit(s) at the New Institution. However, as described in more detail below, you may still be able to obtain these funds from your state government or the Receiver.

You may claim your deposits at the New Institution by taking any of the following actions within 18 months from the Closing Date. If you have more than one account, your action in claiming your deposit in one account will automatically claim your deposit in all of your accounts.

1. Making a deposit to or withdrawal from your account(s). This includes writing a check on any account, or having an automated direct deposit credited to or an automated withdrawal debited from any account;
2. Executing a new signature card on your account(s), enter into a new deposit agreement with the New Institution, changing the ownership on your account(s), or renegotiating the terms of your certificate of deposit account;
3. Providing the New Institution with a completed change of address form; or
4. Writing to the New Institution and notifying them that you wish to keep your account(s) active. Please be sure to include the name(s) of the account(s), the account number(s), and the signature of an authorized signer on the account(s), name and address.

You should know that bank drafts issued by the Failed Institution, including officer's checks, cashier's checks, money orders, dividend checks, interest checks, and expense checks, are all considered deposits and must be claimed within 18 months from the Closing Date.

If you do not claim ownership of your deposit(s) at the New Institution within 18 months from the Closing Date, federal law, 12 U.S.C. Section 1822(e), requires the New Institution to return your deposit(s) to the FDIC and the FDIC to deliver the unclaimed deposit(s) as unclaimed property to the state listed in your address on the Failed Institution's records. If your address is outside of the United States, the FDIC is directed to deliver the unclaimed deposit(s) to the state in which the Failed Institution had its main office. If the state accepts custody of your deposit(s), you will have ten years from the date of delivery to claim your deposit(s) from the state in accordance with its unclaimed property laws. If you do not claim your deposit(s) from the state within the ten years, the funds will be returned to the FDIC, and you will be permanently barred from claiming your deposit(s). If the state declines to accept custody of your unclaimed deposit(s), you will be able to claim your deposit(s) directly from the FDIC until the receivership is terminated. However, please note that a receivership may be terminated at any time. Once the receivership is terminated, you will not be able to claim your deposit(s).

In the event you disagree with the FDIC's determination of your insurance coverage as represented by the account(s) made available at the New Institution, you may seek a review of the FDIC's determination in the United States District Court for the federal judicial district where the principal place of business of the Failed Institution was located. You must file your request for this review no later than 60 days after the date on which the FDIC made your deposit(s) available to you at the New Institution. Filing a request for review will not prevent you from using the funds in your new account.



# The Seattle Times

REPRESENTING THE **Seattle Post-Intelligencer**
PO Box 70, Seattle, WA 98111

MILLER ADVERTISING
ACCOUNTS PAYABLE
71 FIFTH AVE, 7TH FLOOR
NEW YORK, NY 10003

Re: Advertiser Account #9792005
Ad #: 773228300

## Affidavit of Publication

3964579 / 1

STATE OF WASHINGTON
Counties of King and Snohomish

The undersigned, on oath states that he/she is an authorized representative of The Seattle Times Company, publisher of The Seattle Times and representing the Seattle Post-Intelligencer, separate newspapers of general circulation published daily in King and Snohomish Counties, State of Washington. The Seattle Times and the Seattle Post-Intelligencer have been approved as legal newspapers by orders of the Superior Court of King and Snohomish Counties.

The notice, in the exact form annexed, was published in the regular and entire issue of said paper or papers and distributed to its subscribers during all of the said period.

| The Seattle Times | 10/01/08 |
|---|---|

**Debbie Collantes**   Signature _____ Scal _____

Subscribed and sworn to before me on ___ October 7 2008 ___
(DATE)

Maureen E Dugan
(NOTARY SIGNATURE)   Notary Public in and for the State of Washington, residing at Seattle





# FDIC

## NOTICE TO CREDITORS AND DEPOSITORS OF WASHINGTON MUTUAL BANK HENDERSON, NV

On September 25, 2008 (the "Closing Date"), the Office of Thrift Supervision closed Washington Mutual Bank, Henderson, NV 89014 (the "Failed Institution") and appointed the Federal Deposit Insurance Corporation as Receiver (the "Receiver") to handle all matters relating to the Failed Institution.

### TO THE CREDITORS OF THE FAILED INSTITUTION

All creditors having claims against the Failed Institution must submit their claims in writing, together with proof of the claims, to the Receiver by December 30, 2008 (the "Bar Date"), at the following address:

FDIC as Receiver of Washington Mutual Bank
1601 Bryan Street, Dallas, TX 75201
Attention: George Felix

Under federal law, with certain limited exceptions, failure to file such claims by the Bar Date will result in disallowance by the Receiver. The disallowance will be final, and further rights or remedies with regard to the claims will be barred. 12 U.S.C. Section 1821(d)(5)(C), (d)(6).

### TO THE DEPOSITORS OF THE INSTITUTION

The Federal Deposit Insurance Corporation, in its corporate capacity, which insures your deposits (the "FDIC"), arranged for the transfer of the deposits at the Failed Institution to another insured depository institution, JPMORGAN CHASE BANK NATIONAL ASSOCIATION, Columbus, OH, 43240 (the "New Institution"). This arrangement should minimize the inconvenience the closing of the Failed Institution causes you. You may leave your deposits in the New Institution, but you must take action to claim ownership of your deposits.

Federal law 12 U.S.C. Section 1822(e), requires you to claim ownership of ("claim") your deposits at the New Institution within eighteen (18) months from the Closing Date. If you do not claim your deposits at the New Institution by March 25, 2010, the funds in your account(s) will be transferred back to the FDIC, and you will no longer have access to your deposit(s) at the New Institution. However, as described in more detail below, you may still be able to obtain these funds from your state government or the Receiver.

You may claim your deposits at the New Institution by taking any of the following actions within 18 months from the Closing Date. If you have more than one account, your action in claiming your deposit in one account will automatically claim your deposit in all of your accounts.

1. Making a deposit to or withdrawal from your account(s). This includes writing a check on any account, or having an automated direct deposit credited to or an automated withdrawal debited from any account;

2. Executing a new signature card on your account(s), enter into a new deposit agreement with the New Institution, changing the ownership on your account(s), or renegotiating the terms of your certificate of deposit account;

3. Providing to the New Institution with a completed change of address form;

4. Writing to the New Institution and notifying them that you wish to keep your account(s) active. Please be sure to include the name(s) of the account(s), the account number(s), and the signature of an authorized signer on the account(s), name and address.

You should know that check drafts issued by the Failed Institution, including cashier's checks, money orders, interest checks, dividend checks, interest checks, and expense checks, are all considered deposits and must be claimed within 18 months from the Closing Date.

If you do not claim ownership of your deposit(s) at the New Institution within 18 months from the Closing Date, federal law, 12 U.S.C. Section 1822(e), requires the New Institution to return your deposit(s) to the FDIC and the FDIC to deliver the unclaimed deposit(s) as unclaimed property to the state listed in your address on the Failed Institution's records. If your address is outside of the United States, the FDIC is directed to deliver the unclaimed deposit(s) to the state in which the Failed Institution had its main office. If the state accepts custody of your deposit(s), you will have ten years from the date of delivery to claim your deposit(s) from the state within the unclaimed property laws. If you do not claim your deposit(s) from the state within the ten years, the funds will be returned to the FDIC, and you will be permanently barred from claiming your deposit(s). If the state chooses to accept custody of your unclaimed deposit(s), you will be able to claim your deposit(s) directly from the FDIC until the receivership is terminated. However, please note that a receivership may be terminated at any time. Once the receivership is terminated, you will not be able to claim your deposit(s).

In the event you disagree with the FDIC's determination of your insurance coverage as represented by the account(s) made available at the New Institution, you may seek a review of the FDIC's determination in the United States District Court for the federal judicial district where the principal place of business of the Failed Institution was located. You must file your request for the review no later than 60 days after the date on which the FDIC made your deposit(s)



# The Seattle Times

REPRESENTING THE Seattle Post-Intelligencer
PO Box 70, Seattle, WA 98111

MILLER ADVERTISING
ACCOUNTS PAYABLE
71 FIFTH AVE, 7TH FLOOR
NEW YORK, NY 10003

Re: Advertiser Account #9792005
Ad #: 774482200

## Affidavit of Publication

3973152 / 1

STATE OF WASHINGTON
Counties of King and Snohomish

The undersigned, on oath states that he/she is an authorized representative of The Seattle Times Company, publisher of The Seattle Times and representing the Seattle Post-Intelligencer, separate newspapers of general circulation published daily in King and Snohomish Counties, State of Washington. The Seattle Times and the Seattle Post-Intelligencer have been approved as legal newspapers by orders of the Superior Court of King and Snohomish Counties.

The notice, in the exact form annexed, was published in the regular and entire issue of said paper or papers and distributed to its subscribers during all of the said period.

| The Seattle Times | 10/30/08 |
|---|---|

Debbie Collantes    Signature _____

Subscribed and sworn to before me on _____ October 31, 2008
                                                          (DATE)

_____ (NOTARY SIGNATURE)    Notary Public in and for the State of Washington, residing at Seattle



**Reach** more than a million potential buyers every day.

## FDIC

**NOTICE TO CREDITORS AND DEPOSITORS OF WASHINGTON MUTUAL BANK HENDERSON, NV**

On September 25, 2008 (the "Closing Date"), the Office of Thrift Supervision closed Washington Mutual Bank, Henderson, NV 89014 (the "Failed Institution") and appointed the Federal Deposit Insurance Corporation as Receiver (the "Receiver") to handle all matters relating to the Failed Institution.

### TO THE CREDITORS OF THE FAILED INSTITUTION

All creditors having claims against the Failed Institution must submit their claims in writing, together with proof of the claims, to the Receiver by December 30, 2008 (the "Bar Date"), at the following address:

FDIC as Receiver of Washington Mutual Bank
1601 Bryan Street, Dallas, TX 75201
Attention: George Fritz

Under federal law, with certain limited exceptions, failure to file such claims by the Bar Date will result in disallowance by the Receiver, the disallowance will be final, and further rights or remedies with regard to the claims will be barred. 12 U.S.C. Section 1821(d)(5)(C), (d)(6).

### TO THE DEPOSITORS OF THE INSTITUTION

The Federal Deposit Insurance Corporation, in its corporate capacity, which insures your deposits (the "FDIC"), arranged for the transfer of the deposit(s) of the Failed Institution to another depository institution, JPMORGAN CHASE BANK NATIONAL ASSOCIATION, Columbus, OH, 43240 (the New Institution"). This arrangement should minimize the inconvenience to you during the closing of the Failed Institution causes you. You may leave your deposits in the New Institution, but you are at least able to take ownership of your deposits.

Federal law 12 U.S.C. Section 1822(e), requires you to claim ownership of ("claim") your deposits at the New Institution within eighteen (18) months from the Closing Date. If you do not claim your deposits at the New Institution by March 25, 2010, the funds in your account(s) will be transferred back to the FDIC, and you will no longer have access to your deposit(s) at the New Institution. FDIC, as described in more detail below, you may still be able to obtain those funds from your state government or the Receiver.

You may claim your deposits at the New Institution by taking any of the following actions within 18 months from the Closing Date. If you have more than one account, your action in claiming your deposit in one account will automatically claim your deposit in all of your accounts.

1. Making a deposit to or withdrawal from your account(s). This includes writing a check on any account, or having an automated direct deposit credited to or an automated withdrawal debited from any account.

2. Executing a new signature card with your account(s), enter into a new deposit agreement with the New Institution, changing the ownership on your account(s), or renegotiating the terms of your certificate of deposit account;

3. Providing the New Institution with a completed change of address form;

or

4. Writing to the New Institution and notifying them that you wish to keep your account(s) active. Please be sure to include the name(s) of the account(s), the account number(s), and the signature of an authorized signer on the account(s), name and address.

You should know that bank drafts issued by the Failed Institution, including cashier's checks, cashier's checks, money orders, dividend checks, interest checks, and expense checks, are all considered deposits and must be claimed within 18 months from the Closing Date.

If you do not claim ownership of your deposit(s) at the New Institution within 18 months from the Closing Date, federal law, 12 U.S.C. Section 1822(e), requires the New Institution to return your deposit(s) to the FDIC and the FDIC to deliver the unclaimed deposit(s) as unclaimed property to the state listed in your address on the Failed Institution's records. If your address is outside of the United States, the FDIC is directed to deliver the unclaimed deposit(s) to the state in which the Failed Institution had its main office. If the state accepts custody of your deposit(s), you will have ten years from the date of delivery to claim your deposit(s) from the state in accordance with its unclaimed property laws. If you do not claim your deposit(s) from the state within the ten years, the funds will be returned to the FDIC, and you will be permanently barred from claiming your deposit(s). If the state chooses to accept custody of your unclaimed deposit(s), you will be able to claim your deposit(s) directly from the FDIC until the receivership is terminated. However, please note that a receivership may be terminated at any time. Once the receivership is terminated, you will not be able to claim your deposit(s).

In the event you disagree with the FDIC's determination of your insurance coverage as represented by the account(s), made available at the New Institution, you may seek a review of the FDIC's determination in the United States District Court for the federal judicial district where the principal place of business of the Failed Institution was located. You must file your request for this review no later than 60 days after the date on which the FDIC made your deposit(s) available to you at the New Institution. Filing a request for review will not prevent you from using the funds in your new account.

NWclassifieds
206/624-SELL
nwclassifieds.com



# The Seattle Times

REPRESENTING THE *Seattle Post-Intelligencer*
PO Box 70, Seattle, WA 98111

MILLER ADVERTISING
ATTN ACCOUNTS PAYABLE
71 5TH AVE  7TH FLOOR
NEW YORK, NY  10003

Re: Advertiser Account #9792005
Ad #: 775499500

## Affidavit of Publication

3980101 / 1

STATE OF WASHINGTON
Counties of King and Snohomish

The undersigned, on oath states that he/she is an authorized representative of The Seattle Times Company, publisher of The Seattle Times and representing the Seattle Post-Intelligencer, separate newspapers of general circulation published daily in King and Snohomish Counties, State of Washington. The Seattle Times and the Seattle Post-Intelligencer have been approved as legal newspapers by orders of the Superior Court of King and Snohomish Counties.

The notice, in the exact form annexed, was published in the regular and entire issue of said paper or papers and distributed to its subscribers during all of the said period.

| The Seattle Times | 12/01/08 |
| --- | --- |

RECEIVED
JAN 0 2 2009

Debbie Collantes          Signature _____

Subscribed and sworn to before me on _____ December 2, 2008
                                              (DATE)

_____
(NOTARY SIGNATURE)   Notary Public in and for the State of Washington, residing at Seattle

# The Seattle Times

REPRESENTING THE *Seattle Post-Intelligencer*

le Advertiser Account #97792005        Ad # 775499500

Ad TEXT:



**NOTICE TO CREDITORS AND DEPOSITORS OF WASHINGTON MUTUAL BANK HENDERSON, NV**

RECEIVED

JAN 0 2 2009

AFFP    DISTRICT COURT
        Clark County, Nevada

        AFFIDAVIT OF PUBLICATION

        STATE OF NEVADA)
        COUNTY OF CLARK)   SS:

STACEY M. LEWIS, being 1st duly sworn, deposes and says:  That she is the Legal
Clerk for the Las Vegas Review-Journal and the Las Vegas Sun, daily newspapers
regularly issued, published and circulated in the City of Las Vegas, County of Clark,
State of Nevada, and that the advertisement, a true copy attached for,

MILLER ADVERTISING AGENCY                    3883393MIL       4531500

was continuously published in said Las Vegas Review-Journal and / or Las Vegas
Sun in 1 edition(s) of said newspaper issued from 10/01/2008 to 10/01/2008, on the
following days:

        10/01/2008

Signed: _____

SUBSCRIBED AND SWORN BEFORE ME THIS, THE

_1st_ day of __October__, 2008.

_____
Notary Public



AFFP   **DISTRICT COURT**
Clark County, Nevada

AFFIDAVIT OF PUBLICATION

STATE OF NEVADA)
COUNTY OF CLARK)   SS:

STACEY M. LEWIS, being 1st duly sworn, deposes and says: That she is the Legal
Clerk for the Las Vegas Review-Journal and the Las Vegas Sun, daily newspapers
regularly issued, published and circulated in the City of Las Vegas, County of Clark,
State of Nevada, and that the advertisement, a true copy attached for,

MILLER ADVERTISING AGENCY                   3883393MIL        4635048

was continuously published in said Las Vegas Review-Journal and / or Las Vegas
Sun in 1 edition(s) of said newspaper issued from 10/31/2008 to 10/31/2008, on the
following days:

    10/31/2008

Signed: _____

SUBSCRIBED AND SWORN BEFORE ME THIS, THE
3/at day of _____ , 2008.

_____
Notary Public



**NOTICE TO CREDITORS AND DEPOSITORS OF WASHINGTON MUTUAL BANK HENDERSON, NV**

On September 25, 2008 (the "Closing Date"), the Office of Thrift Supervision closed Washington Mutual Bank, Henderson, NV 89014 (the "Failed Institution") and appointed the Federal Deposit Insurance Corporation as Receiver (the "Receiver") to handle all matters relating to the Failed Institution.

**TO THE CREDITORS OF THE FAILED INSTITUTION**

All creditors having claims against the Failed Institution must submit their claims in writing, together with proof of the claims, to the Receiver by December 30, 2008 (the "Bar Date"), at the following address:

FDIC as Receiver of Washington Mutual Bank
1601 Bryan Street, Dallas, TX 75201
Attention: George Feiz

Under federal law, with certain limited exceptions, failure to file such claims by the Bar Date will result in disallowance by the Receiver, the disallowance will be final, and further rights or remedies with regard to the claims will be barred. 12 U.S.C. Section 1821(d)(5)(C), (d)(6).

**TO THE DEPOSITORS OF THE INSTITUTION**

The Federal Deposit Insurance Corporation, in its corporate capacity, which insures your deposits (the "FDIC"), arranged for the transfer of the deposits of the Failed Institution to another insured depository institution, JPMORGAN CHASE BANK NATIONAL ASSOCIATION, Columbus, OH, 43240 ("the New Institution"). This arrangement should minimize the inconvenience the closing of the Failed Institution causes you. You may leave your deposits in the New Institution, but you must take action to claim ownership of your deposits.

Federal law 12 U.S.C. Section 1822(e), requires you to claim ownership of ("claim") your deposits at the New Institution within eighteen (18) months from the Closing Date. If you do not claim your deposits at the New Institution by March 25, 2010, the funds in your account(s) will be transferred back to the FDIC, and you will no longer have access to your deposit(s) at the New Institution. However, as described in more detail below, you may still be able to obtain these funds from your state government or the Receiver.

You may claim your deposits at the New Institution by taking any of the following actions within 18 months from the Closing Date. If you have more than one account, your action in claiming your deposit in one account will automatically claim your deposit in all of your accounts.

1. Making a deposit to or withdrawal from your account(s). This includes writing a check on any account, or having an automated direct deposit, credited to or an automated withdrawal debited from any account;
2. Executing new signature card on your account(s), enter into a new deposit agreement with the New Institution, changing the ownership on your account(s), or renegotiating the terms of your certificate of deposit account;
3. Providing the New Institution with a completed change of address form; or
4. Writing to the New Institution and notifying them that you wish to keep your account(s) active. Please be sure to include the name(s) of the account(s), the account number(s), and the signature of an authorized signer on the account(s), name and address.

You should know that bank drafts issued by the Failed Institution, including cashier's checks, cashier's checks, money orders, dividend checks, interest checks, and expense checks, are all unclaimed deposits and must be claimed within 18 months from the Closing Date.

If you do not claim ownership of your deposit(s) at the New Institution within 18 months from the Closing Date, federal law, 12 U.S.C. Section 1822(e), requires the New Institution to return your deposit(s) to the FDIC and the FDIC to deliver the unclaimed deposit(s) as unclaimed property to the state listed in your address on the Failed Institution's records. If your address is outside of the United States, the FDIC is directed to deliver the unclaimed deposit(s) to the state in which the Failed Institution had its main office. If the state accepts custody of your deposit(s), you will have ten years from the date of delivery to claim your deposit(s) from the state (subject to the unclaimed property laws). If you do not claim your deposit(s) from the state within the ten years, the funds will be returned to the FDIC, and you will be permanently barred from claiming your deposit(s). If the state declines to accept custody of your unclaimed deposit(s), you will be able to claim your deposit(s) directly from the FDIC until the receivership is terminated. However, please note that a receivership may be terminated at any time. Once the receivership is terminated, you will not be able to claim your deposit(s).

In the event you disagree with the FDIC's determination of your insurance coverage as represented by the account(s) made available at the New Institution, you may seek a review of the FDIC's determination in the United States District Court for the federal judicial district where the principal place of business of the Failed Institution was located. You must file your request for this review no later than 60 days after the date on which the FDIC made your deposit(s) available to you at the New Institution. Filing a request for review will not prevent you from using the funds in your new account.

AFFP   **DISTRICT COURT**
Clark County, Nevada

AFFIDAVIT OF PUBLICATION

STATE OF NEVADA)
COUNTY OF CLARK)   SS:

STACEY M. LEWIS, being 1st duly sworn, deposes and says: That she is the Legal
Clerk for the Las Vegas Review-Journal and the Las Vegas Sun, daily newspapers
regularly issued, published and circulated in the City of Las Vegas, County of Clark,
State of Nevada, and that the advertisement, a true copy attached for,

**MILLER ADVERTISING AGENCY**            3883393MIL          4739388

was continuously published in said Las Vegas Review-Journal and / or Las Vegas
Sun in 1 edition(s) of said newspaper issued from 12/01/2008 to 12/01/2008, on the
following days:

    12/01/2008

**RECEIVED**

JAN 0 2 2009

Signed: _____

SUBSCRIBED AND SWORN BEFORE ME THIS, THE

_____ day of _____, 2008.

_____
Notary Public

LINDA ESPINOZA
Notary Public State of Nevada
No. 00-64106-1
My appt. exp. July 17, 2011



**NOTICE TO CREDITORS AND DEPOSITORS OF WASHINGTON MUTUAL BANK HENDERSON, NV**

On September 25, 2008 (the "Closing Date"), the Office of Thrift Supervision closed Washington Mutual Bank, Henderson, NV 89014 (the "Failed Institution") and appointed the Federal Deposit Insurance Corporation as Receiver (the "Receiver") to handle all matters relating to the Failed Institution.

**TO THE CREDITORS OF THE FAILED INSTITUTION**

All creditors having claims against the Failed Institution must submit their claims in writing, together with proof of the claims, to the Receiver by December 30, 2008 (the "Bar Date"), at the following address:

FDIC as Receiver of Washington Mutual Bank
1601 Bryan Street, Dallas, TX 75201
Attention: George Fritz

Under federal law, with certain limited exceptions, failure to file such claims by the Bar Date will result in disallowance by the Receiver, the disallowance will be final, and further rights or remedies with regard to the claims will be barred. 12 U.S.C. Sections 1821(d)(5)(C), (D)(3).

**TO THE DEPOSITORS OF THE INSTITUTION**

The Federal Deposit Insurance Corporation, in its corporate capacity, which insures your deposits (the "FDIC"), arranged for the transfer of the deposit(s) at the Failed Institution to another insured depository institution, JPMORGAN CHASE BANK NATIONAL ASSOCIATION, Columbus, OH, 43240 ("the New Institution"). This arrangement should minimize the inconvenience the closing of the Failed Institution causes you. You may leave your deposits in the New Institution, but you must take no action to claim ownership of your deposits.

Federal law 12 U.S.C. Section 1822(e), requires you to claim ownership of (claim) your deposits at the New Institution within eighteen (18) months from the Closing Date. If you do not claim your deposits at the New Institution by March 25, 2010, the funds in your account(s) will be transferred back to the FDIC, and you will no longer have access to your deposit(s) at the New Institution. However, as described in more detail below, you may still be able to obtain these funds from your state government or the Receiver.

You may claim your deposits at the New Institution by taking any of the following actions within 18 months from the Closing Date. If you have more than one account, your action in claiming your deposit in one account will automatically claim your deposits in all of your accounts.

1. Making a deposit to or withdrawal from your account(s). This includes writing a check on any account, or having an automated direct deposit credited to or an automated withdrawal debited from any account;
2. Executing a new signature card on your account(s), enter into a new deposit agreement with the New Institution, changing the ownership on your account(s), or renegotiating the terms of your certificate of deposit account;
3. Providing the New Institution with a completed change of address form; or
4. Writing to the New Institution and notifying them that you wish to keep your account(s) active. Please be sure to include the name(s) of the account(s), the account number(s), and the signature of an authorized signer on the account(s), name and address.

You should know that bank drafts issued by the Failed Institution, including cashier's checks, cashier's checks, money orders, dividend checks, interest checks, and expense checks, are all considered deposits and must be claimed within 18 months from the Closing Date.

If you do not claim ownership of your deposit(s) at the New Institution within 18 months from the Closing Date, federal law, 12 U.S.C. Section 1822(e), requires the New Institution to return your deposit(s) to the FDIC and the FDIC to deliver the unclaimed deposit(s) as unclaimed property to the state listed in your address on the Failed Institution's records. If your address is outside of the United States, the FDIC is directed to deliver the unclaimed deposit(s) to the state in which the Failed Institution had its main office. If the state accepts custody of your deposit(s), you will have two years from the date of delivery to claim your deposit(s) from the state in accordance with its unclaimed property laws. If you do not claim your deposit(s) from the state within the two years, the funds will be returned to the FDIC, and you will be permanently barred from claiming your deposit(s). If the state declines to accept custody of your unclaimed deposit(s), you will be able to claim your deposit(s) directly from the FDIC until the receivership is terminated. However, please note that a receivership may be terminated at any time. Once the receivership is terminated, you will not be able to claim your deposit(s).

In the event you disagree with the FDIC's determination of your insurance coverage as represented by the amount(s) made available at the New Institution, you may seek a review of the FDIC's determination in the United States District Court for the federal judicial district where the principal place of business of the Failed Institution was located. You must file your request for this review no later than 60 days after the date on which the FDIC made your deposit(s) available to you at the New Institution. Filing a request for review will not prevent you from using the funds in your new account.

RECEIVED

JAN 0 2 2009

# EXHIBIT C

Claimant ID: NS1001515320, Barcode Value: FD00144238, Fund: 10015

**Federal Deposit Insurance Corporation**
**as Receiver for**
**Washington Mutual Bank, Henderson, NV**

## PROOF OF CLAIM

1. SSN/Tax ID No.   ▉▉▉▉▉▉▉▉

2. The undersigned   **Michael A. Willner**

   *(Name of person completing the Proof of Claim)*

   hereby states that the subject Financial Institution, now in liquidation ("Failed Institution"), is indebted

3. to   **Michael A. Willner, Debtor in Possession**   (the "Claimant") in the sum of

   *(Name of Claimant)*

4. $ **7,900,000**

5. Description of Claim

   ┌─────────────────────────────────────────────────────────┐
   │   See Attachment A                                        │
   │                                                           │
   │                                                           │
   │                                                           │
   └─────────────────────────────────────────────────────────┘

The undersigned further states that no part of said debt has been paid, that the Claimant has given no endorsement or assignment of the same or any part thereof, and that there is no set-off or counterclaim, or other legal or equitable defense to said claim or any part thereof.

6. NAME   **Michael A. Willner, Debtor in Possession**         7. DATE  **8/5/2015**

   *(Name, Title, and Signature of person completing the Proof of Claim)*

8. ✗✗✗✗   *Michael A. Willner*   ✗(if applicable) Signature

9. ADDRESS   **11521 Potomac Road**

   *( City, State, and ZIP Code)*   **Lorton, VA 22079-4264**

10. TELEPHONE NUMBER(S)   ▉▉▉▉▉▉▉

The penalty for knowingly making or inviting reliance on a false, forged, or counterfeit statement, document, or thing for the purpose of influencing in any way the action of the Federal Deposit Insurance Corporation is a fine of not more than $1,000,000 or imprisonment for not more than 30 years or both (18 U.S.C. Section 1007).

**IMPORTANT NOTE:** The bar code at the top of this Proof of Claim is unique to this claim and may not be re-used for other claims which you may have or by other potential claimants. If you have other unrelated claims, you must file a separate Proof of Claim with its own unique bar code. Additional Proof of Claim forms may be found on the FDIC web site or obtained by mail at the respective addresses indicated in the Instructions. Re-use of this Proof of Claim may result in processing delays or the rejection of your claim.

### PRIVACY ACT STATEMENT

The FDIC is authorized to request this information from you by 12 U.S.C. § 1819, 1821, and Executive Order 9397. The purpose for collecting the information is to support the administration of claims against the failed financial institution. Furnishing the requested information is voluntary, but failure to provide the requested information in whole or in part may delay or prohibit the processing of your claim. The information provided by individuals is protected by the Privacy Act, 5 USC 552(a). The information may be furnished to third parties as authorized by law or used according to any of the routine uses described in the FDIC Insured Financial Institution Liquidation Records (30-64-0013) System of Records. This System of Records is available for review at www.fdic.gov/regulations/laws/rules/2000-4050.html#200030--64--0013. If you have questions or concerns about the collection or use of the information, you may contact the FDIC's Chief Privacy Officer at Privacy@fdic.gov.

# ATTACHMENT A

### to Proof of Claim of

## MICHAEL A. WILLNER

### A.  INTRODUCTION

1.   This proof of claim ("POC") concerns an attempted illegal foreclosure committed by USBank and its agents, in connection with a home owned by claimant, Michael A. Willner, and his wife, Marguerite Evans Willner, who have held record legal title as tenants by the entirety for 25 years and have continuously resided thereon, (the "Property"). It also relates to the fraudulent practices committed by Washington Mutual Bank ("WMB"), the predecessor in interest to U.S. National Bank Association ("USBank") as trustee for a mortgage-backed securities trust (the "2006-AR15 Trust").

2.   There are three interrelated yet distinct reasons why USBank has no right to foreclose on the Property:

   a)  a purported $3 million note signed by Mr. Willner, but not Mrs. Willner (the "Purported Note"), which USBank claims is secured by a deed of trust (the "First Trust"), is a product of fraud committed by USBank's predecessor in interest, WMB;

   b)  the Purported Note is void *ab initio* because the originator of the Purported Note, Washington Mutual Bank, FA ("WMBFA"), was merely a tradename and, therefore, did not have the legal capacity or authority, as a purported affiliate of WMB, to be a lender and beneficiary under the Purported Note and/or the First Trust; and

   c)  the First Trust, according to its plain and unambiguous language, does not secure the Property.

3.   In 2006, at the peak of the real estate market, the Willners were prepared to sell the Property to monetize almost $3 million of equity they owned therein.  An agent for USBank's predecessor in interest, **WMB**, however, convinced Mr. Willner to refinance the Property by assuring him that due to the significant equity therein, his modest income[1] was irrelevant to the approval of his loan application.

---

[1] Mr. Willner is a serial entrepreneur whose income fluctuates depending upon the success or failure of his latest ventures.

4.    WMB showed the Willners a $5.2 million appraisal of the Property[2], but concealed a second appraisal that came in at just $4 million.

5.    WMB also concealed the fact that it inflated Mr. Willner's estimated income by 1,200% on his loan application, which was prepared by a WMB agent, so the loan would be approved for inclusion in the 2006-AR15 Trust, thus enabling WMB to absolve itself of the risk of default.

6.    If WMB had notified the Willners that the Property had been appraised at only $4 million or that WMB had falsified Mr. Willner's estimated income on his loan application, Mr. Willner would not have signed the Purported Note, and neither he nor Mrs. Willner would have signed the First Trust.

7.    In addition, *but for* WMB's fraud, Mr. Willner would not have been approved for a loan, the interest payments of which he could only afford by taking cash out, and *but for* WMB's fraud, the Willners would not have risked losing their substantial equity in the Property by entering into the loan transaction (the "Loan Transaction").

8.    Within two months of the closing, WMB caused the Purported Note to be sold to the 2006-AR15 Trust, while purportedly retaining its servicing rights.

9.    Two years later in Fall 2008, the Office of Thrift Supervision seized WMB and transferred ownership of the thrift to the Federal Deposit Insurance Corporation (the "FDIC").

10.    The FDIC in turn immediately sold all of WMB's assets and substantially all of its liabilities to JPMorgan Chase Bank, National Association ("Chase"), including the servicing rights to the Purported Note. The 2006-AR15 Trust remained the owner of the Purported Note.

11.    Several years later, despite having substantial equity in the Property, Mr. Willner was unable to refinance it due to his relatively modest income and was unable to continue make payments under the Purported Note.

12.    The Willners listed the Property for sale, well below its appraised value, in order to hasten a sale and avoid foreclosure.

13.    After receiving responses to a number of Qualified Written Requests, the Willners discovered that WMB had failed to disclose that it had falsified Mr. Willner's estimated income on his 2006 loan application and that prior to the closing in 2006

---

[2] Mr. Willner refinanced a $2.4 million mortgage on the Home; thus, with a market value of $5.2 million, the Willners owned $2.8 million of equity in the Property at the time. The Property was recently appraised at $5.5 million.

WMB had commissioned an appraisal on the Property that came in at $1.2 million below the appraised value that it had used to induce Mr. Willner to refinance the Property.

14.   Mr. Willner would not have signed the Purported Note and he and Mrs. Willner would not have signed the First Trust, if WMB had properly disclosed these material facts.

15.   Instead, they would have sold the Property and monetized $2.8 million in equity.

16.   The Willners notified USBank that Mr. Willner had a claim of recoupment against the Purported Note and that, under Virginia law, USBank did not have a right to foreclose without first seeking the aid and direction of a court of equity.

17.   Nevertheless, Chase, as USBank's agent, caused the Willners to receive two weeks' notice that the Property would be sold at a foreclosure sale a few days before Christmas 2012.

18.   Mr. Willner filed for bankruptcy, which halted the sale. Mrs. Willner did not file for bankruptcy.

19.   Mr. Willner is now the Debtor in Possession of his estate which is in Chapter 11 in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court").

20.   USBank filed a proof of claim in the Bankrupty Court ("BPOC") claiming The Purported Note is in default and that it has a right to foreclose on the Property pursuant to the First Trust.

21.   The Willners sought to defend against the BPOC by filing suit in the U.S. District Court for the Eastern District of Virginia ("District Court") where they demanded a trial by jury.

22.   The District Court determined that it did not have subject matter jurisdiction to hear claims against USBank and its Agents "involving WMB's conduct," because the Willners had not exhausted their administrative remedies under the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA).

23.   After convincing the Bankruptcy Court to lift the stay, USBank is eager to foreclose on the Property, which was recently appraised at $5.5 million, and acquire it for a "credit bid" of about $3.6 million. USBank intends to use nonjudicial foreclosure to evade judicial scrutiny of its purported right to foreclose.

3

24.   *But for* USBank's attempt to strip the Willners of their equity in the Property, the Willners would not now face losing millions in equity by foreclosure – nor would Mr. Willner have had to file for bankruptcy protection, thus destroying his reputation and impairing his ability to earn a living as an entrepreneur.

25.   Mr. Willner files this POC seeking declaratory and injunctive relief, recoupment, recission, and/or damages, among other relief subject to proof.

26.   The claims asserted in this POC and remedies requested are in the nature of defenses and/or counterclaims to USBank's BPOC.

## B.   NATURE OF CLAIMS

27.   This POC is filed by Mr. Willner, as debtor in possession of his bankruptcy estate. He and his wife, Marguerite, own the Property as tenants by the entirety.

28.   Mr. Willner refinanced the Property by signing a purported $3 million note dated September 5, 2006 (the Purported Note), (Exhibit A-1) identifying WMBFA as the lender at a loan closing on the same date ("Loan Closing").

29.   Mrs. Willner did not sign the Purported Note.

30.   At the Loan Closing the Willners signed a deed of trust, the First Trust, (Exhibit A-2) which, by its plain, clear, and unambiguous language, secures a note that they both signed -- not the Purported Note, which Mrs. Willner did not sign.

31.   The current holder of the Purported Note is U.S. Bank National Association (USBank), as Trustee, successor in interest to Bank of America, N.A., as Trustee, successor by merger to LaSalle Bank, N.A., as Trustee, of the WaMu Mortgage Pass-Through Certificates Series 2006-AR15 Trust (the 2006-AR15 Trust).

32.   It is undisputed that the 2006-AR15 Trust purchased the Purported Note in November 2006, two years before Washington Mutual Bank (WMB) failed and the FDIC was named receiver. (Exhibit A-3 Excerpts from the 2006-AR15 Trust's Prospectus Supplement and Free Writing Prospectus, Form FWP).[3]

---

[3] Here is a link to the list of filings on the SEC's website made by WaMu Acceptance Corporation ("WAAC") as Depositor for the 2006-AR15 Trust: http://www.sec.gov/cgi-bin/browse-edgar?CIK=0001374627&action=getcompany. Here is a link to the prospectus supplement for the 2006-AR15 Trust: http://www.sec.gov/Archives/edgar/data/1317069/000095011706004341/a44834.htm. And here is a link to the list of mortgage loans in the 2006-AR15 Trust (Form FWP 1): http://www.sec.gov/Archives/edgar/data/1317069/000127727706000741/fwp1intialtapewamu2006_ar15.htm (The loan number for the Note is 3063148179). While Form FWP 1 does not identify any borrowers by name, it lists 40 data points associated with the Note including the

4

33.   JPMorgan Chase Bank, N.A. ("Chase") acquired the purported servicing rights to the Purported Note from the FDIC on September 25, 2008.

34.   Select Portfolio Servicing, Inc. ("SPS"), is a successor in interest to Chase's servicing rights and is the current servicer of the Purported Note.

35.   James Dimon is the CEO and President of Chase and is jointly responsible for its conduct in this matter ("Dimon," together with Chase and SPS, referred to herein as "USBank's Agents" or "Agents").

36.   Mr. Willner stopped making payments on the Purported Note in May 2011.

37.   On November 8, 2012, Chase, as the attorney-in-fact for USBank, appointed a substitute trustee purportedly under the First Trust. On November 30, 2012, the substitute trustee scheduled a foreclosure sale of the Property for December 18, 2012.

38.   On December 13, 2012, Mr. Willner filed a Chapter 11 bankruptcy petition (Case No. 12-17322-BFK) in the Bankruptcy Court, which stayed the foreclosure sale and tolled the statute of limitations on Mr. Willner's claims against USBank and its Agents (discussed below).

39.   On February 26, 2013, USBank filed a proof of claim with the Bankruptcy Court in the amount of $3,441,397, in which it claimed a right to foreclose on the Property pursuant to the terms of the Purported Note and the First Trust (Exhibit A-4: Proof of Claim filed by USBank with the U.S. Bankruptcy Court for the Eastern District of Virginia).

40.   On December 12, 2014, Mr. Willner as debtor in possession, and Mrs. Willner, individually, filed a complaint (C.A. No. 1:14-CV-1708, the "Complaint") against USBank, and its Agents in the U.S. District Court for the Eastern District of Virginia (the "District Court"). The crux of the Complaint was that the Purported Note and the First Trust are void and/or voidable and that the First Trust does not secure the Purported Note.

41.   The Complaint did not name the FDIC, WMB or WMBFA as defendants.

42.   The Complaint's causes of action were, in effect, affirmative defenses and counterclaims to the BPOC. The reason the Willners filed their claims as causes of action in the District Court instead of affirmative defenses in the Bankruptcy Court was because they wanted a trial by jury.

43.   On March 31, 2015, the Bankruptcy Court conditionally granted a motion for relief of stay filed by USBank, and ruled that Mr. Willner had until September 30, 2015 to sell the Property,

---

loan number, the city, state and zip code in which Mr. Willner resides i.e., Lorton, Virginia, 22079, the original and current loan principal, initial monthly interest payments, original loan-to-value ratio, interest rate change date, borrower's FICO score on the date of the closing, and purpose of the loan, among others.

otherwise the stay would be lifted. (Exhibit A-5 – Order dated March 31, 2015 by Judge Brian F. Kenney.)

44.   On May 11, 2015 the District Court determined that it did not have subject matter jurisdiction to hear claims against USBank and its Agents "involving WMB's conduct," including claims for declaratory judgment, because the Willners had not exhausted their administrative remedies under the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA). (Exhibit A-6 – Order Entered May 11, 2015, by Anthony J. Trenga, U.S. District Judge, "Trenga Order," p. 4).

45.   The District Court held that the Willners' claims against USBank and its Agents "derive from the conduct of WMB and are therefore subject to the FIRREA's exhaustion requirement. WMB was the sponsor and servicer of the WaMu Trust when WMB failed and the FDIC therefore became the sponsor and servicer of the Trust… Plaintiffs' claims therefore necessarily relate to assets that came within the control of the FDIC; and Plaintiffs were required to present their claims with respect to those assets to the FDIC as receiver." (*Id.* at p. 5)

46.   The District Court rejected USBank's argument that the Willners' common law claims, which were subject to Virginia's two-year statute of limitations, had expired, when it held that "the statute of limitation was extended by the filing of Plaintiff Michael Willner's Chapter 11 bankruptcy on December 13, 2012, pursuant to 11 U.S.C. § 108(a)." (*Id.* at p. 7 n. 3). This ruling confirms that the very earliest date upon which any of the Willners' common law claims could have accrued was December 13, 2010, well after the FDIC's December 30, 2008 Claims Bar Date for the filing of claims against WMB.

47.   In this POC, Mr. Willner asserts a number of claims, which are, in effect, affirmative defenses or counterclaims, to USBank's BPOC relating to assets, *i.e.,* the Purported Note and the First Trust, which the District Court found "came within the control of the FDIC," over which the District Court ruled it lacked subject matter jurisdiction including, but not limited to:

> a) a claim of right to a declaratory judgment that USBank does not have the right to foreclose on the Property under the First Trust because, according to its plain language, it does not secure the Purported Note;

> b) a claim of right to a declaratory judgment that the Purported Note and the First Trust are void *ab initio* because WMBFA did not have the legal capacity or authority to enter into the Loan Transaction with Mr. Willner as an affiliate of WMB, nor did it have the legal capacity to be a beneficiary under the First Trust; and

> c) a claim for damages and/or recoupment or rescission against USBank as holder of the Purported Note, lender and beneficiary under the First Trust, and successor in interest to WMB, for the fraudulent concealment by WMB of the material facts that:

1) it falsified Mr. Willner's estimated annual income on his loan application (the "Loan Application");

2) a second appraisal on the Property commissioned by WMB came in at $1.2 million below the appraisal WMB used to induce Mr. Willner to refinance the Property and both he and Mrs. Willner to sign the First Trust;

3) the Loan Transaction would not be consummated if Mr. Willner's Loan Application contained his true 2006 estimated annual income; and

4) WMBFA was not an affiliate of WMB.

48.   Mr. Willner's claims in this action are a defense of USBank's proof of claim of right to foreclose on his primary residence. Therefore, his claims did not arise until USBank caused the scheduling of a foreclosure sale in December 2012 and/or filed its proof of claim with the Bankruptcy Court in February 2013, long after the Bar Date. *See, e.g., Stommel v. LNV Corp.,* 2014 U.S. Dist. LEXIS 47045 (D. Utah Apr. 3, 2014) ("Stommel's claims in this action are a defense of LNV's threatened foreclosure of her primary residence. Therefore, her claims did not arise until LNV threatened to foreclose her home in April 2013, long after America West failed and the FDIC was named receiver.")

## C.   **FACTUAL BACKGROUND**

49.   In 1989 the Willners purchased 11+ acres for approximately $477,000 cash by "Deed of Bargain and Sale" to "Michael A. Willner and Marguerite Evans Willner, husband and wife, as tenants by the entirety with the common law right of survivorship," which was recorded among the land records of Fairfax County, Virginia, on October 19, 1989, in Deed Book 7451, Page 0357, No. 89 146730, (hereinafter the "Record Deed"). (Exhibit A-7)

50.   After purchasing the land, the Willners invested over $2 million to build their house and improve the Property. Since 1992 they have also paid approximately $2.4 million in property taxes, insurance, and mortgage interest.

51.   From 1996 to the present, the Willners' annual income ranged between $35,000 and $75,000.

52.   In 2006 the Willners received two marketing solicitations from Washington Mutual Home Loans, Inc., a WMB affiliate, enticing them to refinance the Property.

53.   On or about August 10, 2006, Mrs. Willner called the telephone number on one of the ads and spoke with Phillip Howell, with whom she and her husband had previously established a good working relationship during two prior refinancings with WMBFA and whose advice they trusted.

54.   Mrs. Willner explained to Howell that she and her husband were prepared to sell the Property and monetize their equity, but they might consider refinancing if WMBFA would approve a "cash-out" refi once again, the proceeds of which they would primarily use to make their mortgage payments.

55.   After speaking with Howell, it was the Willners' understanding that they should refinance rather than sell their rapidly-appreciating waterfront property because they would be hard-pressed to find a better investment than the Property.

56.   Mrs. Willner informed Howell that she did not intend to co-sign the mortgage loan.

57.   The Willners were led to believe that Howell was providing mortgage brokerage services and would get Mr. Willner the best loan on the best terms available under the circumstances.

58.   On or about August 11, 2006, Howell assured the Willners that Mr. Willner's modest compensation was irrelevant to qualifying for the mortgage loan because of the significant equity he and Mrs. Willner owned therein.[4]

59.   Howell told Mr. Willner to call Sanjay Babbar, a WMB agent, who had been instructed by Howell to fill out Mr. Willner's Loan Application over the telephone.

60.   On or about August 11, 2006, Mr. Willner spoke with Babbar on the telephone, who asked Mr. Willner questions for the purpose of filling out the Loan Application.

61.   Mr. Willner truthfully answered each of Babbar's questions. When asked to estimate his annual income for 2006, Mr. Willner told Babbar that he expected to earn close to $52,000.

62.   Mr. Willner subsequently provided his and Mrs. Willner's joint federal tax returns for the two prior years and their two most recent bank and brokerage statements. The tax returns showed that the Willners' total adjusted gross income plus benefits was $56,596 in 2004 and $53,377 in 2005.

63.   The Willners also signed Form 4506-T, which authorized WMB to obtain their tax returns directly from the IRS.

64.   On August 23, 2006, Howell sent the Willners an email titled "loan details" which indicated that, with the Property worth "5,000,000++," and a loan amount of $3 million, the loan met the bank's guidelines of a 60% LTV (loan-to-value). Nothing in the email indicated that Mr. Willner's income was relevant (Exhibit A-8 at p. 4, Howell emails).

65.   Howell's email indicated that the Loan principal could increase to $3.3 million if Mr. Willner chose to make interest-only payments, but that it could be repaid when Mr. Willner refinanced again. *Id.*

---

[4] In November 2011, Howell was found guilty by the Maryland Commission of Financial Regulation of defrauding residential borrowers and operating without a license; he was fined and ordered to Cease and Desist from conducting credit services business activities with Maryland consumers.

8

66.   Howell knew, but did not disclose to the Willners, that Mr. Willner would not, in fact, be able to refinance again and would, therefore, default on the Purported Note, if his income remained the same, and if WMB, or any other bank Mr. Willner approached, considered his income relevant to its funding decision.

67.   On or about August 24, 2006, the Willners were informed that the appraisal report ordered by WMB valued the Property at $5.2 million. Given that the Willners' debt obligation was $2.4 million, if they sold the Property at the appraised value instead of refinancing it, they would have monetized $2.8 million of equity (Exhibit A-9 at p. 2: $5.2 million appraisal).

68.   The Willners believed that the $5.2 million appraisal accurately reflected the market value of the Property and was proof that it continued to substantially appreciate in value year after year. This belief was material to, and a substantial factor in, Mr. Willner's decision to refinance the Property.

69.   It did not even dawn on the Willners that WMB might have ordered another appraisal which it did not disclose to them.

70.   At the closing, Mr. Willner reasonably relied on the settlement attorney, Robert Malico, to show him all the pages containing important information. In addition, Mr. Willner reasonably relied on WMBFA or WMB to ensure Malico was aware of all the pages that contained important information for Mr. Willner to review and sign or initial. Mr. Willner, therefore, signed or initialed all pages of the closing documents that Malico showed him and Mr. Willner believed that all the pages that he was not asked to review, sign, or initial, contained boilerplate or legalese that was relatively inconsequential.

71.   Mrs. Willner was not shown and did not sign any closing documents other than the First Trust.

72.   Mrs. Willner demanded that her name be removed from the signature line of the Purported Note because the Willners did not want WMBFA to have the right to foreclose on the Property. WMB removed Mrs. Willner's name from the signature line as instructed and Mr. Willner signed the Purported Note. Mrs. Willner did not sign it. (Exhibit A-1)

73.   The Willners then signed the First Trust (Exhibit A-2), which was drafted by WMB and which, by its plain, clear, and unambiguous language, secured a note signed by "Borrower" defined as "Michael A. Willner & Marguerite Evans Willner." WMB specifically did not modify the First Trust so that it would secure a note that was only signed by Mr. Willner. Consequently, the First Trust did not give WMBFA the right to foreclose on the Property if Mr. Willner ever defaulted on the Purported Note.

74.   As part of the Loan Transaction, Mr. Willner, but not Mrs. Willner, also entered into a $250,000 credit agreement (the "Credit Agreement") with WMB, not WMBFA. The debt

9

evidenced by the Credit Agreement has since been satisfied and is not at issue in this Proof of Claim.

75.   At the closing, WMB asked Mr. Willner to sign an "Affiliated Business Arrangement Disclosure Statement Notice" (the "Affiliated Business Disclosure") which indicated that WMBFA and WMB existed concurrently as separate and distinct entities (as banks and affiliates) and that each was in a position to provide settlement services to the other for a fee, including a 1-4% loan origination fee based on the loan amount. (Exhibit A-10)

76.   The HUD-1 Settlement Statement for the Purported Note indicated that WMBFA did in fact receive a $30,000 loan origination fee (Exhibit A-11, p. 2, line 801), thus, WMBFA and WMB were involved in the Loan Transaction as two distinct and separate entities.

77.   Two months after the closing, WMB or WMBFA sold the Purported Note to WaMu Asset Acceptance Corporation ("WMAAC"), which then sold it to the 2006-AR15 Trust (Exhibit A-3).

78.   WMB, along with its affiliates, performed every function necessary to create and register the 2006-AR15 Trust with the Securities and Exchange Commission ("SEC") and effectively controlled the 2006-AR15 Trust at the time it acquired the Purported Note. (*See* SEC filings for 2006-AR15 Trust on SEC's website: http://www.sec.gov/cgi-bin/browse-edgar?CIK=0001374627&action=getcompany)

79.   In its Motion for Relief from Stay ("Motion for Relief"), filed in Mr. Willner's bankruptcy case (Docket No. 59), USBank admitted it is a successor in interest to, or assignee of, WMB and/or WMBFA, the purported lender to Mr. Willner under the Purported Note (Exhibit A-12, Motion for Relief ¶ 3).

80.   At the time it acquired the Purported Note, WMB exercised specific, financial, and, as attorney-in-fact, legal control over USBank's predecessor and the operations of the 2006-AR15 Trust, dictated its policies and practices, and exercised power and control over it.

81.   The 2006-AR15 Trust, therefore, as an arm of an entity that defrauded the Willners, acquired the Purported Note in bad faith, with notice that he had a defense or a claim in recoupment against the Purported Note.

82.   LaSalle Bank, as trustee for the 2006-AR15 Trust, knew or should have known that the First Trust did not, on its face, secure the Purported Note.

83.   WMB caused the 2006-AR15 Trust to purchase the Purported Note in bad faith; LaSalle Bank, as trustee, knew or should have known that it was not paying fair value because, at a minimum, it knew:

    a.   Mr. Willner signed the Purported Note under false pretenses;

    b.   the Willners signed the First Trust under false pretenses;

10

    c.  the First Trust, on its face, did not secure the Purported Note; and that

    d.  WMBFA could not have legally made a loan to Mr. Willner or been the lender and beneficiary under the First Trust as a separate and distinct affiliate of WMB in the same Loan Transaction.

84.  In October 2008 Chase notified Mr. Willner that it was the new servicer of the Purported Note (Exhibit A-13). Mrs. Willner did not receive a similar notice.

85.  The Willners received no notice that Chase or the FDIC controlled the Purported Note, despite the fact it was sold to the 2006-AR15 Trust two years before WMB went into receivership, or that any claims, affirmative defenses, or counterclaims that the Willners may have against the Noteholder, USBank, had to be filed with the FDIC. Regardless, the Willners' claims against USBank had not yet accrued and, therefore, they could not file a proof of claim with the FDIC at that time.

86.  From 2009-2010, the worsening economy, contraction of credit, and the tightening of lending standards, all took a toll on Mr. Willner's business prospects and despite having well over $1 million of equity in the Property, Mr. Willner was unable to refinance the Purported Note. In May 2011, after having exhausted all other options and despite having a stellar 30-year credit history, Mr. Willner was unable to make his monthly payment under the Purported Note.

87.  Mr. Willner asked Chase to agree to a 90-day forbearance from foreclosing on the Property so he could hire a private auction company to sell the Property, but Chase refused.

88.  On or about March 23, 2012, in response to a QWR, Chase delivered to Mr. Willner a copy of a second appraisal that WMB had ordered prior to the loan closing in 2006, which came in at $4 million (Exhibit A-14). No WMB employee or agent had previously informed the Willners of the material fact that WMB had ordered and received an appraisal which valued the Property at only $4 million -- $1.2 million less than the $5.2 million appraisal which WMB used to induce Mr. Willner to enter into the Loan Transaction.

89.  Prior to the Closing in 2006, the Willners reasonably believed that the $5.2 million appraisal accurately reflected the Property's value and that it was the only appraisal that WMB had ordered.

90.  If WMB had disclosed the $4 million appraisal to the Willners, Mr. Willner would not have refinanced the Property because he would not have wanted to invest in a potentially depreciating asset and risk not being able to refinance again if necessary. Instead, the Willners would have sold the Property and monetized their substantial equity.

91.  WMB concealed the $4 Million appraisal from the Willners because it did not want to risk losing the deal.

11

92.   According to the "Addendum to Loan Application, Disclosure of Right to Receive a Copy of an Appraisal" signed by Mr. Willner at the Closing, he had "the right to a copy of any appraisal or other property valuation used in connection with [his] application…." (Exhibit A-15).

93.   Also, on or about March 23, 2012, Mr. Willner, while reviewing copies of the 2006 closing documents, discovered that the telephonic Loan Application that WMB had prepared, indicated that Mr. Willner's estimated 2006 income was $52,000/month, not the estimated $52,000/year that Mr. Willner had told Babbar. Thus, WMB had inflated his estimated annual income by 1,200% (Exhibit A-16).

94.   Mr. Willner saw that he had signed three of the four pages of the Loan Application, and the one he had not signed or initialed was the one with the inflated income. He also noticed that Babbar had not signed any of the pages, though the document indicated he had prepared it and taken the information over the phone.

95.   Mrs. Willner's signature was not on any of the Loan Application's pages.

96.   WMB knew or should have known that the estimated 2006 monthly income of $52,000 stated on the Loan Application had been grossly inflated by its agents, yet it concealed this material information from the Willners.

97.   Neither Babbar nor any other WMB agent had asked Mr. Willner to review or sign the Loan Application prior to Closing, as required by law.

98.   Also on or about March 23, 2012, Mr. Willner discovered evidence indicating that WMB agents had removed the Loan Application from the package of documents WMB had sent him for review before the 2006 Closing. More specifically, the checkbox next to the words, "Loan Application," appeared to have been checked, but then was concealed with White Out (Exhibit A-17).

99.   Effectively unchecking this box and removing the Loan Application from the pre-closing document review package, shows consciousness of guilt. Thus, WMB and its agents actively concealed the material fact that a WMB agent had grossly inflated Mr. Willner's estimated 2006 annual income on the Loan Application.

100.  Clearly, WMB did not want the Willners to review the Loan Application before Mr. Willner was asked to sign it at Closing because they did not want to give Mr. Willner a reason to back out of the Loan Transaction.

101. At the 2006 Closing, Mr. Willner was not shown, did not see, and did not sign or initial the page of the Loan Application that contained the falsified estimated monthly income that a WMB agent inserted into the application without Mr. Willner's knowledge or consent. He had no idea that his estimated 2006 income on the Loan Application had been falsified by WMB.

102. Mrs. Willner was not shown and did not see nor sign any page of Mr. Willner's Loan Application before, during, or after the Closing, and had no idea that Mr. Willner's estimated 2006 income on the Loan Application had been falsified by WMB.

103. If the Loan Application had not been falsified, WMB would have not approved the Loan, in which case the Willners would have sold the Property at the peak of the housing market and monetized approximately $2.8 million in equity.

104. Likewise, if the Willners had known that WMB agents had falsified the estimated monthly income on the Loan Application or that WMB would not approve the loan if Mr. Willner's income were not falsified, Mr. Willner would not have refinanced the Property and Mrs. Willner would not have signed the First Trust, in which case the Willners would have sold the Property.

105. Similarly, if the Willners had known that WMBFA did not have the legal authority or capacity to enter into the Loan Transaction, Mr. Willner would not have signed the Purported Note and he and Mrs. Willner would not have signed the First Trust, in which case the Willners would have sold the Property.

106. The Willners reasonably believed that WMB was a highly reputable and heavily regulated financial institution. They did not even consider the possibility that WMB might induce them to enter into the Loan Transaction by concealing material information.

107. The Willners did not know that WMB and its agents had a financial incentive to falsify the income on the Loan Application so Mr. Willner would be approved for a loan he would be unable to refinance in the future due to his income. The Willners did not know that WMB planned to quickly cause the 2006-AR15 Trust to purchase the Purported Note, which would in turn sell certificates of ownership interest to investors, thereby relieving WMB of the default risk associated with holding the Purported Note.

108. Also on or about March 23, 2012, Mr. Willner was reviewing filings made by WMB and its parent, Washington Mutual, Inc., with the SEC when he discovered that on January 1, 2005, WMB had merged into WMBFA, and ceased to exist (Exhibit A-18, Part I, p. 6). Three months later, effective April 4, 2005, the WMBFA Board of Directors changed the full corporate title on the federal bank charter from WMBFA to WMB. There is only one name designated per charter. Therefore, as of April 4, 2005, only WMB existed as a federally-chartered bank and WMBFA

was divested of the attributes, powers, and benefits of a federal bank charter and ceased to exist as a bank (Exhibit A-19).

109. WMBFA was not registered as a broker/dealer, mortgage broker, or mortgage lender in Virginia, nor was WMB registered to do business as WMBFA in Virginia (Exhibit A-20).[5] It was an unincorporated trade name used by WMB agents to perpetrate a fraud on the Willners.

110. Thus, WMBFA did not have the legal capacity to enter into the 2006 Loan Transaction with Mr. Willner when it was masquerading as a separate and distinct entity from WMB in the same transaction.

111. By making it appear that WMBFA was providing mortgage brokerage services to Mr. Willner as an affiliated company (as opposed to WMB merely "doing business" as WMBFA), WMB justified paying WMBFA a $30,000 loan origination fee, when, in reality, it was illegally paying itself for referring Mr. Willner to itself.

112. When faced with a similar fact pattern, where Wells Fargo used an affiliated entity as a vehicle to create a false pretense for obtaining money so that Wells Fargo could earn undisclosed profits, the U.S. District Court for the Northern District of California found that Wells Fargo's conduct, was "plausibly immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *See Bias v. Wells Fargo & Co.*, 2013 U.S. Dist. LEXIS 59530 (N.D. Cal. Apr. 25, 2013)

113. Mr. Willner wanted to discuss his unique circumstances directly with the real party in interest to try to reach a settlement and avoid foreclosure and litigation, but Chase, as USBank's agent, made contradictory claims in numerous letters naming at least five different entities as the "investor" in the Purported Note. Despite Chase's legal obligation to accurately respond to Mr. Willner's QWRs, Chase failed to confirm which of the five identities it claimed to be the investor in the Purported Note was the actual real party in interest (Exhibit A-21 – Chart of responses from Chase and its law firm showing conflicting responses to request for identity of Noteholder).

114. Mrs. Willner informed Chase's foreclosure law firm that she owned the Property as a tenant by the entirety and that due to WMB's fraudulent conduct, Chase had no right to foreclose on behalf of the Noteholder, whomever that may be (Exhibit A-22). Chase, however, ignored her pleas and instead threatened to file criminal charges against Mr. Willner (Exhibit A-23). Mr.

---

[5] Commonwealth of Virginia, State Corporation Commission, Certificate of Fact, dated 11/6/2012, states in relevant part that WMBFA is "not the name of any corporation existing or having existed under the laws of Virginia or of a corporation holding or having held a certificate of authority to transact business in Virginia in September 2006."

Willner demanded that Chase explain how he violated any criminal law, but Chase did not respond.

115. As described above in the section entitled "Nature of Claims" (¶¶ 37-48, *supra*), when USBank sought to foreclose on the Property in December 2012, thus revealing it was the real party in interest, Mr. Willner filed a Chapter 11 bankruptcy petition, which stayed the foreclosure proceedings. He and Mrs. Willner subsequently filed a Complaint with the District Court, which ruled that it did not have jurisdiction to hear a number of the Willners' claims because they had not exhausted their administrative remedies under FIRREA (Exhibit A-6). Mr. Willner filed this Proof of Claim in response to the Court's order.

## D.   DESCRIPTION OF CLAIMS

Mr. Willner re-alleges and incorporates by reference all of the allegations in the preceding paragraphs into each and every claim listed below.

### 1.   FRAUDULENT CONCEALMENT – *Against U.S. Bank as Noteholder and successor in interest to WMBFA and/or WMB – Damages - Claim in Recoupment – Right of Rescission*

116. Virginia law provides that the concealment or omission of a material fact by one who knows that the other party is acting upon the assumption that the fact does not exist constitutes actionable fraud. *Price Auto. II, LLC v. Mass Mgmt., LLC*, 2015 U.S. Dist. LEXIS 7378 (W.D. Va. 2015) (citation and internal quotations omitted).

117. USBank's predecessors in interest, WMB and/or WMBFA, knew that Mr. Willner entered into the Loan Transaction because he reasonably assumed that WMB and/or WMBFA would disclose important information relating to the loan transaction including the following material facts which WMB and/or WMBFA concealed from him:

**A.** one of their agents grossly inflated the income on Mr. Willner's Loan Application or allowed the grossly inflated income to go uncorrected (Exhibit A-16);

**B.** one of their agents had commissioned an appraisal on the Property that came in $1.2 million lower than the $5.2 million appraisal their agent disclosed to the Willners, which induced Mr. Willner to enter into the Loan Transaction and both him and Mrs. Willner to sign the First Trust (Exhibit A-14);

**C.** the Loan Transaction would not be consummated if Mr. Willner's Loan Application contained his true 2006 estimated annual income of $52,000;

15

**D.** WMBFA could not engage in business as a separate and distinct affiliate of WMB in the Loan Transaction and, therefore, could not be the Lender and Beneficiary under the First Trust.

118. Mr. Willner is not required to prove WMB's or WMBFA's intentions. A claim for fraud may be valid, "regardless of whether the fraud is based on intentional misrepresentations, reckless misrepresentations, or even innocent misrepresentations…" *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 628 (4th Cir. 1999).

119. If WMB and/or WMBFA disclosed these material facts, Mr. Willner would not have entered into the Loan Transaction. Instead, he and his wife would have sold the Property and monetized the $2.8 million of equity they owned therein.

120. Mr. Willner's claim of fraudulent concealment against USBank, as successor in interest to WMB and/or WMBFA, for damages, recoupment, and/or rescission of the Purported Note and the First Trust, and for a declaratory judgment that the Purported Note and the First Trust are voidable and hereby declared void and unenforceable, did not accrue until after the Bar Date.

121. The Fourth Circuit has defined recoupment as "the right of the defendant to have the plaintiff's monetary claim reduced by reason of some claim the defendant has against the plaintiff arising out of the very contract giving rise to the plaintiff's claim." *Tavenner v. United States (In re Vance)*, 298 B.R. 262, 267 (Bankr. E.D. Va. 2003) citing *First Nat'l Bank of Louisville v. Master Auto Serv. Corp.*, 693 F.2d 308, 310 n.1 (4th Cir. 1982).

122. The U.S. Supreme Court has held that a statute of limitations is not a bar to a claim against a noteholder in a state that recognizes a party's right of recoupment. "[A] defendant's right to plead recoupment, a defense arising out of some feature of the transaction upon which the plaintiff's action is grounded, survives the expiration of the period provided by a statute of limitation that would otherwise bar the recoupment claim as an independent cause of action." *Beach v. Ocwen Federal Bank*, 523 U.S. 410, 415, 118 S. Ct. 1408, 140 L. Ed. 2d 566 (1998) (internal quotation marks and citation omitted). Virginia recognizes such a right. *See* Va. Code § 8.01-422. *See also Farkas v. Nat'l Union Fire Ins. Co.*, 861 F. Supp. 2d 716, 723 (E.D. Va. 2012); *Suntrust Mortg., Inc. v. United Guar. Residential Ins. Co.*, 809 F. Supp. 2d 485, 490 (E.D. Va. 2011).

123. Mr. Willner also has the right to rescind the Purported Note and he and Mrs. Willner have the right to rescind the First Trust. "While . . . contracting parties may waive their contractual rights and disclaim or limit certain liabilities, a `false representation of a material fact, constituting an inducement to the contract, on which the purchaser had a right to rely, is always ground for rescission of the contract by a court of equity'" or an action for damages in a court of

law. *George Robberecht Seafood, Inc. v. Maitland Bros. Co.*, 255 S.E.2d 682, 683 (Va. 1979) (quoting *Wilson v. Carpenter's Adm'r*, 21 S.E. 243, 244 (Va. 1895)).

124.  To prevail on a claim of fraudulent concealment a plaintiff must prove by clear and convincing evidence that the party misled suffered damages. *Id.*

125.  Mr. Willner suffered damages when his business reputation and future earnings potential were impaired when he filed for bankruptcy on December 13, 2012 in order to stay the illegal foreclosure proceedings initiated by USBank. Mr. Willner's bankruptcy filing also tolled the statute of limitations on all legal claims held by Mr. Willner's bankruptcy estate. Mrs. Willner will suffer damages if and when USBank sells the Property pursuant to a foreclosure sale, if the proceeds available to the Willners after such sale are less than the amount they could have monetized if they had sold the Property instead of refinancing it in 2006.

126.  Mr. Willner's claim in recoupment against USBank accrued in December 2012 when USBank caused the scheduling of a foreclosure sale or in February 2013 when USBank filed a proof of claim with the Bankruptcy Court.

## 2.  DECLARATORY JUDGMENT - *the Purported Note and the First Trust are Void and Unenforceable - WMBFA Lacked the Legal Capacity and/or Authority to Enter into the Loan Transaction as a distinct and separate affiliate of WMB*

127.  At the closing on September 5, 2006, when Mr. Willner purportedly entered into contracts with WMBFA by signing the Purported Note and, along with Mrs. Willner, the First Trust, and WMBFA was designated as the Lender under the Purported Note and the Lender and Beneficiary under the First Trust, WMBFA had no corporate existence and was not legally registered to transact business in Virginia -- it was merely an unincorporated trade name masquerading as a mortgage broker and a bank. *See* ¶¶ 108-112, *supra*.

128.  In order to generate illicit profits, WMB and/or its agents created the illusion that WMBFA was a distinct entity, separate and apart from WMB.

129.  Where WMBFA did not have the legal capacity or authority to enter into the Loan Transaction, it violated Virginia Code § 6.2-398.A., "Every person who trades or deals as a bank, or carries on banking, without authority of law, and their officers and agents, is guilty of a Class 6 felony."

130.  The Purported Note and the First Trust are void *ab initio* because WMBFA had no corporate existence and lacked the legal capacity to enter into a contract as a separate and distinct entity from WMB.

131. Consequently, WMBFA could not convey any enforceable right to its successor, USBank, which, therefore, has no right to enforce the Purported Note or the First Trust.

132. In the alternative, and without waiver of the foregoing, the Purported Note and the First Trust are illegal and contrary to public policy because WMB did not register to do business as WMBFA with the Virginia state government under an assumed name certificate pursuant to Va. Code § 59.1-69. *See Colbert v. Ashland Const. Co.,* 176 Va. 500, 506 (Va. 1940) ("…contract made in violation of [§ 59.1-69] is void…when a plaintiff cannot establish his cause of action without relying upon an illegal contract he cannot recover.") (Exhibit A-20)

133. In addition, WMB did not give substantial performance under the terms of the Purported Note and the First Trust in good faith and without actual knowledge that a license or certificate was required.

134. More specifically, in order to receive an illegal $30,000 origination fee, WMB claimed in writing to be participating in the same loan transaction with WMBFA as its affiliate, not as one and the same entity doing business as WMBFA. At the Closing WMB presented Mr. Willner with an Affiliated Business Disclosure which indicated that WMBFA and WMB existed concurrently as separate and distinct entities (as banks and affiliates) and that each was in a position to provide settlement services to the other - for a fee, including a 1-4% loan origination fee based on the loan amount (Exhibit A-10).

135. The HUD-1 Settlement Statement for the Purported Note indicated that WMBFA did in fact receive a $30,000 loan origination fee (Exhibit A-11).

136. On January 1, 2005, WMB merged into WMBFA, and ceased to exist (Exhibit A-18). Three months later, effective April 4, 2005, the WMBFA Board of Directors changed the full corporate title on the federal bank charter from WMBFA to WMB. There is only one name designated per charter. Therefore, as of April 4, 2005, only WMB existed as a federally-chartered bank and WMBFA was divested of the attributes, powers, and benefits of a federal bank charter and ceased to exist as a bank (Exhibit A-19).

137. The Purported Note and the First Trust are void *ab initio* because WMBFA had no corporate existence or legal authority to enter into a contract or to be the beneficiary of the First Trust as a separate and distinct entity from WMB.[6] *See Snowden v. Checkpoint Check Cashing,*

---

[6] The Note would be void *ab initio* even if WMB had innocently caused WMBFA to conduct business as a separate and distinct entity from WMB in the same transaction. Tortious conduct is not a necessary element of this claim.

290 F.3d 631, 635 (4th Cir. Md. 2002) (the use of a fictitious or assumed business name does not create a separate legal entity) *cited by Siraj v. Hermitage in N. Va.*, 51 Fed. Appx. 102, 104 (4th Cir. Va. 2002) (a trade name is not a separate legal entity capable of being sued). As the FDIC has argued:

> ... a deed to a fictitious grantee is void: "Because the underlying transaction requires both a grantor and a grantee and the deed must identify them in some way, a deed to a grantee who is not a living person or an existing entity is void." R.G. Natelson, Modern Law of Deeds to Real Property, § 5.1 at 108-09 (footnote omitted); *see also Moffat v. United States*, 112 U.S. 24, 31, 28 L. Ed. 623, 5 S. Ct. 10 (1884) ("[A] patent to a fictitious person is, in legal effect, no more than a declaration that the government thereby conveys the property to no one."); *Oregon v. Bureau of Land Management*, 876 F.2d 1419, 1425 (9th Cir. 1989) ("There is a general rule of property law that a deed made out to a fictitious person is void, while a deed made out to a real person, even if obtained by fraud, is only voidable.").

*Roeckl v. FDIC*, 885 P.2d 1067, 1071 (Alaska 1994). *See also, America's Wholesale Lender v. Silberstein*, 87 Conn. App. 485, 489, 866 A.2d 695 (2005) (plaintiff, a trade name, was not an entity with the legal capacity to sue and, therefore, its suit was void *ab initio*); *Elizabeth v. Aim Sher Corp.*, 462 A.2d 811, 812 (Pa. Super. Ct. 1983) (A deed that purports to convey real estate to a nonexistent corporation has no effect and is void *ab initio*).

138. Even if WMB were doing business ("dba") as WMBFA (which it was not), it had no legal authority to do so because WMB was not registered to do business as WMBFA with the Virginia government under an assumed name certificate as required by Va. Code § 59.1-69. *See* ¶¶ 132-33, *supra*.

139. In a case similar to the present one, *Bank of America v. Nash*, (Circuit Court of the Eighteenth Judicial Circuit, Seminole County, FL, Case No. 59-201 1-CA-004389, Division: 14-K, 2014), where the lender had no independent corporate existence and was not authorized to do business in the state, the court found that:

> [9.] b.) the Note and Mortgage are void because the alleged Lender, America's Wholesale Lender, stated to be a New York Corporation, was not in fact incorporated in the year [it entered into the loan transaction] or subsequently, at any time, ....
>
> c.) America's Wholesale Lender, stated to be a corporation under the laws of New York, the alleged Lender in this case, was not licensed as a mortgage

19

lender in Florida in the year [it made the loan to defendant homeowners], or thereafter, and the alleged mortgage loan is therefore, invalid and void.

d.) America's Wholesale Lender, stated to be a New York Corporation, did not have authority to do business in Florida under Florida Statute 607.1506 and the alleged mortgage loan is therefore invalid and void.

e.) Plaintiff and its predecessors in interest had no right to receive payment on the mortgage loan because the loan was invalid and therefore void because the corporate mortgagee named therein, was non-existent, and no valid mortgage loan was ever held by Plaintiff or its predecessors in interest.

10. The [purported assignee of the fictitious entity] has no legal right to attempt to claim ownership of the subject Note and Mortgage, or any right as servicer, for some other unknown entity, and is without any legal basis to attempt to foreclose the subject Mortgage, or to collect on the Mortgage Note, because America's Wholesale Lender, a New York Corporation, did not exist in 2005, and was never formed as a Corporation by Plaintiff or its predecessors in interest. The collection of mortgage payments by the Plaintiff and its predecessors in interest, was therefore illegal and they were without any legal right to receive and use or disburse the funds therefrom on behalf of any owner of the Note and Mortgage, or any other party.

11. Defendant [homeowner] is therefore entitled to recover from Plaintiff [assignee of fictitious lender], all funds reflected on Plaintiff's Exhibit 4 which Plaintiff's witness testified reflected the payment history of monies paid by Defendant to Plaintiff or its predecessors in interest, because the subject note and mortgage were invalid because the alleged mortgage lender did not exist and did not have the legal right to receive and retain or disburse said funds..."

(A Copy of the decision is attached as Exhibit A-24.)

140. *Bank of America v. Nash, supra,* is on all fours with the present case. WMBFA had no legal capacity or authority to transact business as a separate and distinct entity from WMB. In addition, WMB did not register to do business as WMBFA with the Virginia government under an assumed name certificate as required by Va. Code § 59.1-69. Consequently, for either reason, the Purported Note and the First Trust under which WMBFA is the purported lender and beneficiary are void *ab initio*.

20

### 3.   DECLARATORY JUDGMENT – *USBank Has No Right to Foreclose Under the First Trust*

141.  As servicer of the Purported Note, Chase assigned its purported beneficial interest in the First Trust to USBank and then, as USBank's attorney-in-fact, appointed a substitute trustee to notice a foreclosure sale of the Property based on the purported default of the Purported Note (Exhibits A-25, -26, and -27). USBank also filed a proof of claim with the Bankruptcy Court claiming a right to do same (Exhibit A-4).

142.  The First Trust, however, does not secure the Purported Note and, therefore, USBank has no right to foreclose on the Property.

143.  "A deed of trust is construed as a contract under Virginia law." *Jones v. Fulton Bank, N.A.*, 2014 U.S. App. LEXIS 6517 (4th Cir. Va. Apr. 9, 2014). Thus, the First Trust must be construed as a contract.

144.  Under Virginia law, a court will only:

> …**consider the words of a contract within the four corners of the instrument itself**… It is construed as written, without adding terms that were not included by the parties. **When the terms in a contract are clear and unambiguous, the contract is construed according to its plain meaning.** Words that the parties used are normally given their usual, ordinary, and popular meaning. No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly.

*Mathews v. PHH Mortg. Corp.*, 724 S.E.2d 196, 200-201 (Va. 2012) (citations omitted) (emphasis added).

145.  The terms of the First Trust are clear and unambiguous and, according to its plain meaning, it does not secure the Purported Note.

146.  The First Trust gives the Trustee the right to foreclose on the Property only if a note signed by "Borrower" goes into default. *See* Paragraph (E) of the section entitled, "DEFINITIONS" on page 2 of the First Trust (Exhibit A-2), which states in relevant part, "'Note* means the promissory note signed by Borrower...''

147.  The First Trust clearly and unambiguously defines the term "Borrower" as "MICHAEL A. WILLNER & MARGUERITE EVANS WILLNER".  Exhibit A-2 at p. 2.

148. Thus, the term "Borrower" is a defined term with a particular meaning in the First Trust that overrides any generally understood definition of the generic word "borrower."

> The parties [to a contract] are free to select a defined term and to ascribe to it the meaning they choose; once they do so, the meaning of the defined term overrides the definition established by the dictionary or other common usage. *See John Hancock Life Ins. Co. v. Abbott Labs.*, 478 F.3d 1, 7-8 (1st Cir. 2006) (". . . . [P]arties to a contract may serve as their own lexicographers and may assign a particular meaning to any word they choose.'" (citations and internal quotations omitted)). Furthermore, "[i]t is generally accepted as a matter of contract interpretation that where a term is defined in a contract, the term will be accorded that meaning wherever it appears." *Bank of Illinois v. Covey (In re Shara Manning Props., Inc.)*,   B.R.  , 2010 Bankr. LEXIS 3688, 2010 WL 4290667, at *6 (Bankr. C.D. Ill. Oct. 25, 2010).

*Hardesty v. Huntington Nat'l Bank (In re Payne)*, 450 B.R. 711, 719-720 (Bankr. S.D. Ohio 2011).

149. "Borrower," as defined by the First Trust, did not sign the Purported Note. Only Mr. Willner signed the Purported Note. Thus, the purported default of the Purported Note did not trigger the First Trust's foreclosure provisions because, according to the First Trust's clear and unambiguous language, the First Trust only secures a note signed by Borrower, and a note signed by Borrower is not in default.

150. "Where a written contract is clear and unambiguous on its face it is the duty of the court to construe it, whether the contract be contained in a single document or evidenced by several papers." *E. Texas Salvage & Mach. v. Duncan*, 226 Va. 160, 162; 306 S.E.2d 896, 898 (1983).

151. In Virginia, an even more stringent standard of contract interpretation is applied to deeds, which provides practically no deviation from the actual language of the instrument:

> A fundamental principle in the interpretation of deeds is that the expressed intention of the parties should govern **unless the language renders it impossible to give effect to the intention**. While the construction put on contractual language by the parties is entitled to great weight, in the normal situation where a deed contains no ambiguities, parol evidence is not admissible to show the construction given the language by the parties.

*Dillard v. Jefferies*, 118 Va. 81, 86 S.E. 844 (1915) (citation omitted) (emphasis added).

152. Another nail in the coffin preventing any deviation from the express language in the First Trust is that USBank cannot use parol evidence against Mr. Willner, as debtor in possession, to add to his bankruptcy estate's debts. *See State Bank of Toulon v. Covey (In re Duckworth)*, 2014 U.S. App. LEXIS 22054, 1-2 (7th Cir. Ill. Nov. 21, 2014), citing *Safe Deposit Bank & Trust Co. v. Berman*, 393 F.2d 401, 402-03 (1st Cir. 1968); *See also Holcombe v. Debis Fin. Servs. (in Re Holcombe)*, 284 B.R. 141, 142 (Bankr. N.D. Ala. 2001) (11 U.S.C. § 1107 specifically grants the debtor-in-possession all the rights and powers of a bankruptcy trustee). Thus, USBank cannot rely on parol evidence in an attempt to prove that the First Trust does not mean what it says, *i.e.*, that the First Trust secures the Purported Note even though it was not signed by Borrower as defined and required by the First Trust, because such an interpretation would improperly add to the debts of Mr. Willner's bankruptcy estate.

153. Other courts adjudicating issues relating to a bankruptcy estate, as here, have found that a deed of trust does not secure a note that is not precisely identified. In *State Bank of Toulon v. Covey (In re Duckworth)*, *supra* at *18-20, the court held that a deed of trust which referenced a note in all regards except the date did not secure the note. "[P]arol evidence cannot be used to correct even the seemingly minor clerical error in the security agreement. We must hew to the 'necessary technicalities inherent in any law governing commercial transactions,' even when the result is harsh." *See also, Hardesty v. Huntington Nat'l Bank (In re Payne)*, *supra*.

154. In the present case, even if the terms of the First Trust were ambiguous, the Willners would still prevail because USBank's predecessor in interest, WMB, drafted the document and Virginia law requires ambiguous terms to be construed against the drafter. *Rhodes v. Computer Scis. Corp.*, 2014 U.S. Dist. LEXIS 171645 (E.D. Va. Dec. 10, 2014).

155. In addition, even if the FDIC sought to determine the intent of the parties, "courts are bound to say that the parties intended what the written instrument plainly declares." *Tobin v. Tobin*, 2006 Va. App. LEXIS 231, 12-13 (Va. Ct. App. Apr. 18, 2006). Moreover, the parties did, in fact, intend to ensure that WMB would not have a right to foreclose on the Property under the First Trust if Mr. Willner defaulted on a note that Mrs. Willner refused to sign.

156. The First Trust plainly declares that it secures a note signed by Borrower. The Purported Note is not signed by Borrower, as defined in the First Trust. Consequently, the First Trust does not secure the Purported Note because it was not signed by Borrower. In addition, no note signed by Borrower is in default. Thus, USBank has no right to foreclose on the Property.

**4.  QUIET TITLE – *There are No Valid Liens on the Property***

157. The Willners are the legal titleholders to their Property pursuant to a Deed of Bargain and Sale to "Michael A. Willner and Marguerite Evans Willner, husband and wife, as tenants by the entirety", which was recorded among the land records of Fairfax County, Virginia, on October 19, 1989, in Deed Book 7451, Page 0357, No. 89 146730. (Exhibit A-7)

158. The First Trust is void or voidable and unenforceable as argued herein.

159. Thus, "Michael A. Willner and Marguerite Evans Willner, husband and wife, as tenants by the entirety with the common law right of survivorship", have no legal obligations to USBank.

160. In Virginia, "[a]n action for quiet title is based on the premise that a person with good title to certain real or personal property should not be subjected to various future claims against the title." *Maine v. Adams*, 277 Va. 230, 238, 672 S.E.2d 862 (Va. 2009).

161. In *Bagley v. Wells Fargo Bank, N.A.*, 2013 U.S. Dist. LEXIS 11880, 24-25 (E.D. Va. Jan. 29, 2013) the court held:

> In order to assert a claim for quiet title, the plaintiff must plead that he has fully satisfied all legal obligations to the party in interest. *See Tapia v. U.S. Bank*, 718 F. Supp. 2d 689, 700 (E.D. Va. 2010), aff'd 441 F. App'x 166 (4th Cir. 2011); *see also Matanic v. Wells Fargo Bank, N.A.*, 3:12CV472, 2012 U.S. Dist. LEXIS 134154, * 21-22 (E.D. Va. Sept. 19, 2012) (denying plaintiff's claim for quiet title because plaintiff admitted owing money on the note and deed of trust).

162. Consequently, where Mr. Willner does not owe any money under the Purported Note which is void or voidable and against which he has a claim of recoupment, and/or where the First Trust does not secure the Purported Note, the Willners have the right to quiet title in the Property.

**5. UNJUST ENRICHMENT – *No Valid Contracts with USBank***

163. The elements of unjust enrichment are: 1) there must be some benefit conferred on the defendant; 2) the defendant must have knowledge of the benefit; and 3) the defendant must have accepted or retained the benefit without paying for its value. *Citimortgage, Inc. v. Hayes*, 86 Va. Cir. 297, 298 (Va. Cir. Ct. 2013)

164. Mr. Willner conferred payments, including fees, principal and interest, penalties, and other charges, benefits that were non-gratuitous, upon USBank and its predecessors in interest, without knowledge of the unlawful and deceptive pattern and practice in which USBank, and its

predecessors in interest had engaged. These benefits are beyond that to which USBank and its predecessors in interest are or were entitled.

165. USBank, and its predecessors in interest accepted or retained the non-gratuitous benefits conferred by Mr. Willner even though they did not provide the quality of, or fairness in, home loan origination and servicing, that had been represented by its predecessors in interest, WMBFA and/or WMB, or that reasonable borrowers would have expected.

166. In addition, if USBank were allowed to unjustly foreclose on the Property, USBank would unlawfully acquire the Property and the Willners' significant equity therein.

167. Moreover, the Purported Note is void or voidable, and unenforceable. Consequently, Mr. Willner had no legal obligation to pay interest to USBank or its predecessors in interest.

168. Retaining the non-gratuitous benefits conferred upon USBank and its predecessors in interest by Mr. Willner and allowing USBank to abscond with the Property and the Willners' equity therein under these circumstances would result in the unjust enrichment of USBank.

169. Accordingly, Mr. Willner is entitled to, and hereby seeks, disgorgement and restitution from USBank for wrongful profits, revenue, and benefits, in a manner established by the FDIC and available under applicable law.

170. Mr. Willner is entitled to the imposition of a constructive trust upon USBank such that its enrichment, benefits, and ill-gotten gains may be allocated and distributed equitably by the FDIC to and/or for the benefit of Mr. Willner.

171. In addition, USBank is estopped from pursuing any further foreclosure proceedings, the result of which would inure to its inequitable benefit and additional unjust enrichment.

## 6. CONSPIRACY TO COMMIT FRAUDULENT CONCEALMENT – *against USBank, Chase, SPS, and Dimon*

172. A common law conspiracy consists of two or more persons combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means. *Commercial Business Systems v. BellSouth*, 249 Va. 39, 48, 453 S.E.2d 261 (1995).

173. USBank and its Agents combined with and acted in concert along with their predecessors in interest, assigns, and/or agents for the purpose of accomplishing a fraudulent scheme to refinance the Property and subsequently initiate foreclosure proceedings, by unlawful means,

including, but not limited to, engaging in fraudulent concealment as described herein, which induced the Willners to enter into the Loan Transaction. USBank and its Agents then attempted to, and still intend to, foreclose on the Property without first seeking the aid and direction of a court of equity as required by Virginia law, despite their knowledge:

    **A.** of the fraudulent conduct of their predecessors in interest;

    **B.** of Mr. Willner's claim of recoupment;

    **C.** that the First Trust, on its face, does not secure the Purported Note;

    **D.** that WMBFA had no legal capacity to enter into the loan transaction and, therefore, the Purported Note and the First Trust are void; and

    **E.** the legal requirement to first seek the aid and direction of a court of equity before initiating foreclosure proceedings against the Property where Mr. Willner has a claim of recoupment against the Note (*See* ¶ 184.B. *infra*).

174. USBank and its Agents are liable for the damages sustained by or expected to be sustained by the Willners resulting from the conduct of USBank and its Agents and/or that of their predecessors in interest as co-conspirators, in a scheme to fraudulently conceal material information from the Willners and attempting to illegally foreclose on the Property, thus consummating the fraudulent scheme to rob the Willners of their equity in the Property.

175. Dimon is liable for Chase's conduct in this matter.

176. Dimon is responsible for overseeing executive officers and other employees to ensure their compliance with the company's code of conduct, all court and regulatory consent orders, and other laws and regulations.

177. By instituting a strategy to maximize profits by ignoring its legal obligations, Dimon is responsible for Chase's pattern of flagrant violations, which resulted in expenditures of $23 billion in 2013 alone to settle lawsuits relating to its fraudulent conduct in respect to its mortgage loan business among others. And yet Chase still generated net income of $17 BILLION in 2013.

178. Chase's tortious conduct in this matter stemmed from Dimon's overarching strategy to maximize Chase's profits regardless of its legal obligations. As the Huffington Post reported, when Senator Elizabeth Warren told Dimon she thought Chase was breaking the law, his response was, *"So hit me with a fine. We can afford it."* (Samantha Lachman, Huffington Post, 3/31/2015, *"Guess What Happened When JPMorgan's CEO Visited Elizabeth Warren's Office"*

available at http://www.huffingtonpost.com/2015/03/31/elizabeth-warren-jamie-dimon_n_6972182.html?ncid=txtlnkusaolp00000592.

179.  Judicial notice can be taken of a press release. *See, e.g., Caner v. Autry*, 16 F. Supp. 3d 689, 696 (W.D. Va. 2014). In addition, "… out-of-court statements which tend to prove a plan, design, or intention of the declarant are admissible, subject to the usual limitations..." *Mayor of Phila. v. Educ. Equal. League*, 415 U.S. 605, 645-646 (U.S. 1974) (citation omitted).  "Rule 801(d)(2) expressly acknowledges that an admission by a party-opponent is not hearsay if the statement is offered against the party and was actually made by him in either his individual or representative capacity." *Id.*

180.  As a result of Chase's egregious conduct relating to its mortgage business, Dimon signed a Consent Cease and Desist Order (*Id.* ¶ 183) which states in relevant part that the Office of the Comptroller of the Currency ("OCC"):

> … has identified certain deficiencies and unsafe or unsound practices in residential mortgage servicing and in the Bank's [Chase's] initiation and handling of foreclosure proceedings... The Bank has committed to taking all necessary and appropriate steps to remedy the deficiencies and unsafe or unsound practices identified by the OCC, and to enhance the Bank's residential mortgage servicing and foreclosure processes.

*In the Matter of JPMorgan Chase Bank, N.A.,* Office of the Comptroller of the Currency ("OCC"), Consent Order, April 13, 2011 ("2011 Consent Order"), p. 1, http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47e.pdf.

181.  The OCC found that, in connection with its foreclosure operations, Chase filed fraudulent affidavits in state and federal courts, initiated nonjudicial foreclosure proceedings without proper documentation, failed to sufficiently oversee outside counsel and other third-party providers handling foreclosure-related services, and otherwise engaged in "unsafe or unsound banking practices." *Id.* at pp. 2-3.  Chase, under Dimon's profit-maximizing mandate, engaged in this very same conduct in the present case despite consenting, under Dimon's signature, to cease and desist from these activities.

182.  Dimon also consented to implement measures to ensure, among other things, that Chase had documentation sufficient to establish its right to foreclose (*Id.* at 11, Article V(1)(c)), and to establish a single point of contact for each borrower with whom to communicate throughout the foreclosure process. *Id.* at 20, Article IX(1)(c). The OCC held that "…the Board [of which Dimon was the chairman] has the ultimate responsibility for proper and sound management of the Bank…[and] the Board shall follow-up on any material non-compliance with … its obligations and undertakings under the terms of this Order." *Id.* at 25, Article XIII(1). Dimon was also responsible for ensuring that Chase had sufficient "staffing to support existing and/or

future Loss Mitigation and foreclosure activities and ensure compliance with this Order." *Id.* at 5, Article III(3)(b).

183. Dimon shirked his obligations under the Consent Order and on February 9, 2012, the OCC fined Chase $113 million in connection with the unsafe and unsound mortgage servicing and foreclosure practices that were the subject of the Order (available at: http://www.occ.gov/news-issuances/news-releases/2012/nr-occ-2012-20.html). Also on February 9, 2012, Chase and four other banks agreed to a $25 billion settlement with a coalition of state attorneys general and federal agencies over charges of systemic and widespread mortgage loan servicing and foreclosure abuses and fraud (available at: http://www.naag.org/naag/media/naag-news/state-attorneys-general-feds-reach-25-billion-settlement-with-five-largest-mortgage-servicers-on-foreclosure-wrongs.php).

184. Thus, Dimon, is ultimately responsible for Chase's disregard of its obligations under the Consent Order, among other legal obligations, including, but not limited to:

    **A.** Engaging in extortion by threatening to file baseless criminal charges against Mr. Willner in order to coerce him to drop his demand that Chase cause the substitute trustee to forbear from initiating foreclosure proceedings and instead seek the aid and direction of a court of equity as required by law (Exhibit A-23).

    **B.** Causing U.S. Bank, as its attorney in fact, to initiate a nonjudicial foreclosure: a) pursuant to the First Trust, which, on its face, did not secure the Purported Note; b) pursuant to the Purported Note and the First Trust which are void *ab initio*; and c) failing to cause the substitute trustee to seek the aid and direction of a court as required by Virginia law where Mr. Willner had a claim of recoupment against the Note, based on documentary evidence provided by Chase. *See Bremer v. Bitner,* 44 Va. Cir. 505, 512-13 (Va. Cir. Ct. 1996) (court held that trustee who failed to cancel foreclosure breached fiduciary duty to seek the aid and direction of a court of equity to determine the value of claims which the debtor might be able to recoup against the creditor's note). *See also, Samuel I. White, P.C. v. Caudle,* 65 Va. Cir. 377, 382 (Va. Cir. Ct. 2004) ("A trustee may not permit the insistence of the creditor in seeking to realize on security to force a sale which would unfairly injure the debtor.")

    **C.** Actively, intentionally, and illegally implementing a strategy to strip the Willners of their equity in the Property while Dimon shamelessly complained to the press that federal government agencies were unfairly blaming his company for the conduct of its predecessor in interest, WMB.

185. Under Virginia law:

28

> [I]ndividual liability can be imposed on a corporate officer,
> director, or employee when he or she personally conducts the corporation's
> affairs in an illegal manner. The Virginia Supreme Court has held that "[a]
> corporation can act [only] through its officers and agents, and where the
> business itself involves a violation of the law the correct rule is that all
> who participate in it are liable." *Crall v. Commonwealth*, 103 Va. 855, 49
> S.E. 638, 640 (Va. 1905). In other words, "[a]n officer cannot avoid
> criminal responsibility for an illegal act on the ground that it was done in
> his official capacity or through the instrumentality of the corporation
> which he controls and dominates...." *Bourgeois v. Commonwealth*, 217
> Va. 268, 227 S.E.2d 714, 718 (Va. 1976). **This doctrine applies in both
> the criminal and civil contexts**. *See, e.g., Commonwealth v. Va.
> Telemarketing, Inc.*, 15 Va. Cir. 489, 496 (Va. Cir. Ct. Fairfax Co. 1989);
> *Stitt v. Nautilus Enter., Inc.*, 17 Va. Cir. 150, 152 (Va. Cir. Ct. Fairfax Co.
> 1989).

*Tsimpedes v. Martin*, 2006 U.S. Dist. LEXIS 53378, 5-6 (E.D. Va. Aug. 2, 2006)
(emphasis added). "A contrary rule would in many instances afford immunity to the chief
offenders, the officers of the corporation, without whose assistance it would be impossible for
the corporation to engage in the prohibited business." *Stitt v. Nautilus Enterprises, supra*. Dimon
"should be held personally liable for the deceptive acts of his company because he caused it to
do the deceptive acts or knowingly approved of the actions." *Commonwealth ex rel. Terry v.
Virginia Telemarketing, Inc.*, 15 Va. Cir. 489, 496 (Va. Cir. Ct. 1989).

186.  Personal liability "does not require that the individual participate in every day-to-day
decision. It is sufficient to show that the individual was aware of the actions of the corporation
and knowingly approved of them." *Commonwealth ex rel. Gilmore v. Greenberg*, 42 Va. Cir.
160, 161-162 (Va. Cir. Ct. 1997).

187.  Where Dimon knowingly approved of Chase's strategy to maximize profits regardless of
the company's legal obligations, he is individually liable for Mr. Willner's damages.

## E.    DAMAGES

188.  Mr. Willner has suffered or will suffer damages of approximately $ 7,908,478 according to
proof, including, but not limited to, the following:

> **A.**  the loss of the value of his equity in the Property (if USBank forecloses);
> **B.**  the lost opportunity to sell the Property in 2006 into a strong real estate
> market, and monetize his equity in the Property plus interest;
> **C.**  the interest Mr. Willner paid on the Purported Note;

    **D.** the value of Mr. Willner's time, energy, and expense, to prepare to assert his legal rights in litigation against USBank and its Agents, including attorney's fees and court costs;

    **E.** forcing Mr. Willner into bankruptcy, which severely damaged his reputation, defamed his character, and resulted in a loss of trade, business, and profits and the diminution of his capacity to earn profits in the future;

    **F.** loss of privacy due to requirement to file monthly financial reports with the bankruptcy court which are accessible by the public;

    **G.** significantly reducing the time Mr. Willner has been able to spend working on his businesses, thus reducing the earnings he could have generated and the value of his holdings therein;

    **H.** severely damaging Mr. Willner's credit ratings, which diminished his purchasing power while increasing his cost of credit, impaired his ability to obtain credit at a more favorable rate than before the decrease in credit rating, reduced availability of goods and services tied to credit ratings, and increased costs of those services;

    **I.** punitive damages; and

    **J.** other financial losses according to proof.

**F.**    <u>**PRAYER FOR RELIEF**</u>

189. Mr. Willner seeks the following relief:

    **A.** Declaratory Judgment that the Purported Note and the First Trust are void and unenforceable;

    **B.** in the alternative, and without waiver of the foregoing, a Declaratory Judgment that the Purported Note and the First Trust are voidable and are hereby voided and unenforceable;

    **C.** a Declaratory Judgement that the trustee or substitute trustee under the First Trust does not have the authority to foreclose on the Property;

    **D.** an Order rescinding the Purported Note and the First Trust and restitution and disgorgement of wrongful profits, revenue, benefits, and all monies paid to USBank or accrued by USBank;

    **E.** an Order establishing a constructive trust upon USBank such that its enrichment, benefit and ill-gotten gains may be allocated and distributed equitably by the Court to and/or for the benefit of Mr. Willner;

    **F.** an Order rescinding the Notice of Default;

    **G.** an Order rescinding the appointment of the Substitution of Trustee;

    **H.** an Award of actual, statutory, compensatory, and consequential damages in favor of Mr. Willner against USBank and its Agents, jointly and severally, for

all damages sustained as a result of their wrongdoing and/or that of their predecessors in interest, in the amount of at least $7,908,478, according to proof;

I.  an Award of recoupment according to proof against any valid claim of payment or repayment USBank may have;

J.  an Award of interest on the monies wrongfully obtained from the date of closing through the date of entry of judgment in this action;

K.  an Award of punitive damages and/or exemplary damages as provided by applicable law;

L.  a Declaratory Judgment that the First Trust is unenforceable

M.  an Injunction enjoining USBank and its Agents to cease all foreclosure activity and remove all deeds of trust and recorded liens relating to the Property from the county land records;

N.  an Order quieting title to the Property in the Willners;

O.  an Award of attorneys' fees, expenses, and recoverable costs reasonably incurred in connection with the preparation for, commencement and prosecution of Mr. Willner's claims;

P.  an Award of prejudgment interest at the maximum legal rate; and

Q.  such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by the FDIC.

## G. <u>MISCELLANEOUS</u>

190.  By executing and filing this Proof of Claim, Mr. Willner does not waive any right with respect to any claim that he has or may have against USBank or its Agents or any other person or persons. The filing of this Proof of Claim is not intended and should not be construed to be an election of remedies or waiver of any past, present, or future claims Mr. Willner may have against USBank or its Agents or anyone else deriving from the events described herein.

191.  To Mr. Willner's knowledge, the claims are not subject to any setoff or counterclaim not described herein, and no judgment has been rendered on the merits of the claims.

192.  Mr. Willner reserves his right to amend and/or supplement this Proof of Claim and to assert any and all other claims of whatever kind or nature that he has, or may have that come to his attention or arise after the filing of this Proof of Claim. The filing of this Proof of Claim shall not be deemed a waiver of any such claims or rights.

193.  Nothing contained in this Proof of Claim shall be deemed or construed as: (a) a waiver of, or other limitation on, any rights or remedies of Mr. Willner under the Purported Note or the First Trust at law, or in equity, including any setoff rights, lien rights, rights of recoupment or

rescission. or any other rights that Mr. Willner may have against USBank, any of its Agents, or other related entities including affiliates, other agents, employees, predecessors in interest, the FDIC, or any other entity, past, present, or future (together, "Related Entities"), all of which rights are expressly reserved; (b) a consent by Mr. Willner to the jurisdiction of any court with respect to proceedings, if any, commenced in any action against, or otherwise involving Mr. Willner and USBank, its Agents or Related Entities; (c) a waiver or release of, or any limitation on Mr. Willner's right to trial by jury in any court in any proceeding; (d) a waiver or release of, or any other limitation on Mr. Willner's rights to have any orders entered only after de novo review by the applicable court; (e) a waiver of, or any other limitation on, Mr. Willner's right to seek a withdrawal of the reference with respect to any matter, including any matter relating to this Proof of Claim: or (f) a waiver or release of, or any other limitation on, Mr. Willner's right to assert that any portion of the claims asserted herein are entitled to treatment as priority claims.

Without limiting the generality of the foregoing, Mr. Willner asserts the right to set off the amount of all his claims against all claims and amounts assertable by or distributable to USBank, its Agents, or Related Entities in any capacity, including, without limitation, any rights of USBank, its Agents, or Related Entities to recover any principal of or interest on the Purported Note.

# EXHIBIT A-15

WAD2    M35                                                   3063 148 179-071

**Washington Mutual** 

## ADDENDUM TO LOAN APPLICATION

### NOTICES AND DISCLOSURES

**Important Information About Procedures for Opening a New Account**
To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.

What this means for you: When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

**Disclosure for Appraisals:** Lender will make arrangements for an appraisal or property valuation to be used internally in the evaluation of your loan application. In doing so, the Lender does not warrant the sales price, value, and/or conditions of the property, nor should you rely on any appraisals or other property valuations arranged for by the Lender in making your decision to purchase and/or borrow against the property.

**Disclosure of Right to Receive a Copy of an Appraisal:** If you are applying for a loan to be secured by a 1 to 4 family dwelling, you have the right to a copy of any appraisal or other property valuation used in connection with your application for credit as long as you have paid sufficient funds to cover the cost of the appraisal.

If you have not received a copy of your report at the time your loan request is closed, denied, or withdrawn, and you would like a copy, please write to us at Washington Mutual, Attn: Home Loan Administration, 3860MBA, 17877 Von Karman, Irvine, CA 92614. In your letter, give us (1) your name, (2) your loan/application number, and (3) your mailing address. We must hear from you no later than 90 days after notification of the action taken, withdrawal of your credit application, or loan funding, as applicable.

**Non-Discriminatory Underwriting Guidelines:** Anyone who inquires about the availability of credit from Lender has the right to receive a copy of our non-discriminatory underwriting guidelines. To obtain a copy of these underwriting guidelines, simply contact the manager at any one of our offices.

**Lender's Attorney:** It is the responsibility of the Lender's Attorney to protect the Lender's interest. Applicant may, at Applicant's expense, engage an attorney of Applicant's choice to represent Applicant's interest in the transaction.

**Ohio Law:** The Ohio Laws against discrimination require that all creditors make credit equally available to all creditworthy customers, and that credit reporting agencies maintain separate credit histories on each individual upon request. The Ohio Civil Rights Commission administers compliance with this law.

*Notice To HUD/FHA Applicants: This is notice to the applicants as required by the Right to Financial Privacy Act of 1978 that HUD/FHA has a right of access to financial records held by financial institutions in connection with the consideration or administration of assistance to you. Financial records involving your transaction will be available to HUD/FHA without further notice or authorization but will not be disclosed or released by this institution to another Government Agency or Department without your consent except as required or permitted by law.*

**Indian Tribal Lands:** If the type of land ownership is Indian Tribal Trust, Individual Trust or Allotments, the financial records involving your transaction may be available to the Bureau of Indian affairs and/or the U.S. Department of Interior without further notice or authorization as required to obtain their approval for your loan.

•••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

### CREDIT REPORT AUTHORIZATION

I hereby authorize ☐ Washington Mutual Bank ☐ Washington Mutual Bank fsb ☒ Washington Mutual Bank, FA (the "Lender"), and any of its agents and assignees, to verify my employment record(s), banking accounts, credit history, and/or any other information which any of them finds necessary in connection with my home loan application. I understand that the use of a photocopy of this form may be necessary to verify one or more of my credit references. I authorize this use and request that a photocopy be honored.

I understand that a credit report will be ordered from a consumer reporting agency prior to loan closing as a part of the application process, and may be ordered in connection with the Lender's review of my account, Quality Control Program, servicing or collection of the loan.

I also authorize the Lender and the Lender's affiliates to obtain a credit report on me, in consideration of any product or service which the Lender or the Lender's affiliates may consider offering me at any time during the application process and while I am a customer.

**By signing below, I authorize the Bank to obtain credit reports on me in the manner just described.**

_Michael A. Willmir_
_____              _____
Applicant Signature                              Co-Applicant Signature

## CERTIFICATION AND AUTHORIZATION

3063148179-071

**Environmental - Applicant's Certification:** By signing below, I do hereby represent and warrant that I am not aware of any substances, materials or products which may be an environmental hazard such as, but not limited to, asbestos, formaldehyde, radon gas, lead-based paint, fuel or chemical storage tanks (above or below ground) and contaminated soil or water on the subject property. I acknowledge that the Lender is relying on this representation and warranty as a material part of its loan application process. I also am not aware of any landfill on the property or portion thereof.
Exceptions to the above: _____

I further acknowledge: (1) receipt of applicable disclosures from the seller in purchase transactions; (2) that lead-based paint may exist in housing constructed prior to 1978; (3) that the Lender performs no environmental investigation on my behalf and owes no duty to me to identify lead-based paint or any other environmental condition which might impact the property or its residents; and (4) that it is my sole obligation to investigate for potential impact to the property from environmental conditions.

**Certifications:** I certify by signing below that (1) if an Adjustable Rate Mortgage has been selected, I have received a copy of the Consumer Handbook on Adjustable Rate Mortgages and the appropriate Adjustable Rate Mortgage Loan Disclosure Statement; (2) all of the loan application information provided is true and complete; (3) I understand any intentional or negligent misrepresentation(s) of the information provided in conjunction with our application may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq. and liability for monetary damages to the Lender, its agents, successors and assigns, insurers and any other person who may suffer any loss due to reliance upon any misrepresentation which I have made on the application; and (4) any significant change from the information provided at time of application until the final Loan Application is signed may have a bearing on the approval of my application for a home loan.

**Insurance Quote(s):**
☐ I understand that Lender's affiliate, Washington Mutual Insurance Services, Inc. would like to contact me with a quote for hazard and, if applicable, flood insurance. Unless this box is checked, I authorize Lender to share information contained in my application with Washington Mutual Insurance Services for this purpose. I authorize Washington Mutual Insurance Services, as an affiliate of the Lender, to obtain a credit report from a third party credit bureau on me for purposes of preparing this quote. Purchasing hazard or flood insurance from Washington Mutual Insurance Services is not a requirement for obtaining the loan.

Are you a California registered domestic partner?
☐ Yes   ☑ No

This question is being posed in light of The California Domestic Partner Rights and Responsibilities Act of 2003, which extends the rights, protections, benefits, responsibilities, obligations and duties of spouses to persons who are members of Registered Domestic Partnerships.

Are you a Connecticut civil union partner?
☐ Yes   ☑ No

This question is being posed in light of an Act concerning Civil Unions in Connecticut, which extends to civil union partners the same benefits, protections and responsibilities under law, as are granted to spouses in a marriage.

You should consult with your own legal advisor for specific legal advice regarding the rights, protections, benefits, responsibilities, obligations and duties of persons who are partners in California Domestic Partnerships or Connecticut Civil Unions.

..................................................................................

**By signing below, each Applicant hereby acknowledges (1) making the above certifications and authorizations and (2) that each Applicant has received and understands the above notices and disclosures.**

_Michael A Will_
Applicant Signature

_Michael A. Willner_
Printed Name

                                          09/05/2006
Social Security Number                     Date

_____
Co-Applicant Signature

_____
Printed Name

_____
Social Security Number        Date

Claimant ID: NS1001515321, Barcode Value: FD00144239, Fund: 10015

**Federal Deposit Insurance Corporation
as Receiver for
Washington Mutual Bank, Henderson, NV**

## PROOF OF CLAIM

1. SSN/Tax ID No.

2. The undersigned    Marguerite Evans Willner
    *(Name of person completing the Proof of Claim)*

    hereby states that the subject Financial Institution, now in liquidation ("Failed Institution"), is indebted

3.    to    Marguerite Evans Willner                              (the "Claimant") in the sum of
        *(Name of Claimant)*

4.    $   6,400,000

5.    Description of Claim

See Attachment A

The undersigned further states that no part of said debt has been paid, that the Claimant has given no endorsement or assignment of the same or any part thereof, and that there is no set-off or counterclaim, or other legal or equitable defense to said claim or any part thereof.

6. NAME    Marguerite Evans Willner, Claimant              7. DATE    8/10/2015
        *(Name, Title, and Signature of person completing the Proof of Claim)*

8. XXX                                                      XXXXXXXX Signature

9. ADDRESS    11521 Potomac Road
    *( City, State, and ZIP Code)*    Lorton, VA 22079-4264

10. TELEPHONE NUMBER(S)

The penalty for knowingly making or inviting reliance on a false, forged, or counterfeit statement, document, or thing for the purpose of influencing in any way the action of the Federal Deposit Insurance Corporation is a fine of not more than $1,000,000 or imprisonment for not more than 30 years or both (18 U.S.C. Section 1007).

**IMPORTANT NOTE:** The bar code at the top of this Proof of Claim is unique to this claim and may not be re-used for other claims which you may have or by other potential claimants. If you have other unrelated claims, you must file a separate Proof of Claim with its own unique bar code. Additional Proof of Claim forms may be found on the FDIC web site or obtained by mail at the respective addresses indicated in the Instructions. Re-use of this Proof of Claim may result in processing delays or the rejection of your claim.

### PRIVACY ACT STATEMENT

The FDIC is authorized to request this information from you by 12 U.S.C. § 1819, 1821, and Executive Order 9397. The purpose for collecting the information is to support the administration of claims against the failed financial institution. Furnishing the requested information is voluntary, but failure to provide the requested information in whole or in part may delay or prohibit the processing of your claim. The information provided by individuals is protected by the Privacy Act, 5 USC 552(a). The information may be furnished to third parties as authorized by law or used according to any of the routine uses described in the FDIC Insured Financial Institution Liquidation Records (30-64-0013) System of Records. This System of Records is available for review at www.fdic.gov/regulations/laws/rules/2000-4050.html#200030--64--0013. If you have questions or concerns about the collection or use of the information, you may contact the FDIC's Chief Privacy Officer at Privacy@fdic.gov.

**ATTACHMENT A**
**to**
**Proof of Claim of**

**MARGUERITE EVANS WILLNER**

## A.    INTRODUCTION

1.    This proof of claim ("POC") concerns an attempted illegal foreclosure committed by USBank and its agents, in connection with a home owned by claimant, Marguerite Evans Willner, and her husband, Michael A. Willner, who have held record legal title as tenants by the entirety for 25 years and have continuously resided thereon, (the "Property"). It also relates to the fraudulent practices committed by Washington Mutual Bank ("WMB"), the predecessor in interest to U.S. National Bank Association ("USBank") as trustee for a mortgage-backed securities trust (the "2006-AR15 Trust").

2.    There are three interrelated yet distinct reasons why USBank has no right to foreclose on the Property:

   a) a purported $3 million note signed by Mr. Willner, but not Mrs. Willner ("the Purported Note" or "his Note"), which USBank claims is secured by a deed of trust (the "First Trust"), is a product of fraud committed by USBank's predecessor in interest, WMB;

   b) the Purported Note is void *ab initio* because its originator, Washington Mutual Bank, FA ("WMBFA"), was merely a tradename and, therefore, did not have the legal capacity or authority, as a purported affiliate of WMB, to be a lender and beneficiary under the Purported Note and/or the First Trust; and

   c) the First Trust, according to its plain and unambiguous language, does not secure The Purported Note.

3.    In 2006, at the peak of the real estate market, the Willners were prepared to sell the Property to monetize almost $3 million of equity they owned therein. An agent for USBank's predecessor in interest, **WMB**, however, convinced Mr. Willner to refinance the Property by assuring him that due to the significant equity therein, his modest income[1] was irrelevant to the approval of his loan application.

---

[1] Mr. Willner is a serial entrepreneur whose income fluctuates depending upon the success or failure of his latest ventures.

4.    WMB showed the Willners a $5.2 million appraisal of the Property[2], but concealed a second appraisal that came in at just $4 million.

5.    WMB also concealed the fact that it inflated Mr. Willner's estimated income by 1,200% on his loan application, which was prepared by a WMB agent, so the loan would be approved for inclusion in the 2006-AR15 Trust, thus enabling WMB to absolve itself of the risk of default.

6.    If WMB had notified the Willners that the Property had been appraised at only $4 million or that WMB had falsified Mr. Willner's estimated income on his loan application, Mr. Willner would not have signed his Note, and neither he nor Mrs. Willner would have signed the First Trust.

7.    In addition, *but for* WMB's fraud, Mr. Willner would not have been approved for a loan, the interest payments of which he could only afford by taking cash out, and *but for* WMB's fraud, the Willners would not have risked losing their substantial equity in the Property by entering into the loan transaction (the "Loan Transaction").

8.    Within two months of the closing, WMB caused the Purported Note to be sold to the 2006-AR15 Trust, while purportedly retaining its servicing rights.

9.    Two years later in Fall 2008, the Office of Thrift Supervision seized WMB and transferred ownership of the thrift to the Federal Deposit Insurance Corporation (the "FDIC").

10.    The FDIC in turn immediately sold all of WMB's assets and substantially all of its liabilities to JPMorgan Chase Bank, National Association ("Chase"), including the purported servicing rights to the Purported Note. The 2006-AR15 Trust remained the owner of the Purported Note.

11.    Several years later, despite having substantial equity in the Property, Mr. Willner was unable to refinance it due to his relatively modest income and was unable to continue make payments under the Purported Note.

12.    The Willners listed the Property for sale, well below its appraised value, in order to hasten a sale and avoid foreclosure.

13.    After receiving responses to a number of Qualified Written Requests, the Willners discovered that WMB had failed to disclose that it had falsified Mr. Willner's estimated income on his 2006 loan application and that prior to the closing in 2006

---

[2] Mr. Willner refinanced a $2.4 million mortgage on the Home; thus, with a market value of $5.2 million, the Willners owned $2.8 million of equity in the Property at the time. The Property was recently appraised at $5.5 million.

WMB had commissioned an appraisal on the Property that came in at $1.2 million below the appraised value that it had used to induce Mr. Willner to refinance the Property.

14. Mr. Willner would not have signed his Note and he and Mrs. Willner would not have signed the First Trust, if WMB had properly disclosed these material facts.

15. Instead, they would have sold the Property and monetized $2.8 million in equity.

16. The Willners notified USBank that Mr. Willner had a claim of recoupment against his Note and that, under Virginia law, USBank did not have a right to foreclose without first seeking the aid and direction of a court of equity.

17. Nevertheless, Chase, as USBank's agent, caused the Willners to receive two weeks' notice that the Property would be sold at a foreclosure sale a few days before Christmas 2012.

18. Mr. Willner filed for bankruptcy, which halted the sale. Mrs. Willner did not file for bankruptcy.

19. Mr. Willner is now the debtor in possession of his estate which is in Chapter 11 in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court").

20. USBank filed a proof of claim in the Bankrupty Court ("BPOC") claiming the Purported Note is in default and that it has a right to foreclose on the Property pursuant to the First Trust.

21. The Willners sought to defend against the BPOC by filing suit in the U.S. District Court for the Eastern District of Virginia ("District Court") where they demanded a trial by jury.

22. The District Court determined that it did not have subject matter jurisdiction to hear claims against USBank and its Agents "involving WMB's conduct," because the Willners had not exhausted their administrative remedies under the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA).

23. After convincing the Bankruptcy Court to lift the stay, USBank is eager to foreclose on the Property, which was recently appraised at $5.5 million, and acquire it for a "credit bid" of about $3.6 million. USBank intends to use nonjudicial foreclosure to evade judicial scrutiny of its purported right to foreclose.

24.   *But for* USBank's attempt to strip the Willners of their equity in the Property, the Willners would not now face losing millions in equity by foreclosure.

25.   Mrs. Willner files this POC seeking declaratory and injunctive relief, recoupment, recission, and/or damages, among other relief subject to proof.

26.   The claims asserted in this POC and remedies requested are in the nature of defenses and/or counterclaims to USBank's BPOC.

B.   **NATURE OF CLAIMS**

27.   This POC is filed by Marguerite Evans Willner. She and Mr. Willner own the Property as tenants by the entirety.

28.   Mr. Willner refinanced the Property by signing a purported $3 million note dated September 5, 2006 (the Purported Note), (Exhibit A-1) identifying WMBFA as the lender at a loan closing on the same date ("Loan Closing").

29.   Mrs. Willner did not sign the Note.

30.   At the Loan Closing the Willners signed a deed of trust, the First Trust, (Exhibit A-2) which, by its plain, clear, and unambiguous language, secures a note that they both signed -- not the Purported Note, which Mrs. Willner did not sign.

31.   The current holder of the Purported Note is U.S. Bank National Association (USBank), as Trustee, successor in interest to Bank of America, N.A., as Trustee, successor by merger to LaSalle Bank, N.A., as Trustee, of the WaMu Mortgage Pass-Through Certificates Series 2006-AR15 Trust (the 2006-AR15 Trust).

32.   It is undisputed that the 2006-AR15 Trust purchased the Purported Note in November 2006, two years before Washington Mutual Bank (WMB) failed and the FDIC was named receiver. (Exhibit A-3 - Excerpts from the 2006-AR15 Trust's Prospectus Supplement and Free Writing Prospectus, Form FWP).[3]

_____

[3] Here is a link to the list of filings on the SEC's website made by WaMu Acceptance Corporation ("WAAC") as Depositor for the 2006-AR15 Trust: http://www.sec.gov/cgi-bin/browse-edgar?CIK=0001374627&action=getcompany. Here is a link to the prospectus supplement for the 2006-AR15 Trust: http://www.sec.gov/Archives/edgar/data/1317069/000095011706004341/a44834.htm. And here is a link to the list of mortgage loans in the 2006-AR15 Trust (Form FWP 1): http://www.sec.gov/Archives/edgar/data/1317069/000127727706000741/fwp1intialtapewamu2006_ar15.htm (The loan number for the Note is 3063148179). While Form FWP 1 does not identify any borrowers by name, it lists 40 data points associated with the Note including the loan number, the city, state and zip code in which Mr. Willner resides i.e., Lorton, Virginia, 22079, the original and current loan principal, initial monthly interest payments, original loan-to-

33.   JPMorgan Chase Bank, N.A. ("Chase") acquired the purported servicing rights to the Purported Note from the FDIC on September 25, 2008.

34.   Select Portfolio Servicing, Inc. ("SPS"), is a successor in interest to Chase's servicing rights and is the current servicer of.

35.   James Dimon is the CEO and President of Chase and is jointly responsible for its conduct in this matter ("Dimon," together with Chase and SPS, referred to herein as "USBank's Agents" or "Agents").

36.   Mr. Willner stopped making payments on his Note in May 2011.

37.   On November 8, 2012, Chase, as the attorney-in-fact for USBank, appointed a substitute trustee purportedly under the First Trust which scheduled a foreclosure sale of the Property for December 18, 2012.

38.   On December 13, 2012, Mr. Willner filed a Chapter 11 bankruptcy petition (Case No. 12-17322-BFK) in the Bankruptcy Court, which stayed the foreclosure sale and tolled the statute of limitations on Mr. Willner's claims against USBank and its Agents (discussed below).

39.   On February 26, 2013, USBank filed a proof of claim with the Bankruptcy Court (BPOC) in the amount of $3,441,397, in which it claimed a right to foreclose on the Property pursuant to the terms of the Purported Note and the First Trust. (Exhibit A-4: Proof of Claim filed by USBank with the U.S. Bankruptcy Court for the Eastern District of Virginia)

40.   On December 12, 2014, Mr. Willner as debtor in possession, and Mrs. Willner, individually, filed a complaint (C.A. No. 1:14-CV-1708, the "Complaint") against USBank, and its Agents in the U.S. District Court for the Eastern District of Virginia (the "District Court"). The crux of the Complaint was that the Purported Note and the First Trust are void and/or voidable and that the First Trust does not secure the Purported Note.

41.   The Complaint did not name the FDIC, WMB or WMBFA as defendants.

42.   The Complaint's causes of action were, in effect, affirmative defenses and counterclaims to the BPOC. The reason the Willners filed their claims as causes of action in the District Court instead of affirmative defenses in the Bankruptcy Court was because they wanted a trial by jury.

43.   On March 31, 2015, the Bankruptcy Court conditionally granted a motion for relief of stay filed by USBank, and ruled that Mr. Willner had until September 30, 2015 to sell the Property, otherwise the stay would be lifted. (Exhibit A-5 – Order dated March 31, 2015 by Judge Brian F. Kenney.)

---

value ratio, interest rate change date, borrower's FICO score on the date of the closing, and purpose of the loan, among others.

44.   On May 11, 2015 the District Court determined that it did not have subject matter jurisdiction to hear claims against USBank and its Agents "involving WMB's conduct," including claims for declaratory judgment, because the Willners had not exhausted their administrative remedies under the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA). (Exhibit A-6 – Order Entered May 11, 2015, by Anthony J. Trenga, U.S. District Judge, "Trenga Order," p. 4).

45.   The District Court held that the Willners' claims against USBank and its Agents "derive from the conduct of WMB and are therefore subject to the FIRREA's exhaustion requirement. WMB was the sponsor and servicer of the WaMu Trust when WMB failed and the FDIC therefore became the sponsor and servicer of the Trust… Plaintiffs' claims therefore necessarily relate to assets that came within the control of the FDIC; and Plaintiffs were required to present their claims with respect to those assets to the FDIC as receiver." (*Id.* at p. 5)

46.   Responding to USBank's argument that the Willners' common law claims, which were subject to Virginia's two-year statute of limitations, had expired, the District Court held that "the statute of limitation was extended by the filing of Plaintiff Michael Willner's Chapter 11 bankruptcy on December 13, 2012, pursuant to 11 U.S.C. § 108(a)." (*Id.* at p. 7 n. 3). This ruling confirms that the very earliest date upon which any of the Willners' common law claims could have accrued was December 13, 2010, well after the FDIC's December 30, 2008 Claims Bar Date for the filing of claims against WMB.

47.   In this POC Mrs. Willner asserts a number of claims, which are, in effect, affirmative defenses or counterclaims, to USBank's BPOC relating to assets, *i.e.,* the Purported Note and the First Trust, which the District Court found "came within the control of the FDIC," over which the District Court ruled it lacked subject matter jurisdiction including, but not limited to:

a) a claim of right to a declaratory judgment that USBank does not have the right to foreclose on the Property under the First Trust because, according to its plain language, it does not secure the Purported Note;

b) a claim of right to a declaratory judgment that the Purported Note and the First Trust are void *ab initio* because WMBFA did not have the legal capacity or authority to enter into a loan transaction (the "Loan Transaction") with Mr. Willner as an affiliate of WMB, nor did it have the legal capacity to be a beneficiary under the First Trust; and

c) a claim for damages and/or recoupment or rescission against USBank as holder of the Purported Note, lender and beneficiary under the First Trust, and successor in interest to WMB, for the fraudulent concealment by WMB of the material facts that:

1) it falsified Mr. Willner's estimated annual income on his loan application;

6

2) a second appraisal on the Property commissioned by WMB came in at $1.2 million below the appraisal WMB used to induce Mr. Willner to refinance the Property and both he and Mrs. Willner to sign the First Trust;

3) the Loan Transaction would not be consummated if Mr. Willner's Loan Application contained his true 2006 estimated annual income; and

4) WMBFA was not an affiliate of WMB.

48.   Mrs. Willner's claims in this action are a defense of USBank's proof of claim of right to foreclose on her primary residence. Therefore, her claims did not arise until USBank caused the scheduling of a foreclosure sale in December 2012 and/or filed its proof of claim with the Bankruptcy Court in February 2013, long after the Bar Date. *See, e.g., Stommel v. LNV Corp.,* 2014 U.S. Dist. LEXIS 47045 (D. Utah Apr. 3, 2014) ("Stommel's claims in this action are a defense of LNV's threatened foreclosure of her primary residence. Therefore, her claims did not arise until LNV threatened to foreclose her home in April 2013, long after America West failed and the FDIC was named receiver.")

## C.   **FACTUAL BACKGROUND**

49.   In 1989 the Willners purchased 11+ acres for approximately $477,000 cash by "Deed of Bargain and Sale" to "Michael A. Willner and Marguerite Evans Willner, husband and wife, as tenants by the entirety with the common law right of survivorship," which was recorded among the land records of Fairfax County, Virginia, on October 19, 1989, in Deed Book 7451, Page 0357, No. 89 146730, (hereinafter the "Record Deed"). (Exhibit A-7)

50.   After purchasing the land, the Willners invested over $2 million to build their house and improve the Property. Since 1992 they have also paid approximately $2.4 million in property taxes, insurance, and mortgage interest.

51.   From 1996 to the present, the Willners' annual income ranged between $35,000 and $75,000.

52.   In 2006 the Willners received two marketing solicitations from Washington Mutual Home Loans, Inc., a WMB affiliate, enticing them to refinance the Property.

53.   On or about August 10, 2006, Mrs. Willner called the telephone number on one of the ads and spoke with Phillip Howell, with whom she and her husband had previously established a good working relationship during two prior refinancings with WMBFA and whose advice they trusted.

54.   Mrs. Willner explained to Howell that she and her husband were prepared to sell the Property and monetize their equity, but they might consider refinancing if WMBFA would approve a "cash-

out" refi once again, the proceeds of which they would primarily use to make their mortgage payments.

55.     After speaking with Howell, it was the Willners' understanding that they should refinance rather than sell their rapidly-appreciating waterfront property because they would be hard-pressed to find a better investment than the Property.

56.     Mrs. Willner informed Howell that she did not intend to co-sign the mortgage loan.

57.     The Willners were led to believe that Howell would get Mr. Willner the best loan on the best terms available under the circumstances.

58.     On or about August 11, 2006, Howell assured the Willners that Mr. Willner's modest compensation was irrelevant to qualifying for the mortgage loan because of the significant equity he and Mrs. Willner owned therein.[4]

59.     Howell told Mr. Willner to call Sanjay Babbar, a WMB agent, who had been instructed by Howell to fill out Mr. Willner's Loan Application over the telephone.

60.     On or about August 11, 2006, Mr. Willner spoke with Babbar on the telephone, who asked Mr. Willner questions for the purpose of filling out the Loan Application.

61.     Mr. Willner truthfully answered each of Babbar's questions. When asked to estimate his annual income for 2006, Mr. Willner told Babbar that he expected to earn close to $52,000.

62.     Mr. Willner subsequently provided his and Mrs. Willner's joint federal tax returns for the two prior years and their two most recent bank and brokerage statements. The tax returns showed that the Willners' total adjusted gross income plus benefits was $56,596 in 2004 and $53,377 in 2005.

63.     The Willners also signed Form 4506-T, which authorized WMB to obtain the Willners' tax returns directly from the IRS.

64.     On August 23, 2006, Howell sent the Willners an email titled "loan details" which indicated that, with the Property worth "5,000,000++," and a loan amount of $3 million, the loan met the bank's guidelines of a 60% LTV (loan-to-value). Nothing in the email indicated that Mr. Willner's income was relevant. (Exhibit A-8 at p. 4, Howell emails)

65.     Howell's email indicated that the Loan principal could increase to $3.3 million if Mr. Willner chose to make interest-only payments, but that it could be repaid when Mr. Willner refinanced again. *Id.*

---

[4] In November 2011, Howell was found guilty by the Maryland Commission of Financial Regulation of defrauding residential borrowers and operating without a license; he was fined and ordered to Cease and Desist from conducting credit services business activities with Maryland consumers.

66.   Howell knew, but did not disclose to the Willners, that Mr. Willner would not, in fact, be able to refinance again and would, therefore, default on his Note, if his income remained the same, and if WMB, or any other bank Mr. Willner approached, considered his income relevant to its funding decision.

67.   On or about August 24, 2006, the Willners were informed that the appraisal report ordered by WMB valued the Property at $5.2 million. Given that the Willners' debt obligation was $2.4 million, if they sold the Property at the appraised value instead of refinancing it, they would have monetized $2.8 million of equity. (Exhibit A-9 at p. 2: $5.2 million appraisal)

68.   The Willners believed that the $5.2 million appraisal accurately reflected the market value of the Property and was proof that it continued to substantially appreciate in value year after year. This belief was material to, and a substantial factor in, Mrs. Willner's decision to sign the First Trust as evidence that she agreed to allow Mr. Willner to secure his Note with his share of the Property.

69.   It did not even dawn on the Willners that WMB might have ordered another appraisal which it did not disclose to them.

70.   At the closing, Mr. Willner reasonably relied on the settlement attorney, Robert Malico, to show him all the pages containing important information. In addition, Mr. Willner reasonably relied on WMBFA or WMB to ensure Malico was aware of all the pages that contained important information for Mr. Willner to review and sign or initial. Mr. Willner, therefore, signed or initialed all pages of the closing documents that Malico showed him and Mr. Willner believed that all the pages that he was not asked to review, sign, or initial, contained boilerplate or legalese that was relatively inconsequential.

71.   Mrs. Willner was not shown, and did not sign, any closing documents other than the First Trust.

72.   The Willners demanded that Mrs. Willner's name be removed from the signature line of the Purported Note because the Willners did not want WMBFA to have the right to foreclose on the Property. WMB removed Mrs. Willner's name from the signature line as instructed and Mr. Willner signed his Note. Mrs. Willner did not sign it. (Exhibit A-1)

73.   The Willners then signed the First Trust (Exhibit A-2), which was drafted by WMB and which, by its plain, clear, and unambiguous language, secured a note signed by "Borrower" defined as "Michael A. Willner & Marguerite Evans Willner." WMB specifically did not modify the First Trust so that it would secure a note that was only signed by Mr. Willner. Consequently, the First Trust did not give WMBFA the right to foreclose on the Property if Mr. Willner ever defaulted on his Note.

74.   As part of the Loan Transaction, Mr. Willner, but not Mrs. Willner, also entered into a $250,000 credit agreement (the Credit Agreement") with WMB. The debt evidenced by the Credit Agreement has since been satisfied and is not at issue in this Proof of Claim.

9

75.   At the closing, WMB asked Mr. Willner to sign an "Affiliated Business Arrangement Disclosure Statement Notice" (the "Affiliated Business Disclosure") which indicated that WMBFA and WMB existed concurrently as separate and distinct entities (as banks and affiliates) and that each was in a position to provide settlement services to the other for a fee, including a 1-4% loan origination fee based on the loan amount. (Exhibit A-10)

76.   The HUD-1 Settlement Statement for the Purported Note indicated that WMBFA did in fact receive a $30,000 loan origination fee (Exhibit A-11, p. 2, line 801), thus, WMBFA and WMB were involved in the Loan Transaction as two distinct and separate entities.

77.   Two months after the closing, WMBFA or WMB sold the Purported Note to WaMu Asset Acceptance Corporation ("WMAAC"), which then sold it to the 2006-AR15 Trust. (Exhibit A-3)

78.   WMB, along with its affiliates, performed every function necessary to create and register the 2006-AR15 Trust with the Securities and Exchange Commission ("SEC") and effectively controlled the 2006-AR15 Trust at the time it acquired the Purported Note. (*See* SEC filings for 2006-AR15 Trust on SEC's website: http://www.sec.gov/cgi-bin/browse-edgar?CIK=0001374627&action=getcompany)

79.   In its Motion for Relief from Stay ("Motion for Relief"), filed in Mr. Willner's bankruptcy case (Docket No. 59), USBank admitted it is a successor in interest to, or assignee of, WMB and/or WMBFA, the purported lender to Mr. Willner under the Purported Note. (Exhibit A-12, Motion for Relief ¶ 3).

80.   At the time it acquired the Purported Note, WMB exercised specific, financial, and, as attorney-in-fact, legal control over USBank's predecessor and the operations of the 2006-AR15 Trust, dictated its policies and practices, and exercised power and control over it.

81.   The 2006-AR15 Trust, therefore, as an arm of an entity that defrauded the Willners, acquired the Purported Note in bad faith, with notice that he had a defense or a claim in recoupment against the Purported Note.

82.   LaSalle Bank, as trustee for the 2006-AR15 Trust, knew or should have known that the First Trust did not, on its face, secure the Purported Note.

83.   WMB caused the 2006-AR15 Trust to purchase the Purported Note in bad faith; LaSalle Bank, as trustee, knew or should have known that it was not paying fair value because, at a minimum, it knew:

    a.   Mr. Willner signed his Note under false pretenses;

    b.   the Willners signed the First Trust under false pretenses;

    c.   the First Trust, on its face, did not secure the Purported Note; and that

WMBFA could not have legally made a loan to Mr. Willner or been the lender and beneficiary under the First Trust as a separate and distinct entity from WMB in the same Loan Transaction

84.   In October 2008 Chase notified Mr. Willner that it was the new servicer of his Note. (Exhibit A-13) Mrs. Willner did not receive a similar notice.

85.   The Willners received no notice that Chase or the FDIC controlled the Purported Note despite the fact it was sold to the 2006-AR15 Trust two years before WMB went into receivership, or that any claims the Willners may have had against the Noteholder had to be filed with the FDIC. Regardless, the Willners' claims against USBank had not yet accrued and, therefore, they could not file a proof of claim with the FDIC at that time.

86.   From 2009-2010, the worsening economy, contraction of credit, and the tightening of lending standards, all took a toll on Mr. Willner's business prospects and despite having well over $1 million of equity in the Property, Mr. Willner was unable to refinance his Note. In May 2011, after having exhausted all other options and despite having a stellar 30-year credit history, Mr. Willner was unable to make his monthly payment under his Note.

87.   Mr. Willner asked Chase to agree to a 90-day forbearance from foreclosing on the Property so he could hire a private auction company to sell the Property, but Chase refused.

88.   On or about March 23, 2012, in response to a QWR, Chase delivered to Mr. Willner a copy of a second appraisal that WMB had ordered prior to the loan closing in 2006, which came in at $4 million. (Exhibit A-14) No WMB employee or agent had previously informed the Willners of the material fact that WMB had ordered and received an appraisal which valued the Property at only $4 million -- $1.2 million less than the $5.2 million appraisal which WMB used to induce the Willners to enter into the Loan Transaction.

89.   Prior to the Closing in 2006, the Willners reasonably believed that the $5.2 million appraisal accurately reflected the Property's value and that it was the only appraisal that WMB had ordered.

90.   If WMB had disclosed the $4 million appraisal to the Willners, Mr. Willner would not have refinanced the Property because he would not have wanted to invest in a potentially depreciating asset and risk not being able to refinance again if necessary. Instead, the Willners would have sold the Property and monetized their substantial equity.

91.   WMB concealed the $4 Million appraisal from the Willners because it did not want to risk losing the deal.

92.   According to the "Addendum to Loan Application, Disclosure of Right to Receive a Copy of an Appraisal" signed by Mr. Willner at the Closing, he had "the right to a copy of any appraisal or other property valuation used in connection with [his] application...." (Exhibit A-15)

11

93.   Also, on or about March 23, 2012, Mr. Willner, while reviewing copies of the 2006 closing documents, discovered that the telephonic Loan Application that WMB had prepared, indicated that Mr. Willner's estimated 2006 income was $52,000/month, not the estimated $52,000/year that Mr. Willner had told Babbar. Thus, WMB had inflated his estimated annual income by 1,200%. (Exhibit A-16)

94.   Mr. Willner saw that he had signed three of the four pages of the Loan Application, and the one he had not signed or initialed was the one with the inflated income. He also noticed that Babbar had not signed any of the pages, though the document indicated he had prepared it and taken the information over the phone.

95.   Mrs. Willner's signature was not on any of the Loan Application's pages.

96.   WMB knew or should have known that the estimated 2006 monthly income of $52,000 stated on the Loan Application had been grossly inflated by its agents, yet it concealed this material information from the Willners.

97.   Neither Babbar nor any other WMB agent had asked Mr. Willner to review or sign the Loan Application prior to Closing, as required by law.

98.   Also on or about March 23, 2012, Mr. Willner discovered evidence indicating that WMB agents had removed the Loan Application from the package of documents WMB had sent him for review before the 2006 Closing. More specifically, the checkbox next to the words, "Loan Application," appeared to have been checked, but then was concealed with White Out. (Exhibit A-17)

99.   Effectively unchecking this box and removing the Loan Application from the pre-closing document review package, shows consciousness of guilt. Thus, WMB and its agents actively concealed the material fact that a WMB agent had grossly inflated Mr. Willner's estimated 2006 annual income on the Loan Application.

100.   Clearly, WMB did not want the Willners to review the Loan Application before Mr. Willner was asked to sign it at Closing because they did not want to give Mr. Willner a reason to back out of the Loan Transaction.

101.   At the 2006 Closing, Mr. Willner was not shown, did not see, and did not sign or initial the page of the Loan Application that contained the falsified estimated monthly income that a WMB agent inserted into the application without Mr. Willner's knowledge or consent. He had no idea that his estimated 2006 income on the Loan Application had been falsified by WMB.

102.   Mrs. Willner was not shown and did not see nor sign any page of the Loan Application before, during, or after the Closing, and had no idea that Mr. Willner's estimated 2006 income on the Loan Application had been falsified by WMB.

12

103. If the Loan Application had not been falsified, WMB would have not approved the Loan, in which case the Willners would have sold the Property at the peak of the housing market and monetized approximately $2.8 million in equity.

104. Likewise, if the Willners had known that WMB agents had falsified the estimated monthly income on the Loan Application or that WMB would not approve the loan if Mr. Willner's income were not falsified, Mr. Willner would not have refinanced the Property and Mrs. Willner would not have signed the First Trust, in which case the Willners would have sold the Property.

105. Similarly, if the Willners had known that WMBFA did not have the legal authority or capacity to enter into the Loan Transaction, Mr. Willner would not have signed his Note and he and Mrs. Willner would not have signed the First Trust, in which case the Willners would have sold the Property.

106. The Willners reasonably believed that WMB was a highly reputable and heavily regulated financial institution. They did not even consider the possibility that WMB might induce them to enter into the Loan Transaction by concealing material information.

107. The Willners did not know that WMB and its agents had a financial incentive to falsify the income on the Loan Application so Mr. Willner would be approved for a loan he would be unable to refinance in the future due to his income. The Willners did not know that WMB planned to quickly cause the 2006-AR15 Trust to purchase the Purported Note, which would in turn sell certificates of ownership interest to investors, thereby relieving WMB of the default risk associated with holding the Purported Note.

108. Also on or about March 23, 2012, Mr. Willner was reviewing filings made by WMB and its parent, WaMu, Inc., with the SEC when he discovered that on January 1, 2005, WMB had merged into WMBFA, and ceased to exist. (Exhibit A-18, Part I, p. 6) Three months later, effective April 4, 2005, the WMBFA Board of Directors changed the full corporate title on the federal bank charter from WMBFA to WMB. There is only one name designated per charter. Therefore, as of April 4, 2005, only WMB existed as a federally-chartered bank and WMBFA was divested of the attributes, powers, and benefits of a federal bank charter and ceased to exist as a bank (Exhibit A-19).

109. WMBFA was not registered as a broker/dealer, mortgage broker, or mortgage lender in Virginia, nor was WMB registered to do business as WMBFA in Virginia (Exhibit A-20). [5] It was an unincorporated trade name used by WMB agents to perpetrate a fraud on the Willners.

---

[5] Commonwealth of Virginia, State Corporation Commission, Certificate of Fact, dated 11/6/2012, states in relevant part that WMBFA is "not the name of any corporation existing or having existed under the laws of Virginia or of a corporation holding or having held a certificate of authority to transact business in Virginia in September 2006."

110. Thus, WMBFA did not have the legal capacity to enter into the 2006 Loan Transaction with Mr. Willner when it was masquerading as a separate and distinct affiliate of WMB in the same transaction.

111. By making it appear that WMBFA was providing mortgage brokerage services to Mr. Willner as an affiliated company (as opposed to WMB merely "doing business" as WMBFA), WMB justified paying WMBFA a $30,000 loan origination fee, when, in reality, it was illegally paying itself for referring Mr. Willner to itself.

112. When faced with a similar fact pattern, where Wells Fargo used an affiliated entity as a vehicle to create a false pretense for obtaining money so that Wells Fargo could earn undisclosed profits, the U.S. District Court for the Northern District of California found that Wells Fargo's conduct, was "plausibly immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *See Bias v. Wells Fargo & Co.*, 2013 U.S. Dist. LEXIS 59530 (N.D. Cal. Apr. 25, 2013)

113. Mr. Willner wanted to discuss his unique circumstances directly with the real party in interest to try to reach a settlement and avoid foreclosure and litigation, but Chase, as USBank's agent, made contradictory claims in numerous letters naming at least five different entities as the "investor" in the Purported Note. Despite Chase's legal obligation to accurately respond to Mr. Willner's QWRs, Chase failed to confirm which of the five identities it claimed to be the investor in the Purported Note was the actual real party in interest (Exhibit A-21 – Chart of responses from Chase and its law firm showing conflicting responses to request for identity of Noteholder).

114. Mrs. Willner informed Chase's foreclosure law firm that she owned the Property as a tenant by the entirety and that due to WMB's fraudulent conduct, Chase had no right to foreclose on behalf of the Noteholder, whomever that may be (Exhibit A-22). Chase, however, ignored her pleas and instead threatened to file criminal charges against Mr. Willner (Exhibit A-23).

115. As described above in the section entitled "Nature of Claims" (¶¶ 37-48, *supra*), when USBank sought to foreclose on the Property in December 2012, thus revealing it was the real party in interest, Mr. Willner filed a Chapter 11 bankruptcy petition, which stayed the foreclosure proceedings. He and Mrs. Willner subsequently filed a Complaint with the District Court, which ruled that it did not have jurisdiction to hear a number of the Willners' claims because they had not exhausted their administrative remedies under FIRREA (Exhibit A-6). Mrs. Willner filed this Proof of Claim in response to the Court's order.

### D.   **DESCRIPTION OF CLAIMS**

14

Mrs. Willner re-alleges and incorporates by reference all of the allegations in the preceding paragraphs into each and every claim listed below.

1. **FRAUDULENT CONCEALMENT** – *Against U.S. Bank as Noteholder and successor in interest to WMBFA and/or WMB – Damages - Claim in Recoupment – Right of Rescission*

116. Virginia law provides that the concealment or omission of a material fact by one who knows that the other party is acting upon the assumption that the fact does not exist constitutes actionable fraud. *Price Auto. II, LLC v. Mass Mgmt., LLC*, 2015 U.S. Dist. LEXIS 7378 (W.D. Va. 2015) (citation and internal quotations omitted).

117. USBank's predecessors in interest, WMB and/or WMBFA, knew that Mrs. Willner signed the First Trust because she reasonably assumed that WMB and/or WMBFA would disclose important information relating to the Loan Transaction including the following material facts which WMB and/or WMBFA concealed from her:

    **A.** one of their agents grossly inflated the income on Mr. Willner's Loan Application or allowed the grossly inflated income to go uncorrected (Exhibit A-16);

    **B.** one of their agents had commissioned an appraisal on the Property that came in $1.2 million lower than the $5.2 million appraisal their agent disclosed to the Willners, which induced them to enter into the Loan Transaction (Exhibit A-14);

    **C.** the Loan Transaction would not be consummated if Mr. Willner's Loan Application contained his true 2006 estimated annual income of $52,000;

    **D.** WMBFA could not engage in business as a separate and distinct affiliate of WMB in the Loan Transaction and, therefore, could not be the Lender and Beneficiary under the First Trust.

118. Mrs. Willner is not required to prove WMB's or WMBFA's intentions. A claim for fraud may be valid, "regardless of whether the fraud is based on intentional misrepresentations, reckless misrepresentations, or even innocent misrepresentations..." *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 628 (4th Cir. 1999).

119. If WMB and/or WMBFA disclosed these material facts, Mrs. Willner would not have signed the First Trust. Instead, she and her husband would have sold the Property and monetized the $2.8 million of equity they owned therein.

15

120. Mrs. Willner's claim of fraudulent concealment against USBank, as successor in interest to WMB and/or WMBFA, for damages, recoupment, and/or rescission of the Note and First Trust, and for a declaratory judgement that the Purported Note and the First Trust are voidable and hereby declared void and unenforceable, did not accrue until after the Bar Date.

121. The Fourth Circuit has defined recoupment as "the right of the defendant to have the plaintiff's monetary claim reduced by reason of some claim the defendant has against the plaintiff arising out of the very contract giving rise to the plaintiff's claim." *Tavenner v. United States (In re Vance)*, 298 B.R. 262, 267 (Bankr. E.D. Va. 2003) citing *First Nat'l Bank of Louisville v. Master Auto Serv. Corp.*, 693 F.2d 308, 310 n.1 (4th Cir. 1982).

122. The U.S. Supreme Court has held that a statute of limitations is not a bar to a claim against a noteholder in a state that recognizes a party's right of recoupment. "[A] defendant's right to plead recoupment, a defense arising out of some feature of the transaction upon which the plaintiff's action is grounded, survives the expiration of the period provided by a statute of limitation that would otherwise bar the recoupment claim as an independent cause of action." *Beach v. Ocwen Federal Bank*, 523 U.S. 410, 415, 118 S. Ct. 1408, 140 L. Ed. 2d 566 (1998) (internal quotation marks and citation omitted). Virginia recognizes such a right. *See* Va. Code § 8.01-422. *See also Farkas v. Nat'l Union Fire Ins. Co.*, 861 F. Supp. 2d 716, 723 (E.D. Va. 2012); *Suntrust Mortg., Inc. v. United Guar. Residential Ins. Co.*, 809 F. Supp. 2d 485, 490 (E.D. Va. 2011).

123. Mrs. Willner has the right to rescind the First Trust. "While . . . contracting parties may waive their contractual rights and disclaim or limit certain liabilities, a `false representation of a material fact, constituting an inducement to the contract, on which the purchaser had a right to rely, is always ground for rescission of the contract by a court of equity'" or an action for damages in a court of law. *George Robberecht Seafood, Inc. v. Maitland Bros. Co.*, 255 S.E.2d 682, 683 (Va. 1979) (quoting *Wilson v. Carpenter's Adm'r*, 21 S.E. 243, 244 (Va. 1895)).

124. To prevail on a claim of fraudulent concealment a plaintiff must prove by clear and convincing evidence that the party misled suffered damages. *Id.*

125. Mrs. Willner suffered damages when Mr. Willner's business reputation and future earnings potential was impaired, thereby reducing the value of her ownership interest in a company of which Mr. Willner is president, when Mr. Willner declared bankruptcy on December 13, 2012 in order to stay the illegal foreclosure proceedings initiated by USBank. Mrs. Willner will also suffer damages if and when USBank sells the Property pursuant to a foreclosure sale, if the proceeds available to her and her husband after such sale are less than the amount they could have monetized if they had sold the Property instead of refinancing it in 2006.

16

126. Mrs. Willner's claim against USBank to prevent foreclosure of the Property under the First Trust accrued in December 2012 when USBank caused the scheduling of a foreclosure sale or in February 2013 when USBank filed a proof of claim with the Bankruptcy Court.

## 2. DECLARATORY JUDGMENT – *The Purported Note and the First Trust are Void and Unenforceable - WMBFA Lacked the Legal Authority to Enter into the Loan Transaction as a distinct and separate affiliate of WMB*

127. At the closing on September 5, 2006, when Mr. Willner purportedly entered into contracts with WMBFA by signing the Purported Note and, along with Mrs. Willner, the First Trust, and WMBFA was designated as the Lender under the Purported Note and the Lender and Beneficiary under the First Trust, WMBFA had no corporate existence and was not legally registered to transact business in Virginia -- it was merely an unincorporated trade name masquerading as an affiliate of WMB. *See* ¶ 108-112, *supra*.

128. In order to generate illicit profits, WMB and/or its agents created the illusion that WMBFA was a distinct entity, separate and apart from WMB.

129. Where WMBFA did not have the legal capacity or authority to enter into the Loan Transaction, it violated Virginia Code § 6.2-398.A., "Every person who trades or deals as a bank, or carries on banking, without authority of law, and their officers and agents, is guilty of a Class 6 felony."

130. The Purported Note and the First Trust are void *ab initio* because WMBFA had no corporate existence and lacked the legal capacity to enter into a contract as a separate and distinct entity from WMB.

131. Consequently, WMBFA could not convey any enforceable right to its successor, USBank, which, therefore, has no right to enforce the Purported Note or the First Trust.

132. In the alternative, and without waiver of the foregoing, the Purported Note and the First Trust are illegal and contrary to public policy because WMB did not register to do business as WMBFA with the Virginia state government under an assumed name certificate pursuant to Va. Code § 59.1-69. *See Colbert v. Ashland Const. Co.,* 176 Va. 500, 506 (Va. 1940) ("...contract made in violation of a statute [§ 59.1-69] is void...when a plaintiff cannot establish his cause of action without relying upon an illegal contract he cannot recover.") (Exhibit A-20)

133. In addition, WMB did not give substantial performance under the terms of the Purported Note and the First Trust in good faith and without actual knowledge that a license or certificate was required.

134. More specifically, in order to receive an illegal $30,000 origination fee, WMB claimed in writing to be participating in the same loan transaction with WMBFA as its affiliate, not as one and the same entity doing business as WMBFA. At the Closing WMB presented Mr. Willner with an Affiliated Business Disclosure which indicated that WMBFA and WMB existed concurrently as separate and distinct entities (as banks and affiliates) and that each was in a position to provide settlement services to the other - for a fee, including a 1-4% loan origination fee based on the loan amount. (Exhibit A-10)

135. The HUD-1 Settlement Statement for the Purported Note indicated that WMBFA did in fact receive a $30,000 loan origination fee. (Exhibit A-11)

136. On January 1, 2005, WMB merged into WMBFA, and ceased to exist. (Exhibit A-18) Three months later, effective April 4, 2005, the WMBFA Board of Directors changed the full corporate title on the federal bank charter from WMBFA to WMB. There is only one name designated per charter. Therefore, as of April 4, 2005, only WMB existed as a federally-chartered bank and WMBFA was divested of the attributes, powers, and benefits of a federal bank charter and ceased to exist as a bank. (Exhibit A-19)

137. The Purported Note and the First Trust are void *ab initio* because WMBFA had no corporate existence or legal authority to enter into a contract or to be the beneficiary of the First Trust as a separate and distinct affiliate of WMB.[6] *See Snowden v. Checkpoint Check Cashing*, 290 F.3d 631, 635 (4th Cir. Md. 2002) (the use of a fictitious or assumed business name does not create a separate legal entity) cited by *Siraj v. Hermitage in N. Va.*, 51 Fed. Appx. 102, 104 (4th Cir. Va. 2002) (a trade name is not a separate legal entity capable of being sued). As the FDIC has argued:

> … a deed to a fictitious grantee is void: "Because the underlying transaction requires both a grantor and a grantee and the deed must identify them in some way, a deed to a grantee who is not a living person or an existing entity is void." R.G. Natelson, *Modern Law of Deeds to Real Property*, § 5.1 at 108-09 (footnote omitted); *see also Moffat v. United States*, 112 U.S. 24, 31, 28 L. Ed. 623, 5 S. Ct. 10 (1884) ("[A] patent to a fictitious person is, in legal effect, no more than a declaration that the government thereby conveys the property to no one."); *Oregon v. Bureau of Land Management*, 876 F.2d 1419, 1425 (9th Cir. 1989) ("There is a general rule of property law that a deed made out to a

---

[6] The Note would be void *ab initio* even if WMB had innocently caused WMBFA to conduct business as a separate and distinct entity from WMB in the same transaction. Tortious conduct is not a necessary element of this claim.

fictitious person is void, while a deed made out to a real person, even if obtained by fraud, is only voidable.").

*Roeckl v. FDIC*, 885 P.2d 1067, 1071 (Alaska 1994). *See also, America's Wholesale Lender v. Silberstein*, 87 Conn.App. 485, 489, 866 A.2d 695 (2005) (plaintiff, a trade name, was not an entity with the legal capacity to sue and, therefore, its suit was void *ab initio*); *Elizabeth v. Aim Sher Corp.*, 462 A.2d 811, 812 (Pa. Super. Ct. 1983 (A deed that purports to convey real estate to a nonexistent corporation has no effect and is void *ab initio*).

138. Even if WMB were doing business ("dba") as WMBFA (which it was not), it had no legal authority to do so because WMB was not registered to do business as WMBFA with the Virginia government under an assumed name certificate as required by Va. Code § 59.1-69. *See* ¶¶ 132-33, *supra*.

139. In a case similar to the present one, *Bank of America v. Nash*, (Circuit Court of the Eighteenth Judicial Circuit, Seminole County, FL, Case No. 59-201 l-CA-004389, Division: 14-K, 2014), where the lender had no independent corporate existence and was not authorized to do business in the state, the court found that:

> [9.] b.) the Note and Mortgage are void because the alleged Lender, America's Wholesale Lender, stated to be a New York Corporation, was not in fact incorporated in the year [it entered into the loan transaction] or subsequently, at any time, ....

> c.) America's Wholesale Lender, stated to be a corporation under the laws of New York, the alleged Lender in this case, was not licensed as a mortgage lender in Florida in the year [it made the loan to defendant homeowners], or thereafter, and the alleged mortgage loan is therefore, invalid and void.

> d.) America's Wholesale Lender, stated to be a New York Corporation, did not have authority to do business in Florida under Florida Statute 607.1506 and the alleged mortgage loan is therefore invalid and void.

> e.) Plaintiff and its predecessors in interest had no right to receive payment on the mortgage loan because the loan was invalid and therefore void because the corporate mortgagee named therein, was non-existent, and no valid mortgage loan was ever held by Plaintiff or its predecessors in interest.

> 10. The [purported assignee of the fictitious entity] has no legal right to attempt to claim ownership of the subject Note and Mortgage, or any right as

servicer, for some other unknown entity, and is without any legal basis to attempt to foreclose the subject Mortgage, or to collect on the Mortgage Note, because America's Wholesale Lender, a New York Corporation, did not exist in 2005, and was never formed as a Corporation by Plaintiff or its predecessors in interest. The collection of mortgage payments by the Plaintiff and its predecessors in interest, was therefore illegal and they were without any legal right to receive and use or disburse the funds therefrom on behalf of any owner of the Note and Mortgage, or any other party.

11. Defendant [homeowner] is therefore entitled to recover from Plaintiff [assignee of fictitious lender], all funds reflected on Plaintiff's Exhibit 4 which Plaintiff's witness testified reflected the payment history of monies paid by Defendant to Plaintiff or its predecessors in interest, because the subject note and mortgage were invalid because the alleged mortgage lender did not exist and did not have the legal right to receive and retain or disburse said funds..."

(A Copy of the decision is attached as Exhibit A-24)

140. *Bank of America v. Nash, supra,* is on all fours with the present case. WMBFA had no legal capacity or authority to transact business as a separate and distinct entity from WMB in the same transaction. In addition, WMB did not register to do business as WMBFA with the Virginia government under an assumed name certificate as required by Va. Code § 59.1-69. Consequently, for either reason, the Purported Note and the First Trust under which WMBFA is the purported lender and beneficiary are void *ab initio*.

### 3.  DECLARATORY JUDGMENT – *USBank Has No Right to Foreclose Under the First Trust*

141. As servicer of the Purported Note, Chase assigned its purported beneficial interest in the First Trust to USBank and then, as USBank's attorney-in-fact, appointed a substitute trustee to notice a foreclosure sale of the Property based on the purported default of the Purported Note (Exhibits A-25, -26, and -27). USBank also filed a proof of claim with the Bankruptcy Court claiming a right to do same (Exhibit A-4).

142. The First Trust, however, does not secure the Purported Note and, therefore, USBank had no right and has no right to foreclose on the Property.

143. "A deed of trust is construed as a contract under Virginia law." *Jones v. Fulton Bank, N.A.*, 2014 U.S. App. LEXIS 6517 (4th Cir. Va. Apr. 9, 2014). Thus, the First Trust must be construed as a contract.

144. Under Virginia law, a court will only:

> ...**consider the words of a contract within the four corners of the instrument itself**... It is construed as written, without adding terms that were not included by the parties. **When the terms in a contract are clear and unambiguous, the contract is construed according to its plain meaning.** Words that the parties used are normally given their usual, ordinary, and popular meaning. No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly.

*Mathews v. PHH Mortg. Corp.*, 724 S.E.2d 196, 200-201 (Va. 2012) (citations omitted) (emphasis added).

145. The terms of the First Trust are clear and unambiguous and, according to its plain meaning, it does not secure the Purported Note.

146. The First Trust gives the Trustee the right to foreclose on the Property only if a note signed by "Borrower" goes into default. *See* Paragraph (E) of the section entitled, "DEFINITIONS" on page 2 of the First Trust (Exhibit A-2), which states in relevant part, "'Note* means the promissory note signed by Borrower..."

147. The First Trust clearly and unambiguously defines the term "Borrower" as "MICHAEL A. WILLNER & MARGUERITE EVANS WILLNER". Exhibit A-2 at p. 2.

148. Thus, the term "Borrower" is a defined term with a particular meaning in the First Trust that overrides any generally understood definition of the generic word "borrower."

> The parties [to a contract] are free to select a defined term and to ascribe to it the meaning they choose; once they do so, the meaning of the defined term overrides the definition established by the dictionary or other common usage. *See John Hancock Life Ins. Co. v. Abbott Labs.*, 478 F.3d 1, 7-8 (1st Cir. 2006) (". . . . [P]arties to a contract may serve as their own lexicographers and may assign a particular meaning to any word they choose." (citations and internal quotations omitted)). Furthermore, "[i]t is generally accepted as a matter of contract interpretation that where a term is defined in a contract, the term will

21

be accorded that meaning wherever it appears." *Bank of Illinois v. Covey (In re Shara Manning Props., Inc.),*   B.R.   , 2010 Bankr. LEXIS 3688, 2010 WL 4290667, at *6 (Bankr. C.D. Ill. Oct. 25, 2010).

*Hardesty v. Huntington Nat'l Bank (In re Payne),* 450 B.R. 711, 719-720 (Bankr. S.D. Ohio 2011).

149. "Borrower," as defined by the First Trust, did not sign the Purported Note. Only Mr. Willner signed his Note. Thus, the purported default of the Purported Note did not trigger the First Trust's foreclosure provisions because, according to the First Trust's clear and unambiguous language, the First Trust only secures a note signed by Borrower, and a note signed by Borrower is not in default.

150. "Where a written contract is clear and unambiguous on its face it is the duty of the court to construe it, whether the contract be contained in a single document or evidenced by several papers." *E. Texas Salvage & Mach. v. Duncan,* 226 Va. 160, 162; 306 S.E.2d 896, 898 (1983).

151. In Virginia, an even more stringent standard of contract interpretation is applied to deeds, which provides practically no deviation from the actual language of the instrument:

> A fundamental principle in the interpretation of deeds is that the expressed intention of the parties should govern **unless the language renders it impossible to give effect to the intention**. While the construction put on contractual language by the parties is entitled to great weight, in the normal situation where a deed contains no ambiguities, parol evidence is not admissible to show the construction given the language by the parties.

*Dillard v. Jefferies,* 118 Va. 81, 86 S.E. 844 (1915) (citation omitted) (emphasis added).

152. Another nail in the coffin preventing any deviation from the express language in the First Trust is that USBank cannot use parol evidence against Mr. Willner, as debtor in possession, to add to his bankruptcy estate's debts. *See State Bank of Toulon v. Covey (In re Duckworth),* 2014 U.S. App. LEXIS 22054, 1-2 (7th Cir. Ill. Nov. 21, 2014), citing *Safe Deposit Bank & Trust Co. v. Berman,* 393 F.2d 401, 402-03 (1st Cir. 1968); *See also Holcombe v. Debis Fin. Servs. (in Re Holcombe),* 284 B.R. 141, 142 (Bankr. N.D. Ala. 2001) (11 U.S.C. § 1107 specifically grants the debtor-in-possession all the rights and powers of a bankruptcy trustee). Thus, USBank cannot rely on parol evidence in an attempt to prove that the First Trust does not mean what it says, *i.e.,* that the First Trust secures the Purported Note even though it was not signed by Borrower as

defined and required by the First Trust, because such an interpretation would improperly add to the debts of Mr. Willner's bankruptcy estate.

153. Other courts adjudicating issues relating to a bankruptcy estate, as here, have found that a deed of trust does not secure a note that is not precisely identified. In *State Bank of Toulon v. Covey (In re Duckworth)*, *supra* at *18-20, the court held that a deed of trust which referenced a note in all regards except the date did not secure the note. "[P]arol evidence cannot be used to correct even the seemingly minor clerical error in the security agreement. We must hew to the 'necessary technicalities inherent in any law governing commercial transactions,' even when the result is harsh." *See also, Hardesty v. Huntington Nat'l Bank (In re Payne), supra.*

154. In the present case, even if the terms of the First Trust were ambiguous, the Willners would still prevail because USBank's predecessor in interest, WMB, drafted the document and Virginia law requires ambiguous terms to be construed against the drafter. *Rhodes v. Computer Scis. Corp.*, 2014 U.S. Dist. LEXIS 171645 (E.D. Va. Dec. 10, 2014).

155. In addition, even if the FDIC sought to determine the intent of the parties, "courts are bound to say that the parties intended what the written instrument plainly declares." *Tobin v. Tobin*, 2006 Va. App. LEXIS 231, 12-13 (Va. Ct. App. Apr. 18, 2006). Moreover, the parties did, in fact, intend to ensure that WMB would not have a right to foreclose on the Property under the First Trust if Mr. Willner defaulted on a note that Mrs. Willner refused to sign.

156. The First Trust plainly declares that it secures a note signed by Borrower. The Purported Note is not signed by Borrower, as defined in the First Trust. Consequently, the First Trust does not secure the Purported Note. In addition, no note signed by Borrower is in default. Thus, USBank has no right to foreclose on the Property.

### 4. QUIET TITLE – *There are No Valid Liens on the Property*

157. The Willners are the legal titleholders to their Property pursuant to a Deed of Bargain and Sale to "Michael A. Willner and Marguerite Evans Willner, husband and wife, as tenants by the entirety", which was recorded among the land records of Fairfax County, Virginia, on October 19, 1989, in Deed Book 7451, Page 0357, No. 89 146730 (Exhibit A-7).

158. The First Trust is void or voidable and unenforceable as argued herein.

159. Thus, "Michael A. Willner and Marguerite Evans Willner, husband and wife, as tenants by the entirety with the common law right of survivorship", have no legal obligations to USBank.

160.  In Virginia, "[a]n action for quiet title is based on the premise that a person with good title to certain real or personal property should not be subjected to various future claims against the title." *Maine v. Adams*, 277 Va. 230, 238, 672 S.E.2d 862 (Va. 2009).

161.  In *Bagley v. Wells Fargo Bank, N.A.*, 2013 U.S. Dist. LEXIS 11880, 24-25 (E.D. Va. Jan. 29, 2013) the court held:

> In order to assert a claim for quiet title, the plaintiff must plead that he
> has fully satisfied all legal obligations to the party in interest. *See*
> *Tapia v. U.S. Bank*, 718 F. Supp. 2d 689, 700 (E.D. Va. 2010), aff'd
> 441 F. App'x 166 (4th Cir. 2011); *see also Matanic v. Wells Fargo*
> *Bank, N.A.*, 3:12CV472, 2012 U.S. Dist. LEXIS 134154, * 21-22
> (E.D. Va. Sept. 19, 2012) (denying plaintiff's claim for quiet title
> because plaintiff admitted owing money on the note and deed of trust).

162.  Consequently, where Mr. Willner does not owe any money under his Note which is void or voidable and against which he has a claim of recoupment, and/or where the First Trust does not secure the Purported Note, the Willners have the right to quiet title in the Property.

## 5. UNJUST ENRICHMENT – *Declaratory Judgment, USBank May Not Foreclose on the Property*

163.  The elements of unjust enrichment are: 1) there must be some benefit conferred on the defendant; 2) the defendant must have knowledge of the benefit; and 3) the defendant must have accepted or retained the benefit without paying for its value. *Citimortgage, Inc. v. Hayes*, 86 Va. Cir. 297, 298 (Va. Cir. Ct. 2013)

164.  If USBank were allowed to unjustly foreclose on the Property, USBank would unlawfully acquire the Property and the Willners' significant equity therein.

165.  Allowing USBank to abscond with the Property and the Willners' equity therein under the circumstances described herein would result in the unjust enrichment of USBank.

166.  Accordingly, USBank is estopped from pursuing any further foreclosure proceedings, the result of which would inure to its inequitable benefit and unjust enrichment.

### 6. CONSPIRACY TO COMMIT FRAUDULENT CONCEALMENT – *against USBank and its Agents, i.e., Chase, SPS, and Dimon*

167. A common law conspiracy consists of two or more persons combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means. *Commercial Business Systems v. BellSouth*, 249 Va. 39, 48, 453 S.E.2d 261 (1995).

168. USBank and its Agents combined with and acted in concert along with their predecessors in interest, assigns, and/or agents for the purpose of accomplishing a fraudulent scheme to refinance the Property and subsequently initiate foreclosure proceedings, by unlawful means, including, but not limited to, engaging in fraudulent concealment as described herein, which induced the Willners to enter into the Loan Transaction. USBank and its Agents then attempted to, and still intend to, foreclose on the Property without first seeking the aid and direction of a court of equity despite their knowledge:

   A. of the fraudulent conduct of their predecessors in interest;

   B. of Mr. Willner's claim of recoupment;

   C. that the First Trust, on its face, does not secure the Purported Note;

   D. that WMBFA had no legal capacity to enter into the loan transaction and, therefore, the Purported Note and the First Trust are void; and

   E. the legal requirement to first seek the aid and direction of a court of equity before initiating foreclosure proceedings against the Property where Mr. Willner has a claim of recoupment against the Note (*See* ¶ 179.B. *infra)*.

169. USBank and its Agents are liable for the damages sustained by or expected to be sustained by the Willners resulting from the conduct of USBank and its Agents and/or that of their predecessors in interest as co-conspirators, in a scheme to fraudulently conceal material information from the Willners and attempting to illegally foreclose on the Property, thus consummating the fraudulent scheme to rob the Willners of their equity in the Property.

170. Dimon is liable for Chase's conduct in this matter.

171. Dimon is responsible for overseeing executive officers and other employees to ensure their compliance with the company's code of conduct, all court and regulatory consent orders, and other laws and regulations.

25

172. By instituting a strategy to maximize profits by ignoring its legal obligations, Dimon is responsible for Chase's pattern of flagrant violations, which resulted in expenditures of $23 billion in 2013 alone to settle lawsuits relating to its fraudulent conduct in respect to its mortgage loan business among others. And yet Chase still generated net income of $17 BILLION in 2013.

173. Chase's tortious conduct in this matter stemmed from Dimon's overarching strategy to maximize Chase's profits regardless of its legal obligations. As the Huffington Post reported, when Senator Elizabeth Warren told Dimon she thought Chase was breaking the law, his response was, *"So hit me with a fine. We can afford it."* (Samantha Lachman, Huffington Post, 3/31/2015, *"Guess What Happened When JPMorgan's CEO Visited Elizabeth Warren's Office"* available at http://www.huffingtonpost.com/2015/03/31/elizabeth-warren-jamie-dimon_n_6972182.html?ncid=txtlnkusaolp00000592.

174. Judicial notice can be taken of a press release. *See, e.g., Caner v. Autry*, 16 F. Supp. 3d 689, 696 (W.D. Va. 2014). In addition, "... out-of-court statements which tend to prove a plan, design, or intention of the declarant are admissible, subject to the usual limitations..." *Mayor of Phila. v. Educ. Equal. League*, 415 U.S. 605, 645-646 (U.S. 1974) (citation omitted). "Rule 801(d)(2) expressly acknowledges that an admission by a party-opponent is not hearsay if the statement is offered against the party and was actually made by him in either his individual or representative capacity." *Id.*

175. As a result of Chase's egregious conduct, Dimon signed a Consent Cease and Desist Order (*Id.* ¶ 183) which states in relevant part that the Office of the Comptroller of the Currency ("OCC"):

> ... has identified certain deficiencies and unsafe or unsound practices in residential mortgage servicing and in the Bank's [Chase's] initiation and handling of foreclosure proceedings... The Bank has committed to taking all necessary and appropriate steps to remedy the deficiencies and unsafe or unsound practices identified by the OCC, and to enhance the Bank's residential mortgage servicing and foreclosure processes.

*In the Matter of JPMorgan Chase Bank, N.A.,* Office of the Comptroller of the Currency ("OCC"), Consent Order, April 13, 2011 ("2011 Consent Order"), p. 1, http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47e.pdf.

176. The OCC found that, in connection with its foreclosure operations, Chase filed fraudulent affidavits in state and federal courts, initiated nonjudicial foreclosure proceedings without proper documentation, failed to sufficiently oversee outside counsel and other third-party providers handling foreclosure-related services, and otherwise engaged in "unsafe or unsound banking practices." *Id.* at pp. 2-3. Chase, under Dimon's profit-maximizing mandate, engaged in this

very same conduct in the present case despite consenting, under Dimon's signature, to cease and desist from these activities.

177. Dimon also consented to implement measures to ensure, among other things, that Chase had documentation sufficient to establish its right to foreclose (*Id.* at 11, Article V(1)(c)), and to establish a single point of contact for each borrower with whom to communicate throughout the foreclosure process. *Id.* at 20, Article IX(1)(c). The OCC held that "...the Board [of which Dimon was the chairman] has the ultimate responsibility for proper and sound management of the Bank...[and] the Board shall follow-up on any material non-compliance with ... its obligations and undertakings under the terms of this Order." *Id.* at 25, Article XIII(1). Dimon was also responsible for ensuring that Chase had sufficient "staffing to support existing and/or future Loss Mitigation and foreclosure activities and ensure compliance with this Order." *Id.* at 5, Article III(3)(b).

178. Dimon shirked his obligations under the Consent Order and on February 9, 2012, the OCC fined Chase $113 million in connection with the unsafe and unsound mortgage servicing and foreclosure practices that were the subject of the Order (available at: http://www.occ.gov/news-issuances/news-releases/2012/nr-occ-2012-20.html). Also on February 9, 2012, Chase and four other banks agreed to a $25 billion settlement with a coalition of state attorneys general and federal agencies over charges of systemic and widespread mortgage loan servicing and foreclosure abuses and fraud (available at: http://www.naag.org/naag/media/naag-news/state-attorneys-general-feds-reach-25-billion-settlement-with-five-largest-mortgage-servicers-on-foreclosure-wrongs.php).

179. Thus, Dimon, is ultimately responsible for Chase's disregard of its obligations under the Consent Order, among other legal obligations, including, but not limited to:

   **A.** Engaging in extortion by threatening to file baseless criminal charges against Mr. Willner in order to coerce him to drop his demand that Chase cause the substitute trustee to forbear from initiating foreclosure proceedings and instead seek the aid and direction of a court of equity as required by law (Exhibit A-23).

   **B.** Causing U.S. Bank, as its attorney in fact, to initiate a nonjudicial foreclosure: a) pursuant to the First Trust, which, on its face, did not secure the Purported Note; b) pursuant to the Purported Note and the First Trust which are void *ab initio*; and c) failing to cause the substitute trustee to seek the aid and direction of a court as required by Virginia law where Mr. Willner had a claim of recoupment against the Note, based on documentary evidence provided by Chase. *See Bremer v. Bitner*, 44 Va. Cir. 505, 512-13 (Va. Cir. Ct. 1996) (court held that trustee who failed to cancel foreclosure breached fiduciary duty to seek the aid and direction of a court of equity to determine the value of claims which the debtor might be able to recoup against

27

the creditor's note). *See also, Samuel I. White, P.C. v. Caudle,* 65 Va. Cir. 377, 382 (Va. Cir. Ct. 2004) ("A trustee may not permit the insistence of the creditor in seeking to realize on security to force a sale which would unfairly injure the debtor.")

**C.** Actively, intentionally, and illegally implementing a strategy to strip the Willners of their equity in the Property while Dimon shamelessly complained to the press that federal government agencies were unfairly blaming his company for the conduct of its predecessor in interest, WMB.

180. Under Virginia law:

> [I]ndividual liability can be imposed on a corporate officer, director, or employee when he or she personally conducts the corporation's affairs in an illegal manner. The Virginia Supreme Court has held that "[a] corporation can act [only] through its officers and agents, and where the business itself involves a violation of the law the correct rule is that all who participate in it are liable." *Crall v. Commonwealth,* 103 Va. 855, 49 S.E. 638, 640 (Va. 1905). In other words, "[a]n officer cannot avoid criminal responsibility for an illegal act on the ground that it was done in his official capacity or through the instrumentality of the corporation which he controls and dominates...." *Bourgeois v. Commonwealth,* 217 Va. 268, 227 S.E.2d 714, 718 (Va. 1976). **This doctrine applies in both the criminal and civil contexts.** *See, e.g., Commonwealth v. Va. Telemarketing, Inc.,* 15 Va. Cir. 489, 496 (Va. Cir. Ct. Fairfax Co. 1989); *Stitt v. Nautilus Enter., Inc.,* 17 Va. Cir. 150, 152 (Va. Cir. Ct. Fairfax Co. 1989).

*Tsimpedes v. Martin,* 2006 U.S. Dist. LEXIS 53378, 5-6 (E.D. Va. Aug. 2, 2006) (emphasis added). "A contrary rule would in many instances afford immunity to the chief offenders, the officers of the corporation, without whose assistance it would be impossible for the corporation to engage in the prohibited business. *Stitt v. Nautilus Enterprises, supra.* Dimon "should be held personally liable for the deceptive acts of his company because he caused it to do the deceptive acts or knowingly approved of the actions." *Commonwealth ex rel. Terry v. Virginia Telemarketing, Inc.,* 15 Va. Cir. 489, 496 (Va. Cir. Ct. 1989).

181. Personal liability "does not require that the individual participate in every day-to-day decision. It is sufficient to show that the individual was aware of the actions of the corporation and knowingly approved of them." *Commonwealth ex rel. Gilmore v. Greenberg,* 42 Va. Cir. 160, 161-162 (Va. Cir. Ct. 1997).

182. Where Dimon knowingly approved of Chase's strategy to maximize profits regardless of the company's legal obligations, he is individually liable for the Willners' actual and prospective damages.

## E.   **DAMAGES**

183. Mrs. Willner has suffered or will suffer damages of approximately $ 6,408,478 according to proof, including, but not limited to, the following

> A. the loss of the value of her equity in the Property (if USBank forecloses);
> B. the lost opportunity to sell the Property in 2006 into a strong real estate market, and monetize her equity in the Property plus interest;
> C. the loss of the value of her ownership interest in the earnings that would have been generated by the company in which she and Mr. Willner own a majority interest if Mr. Willner had not filed for bankruptcy;
> D. the value of Mrs. Willner's time, energy, and expense, to prepare to assert her legal rights in litigation against USBank and its Agents, including attorney's fees and court costs;
> E. punitive damages against USBank and its Agents; and
> F. other financial losses according to proof.

## F.   **PRAYER FOR RELIEF**

184. Mrs. Willner seeks the following relief:

> A. Declaratory Judgment that the Purported Note and the First Trust are void and unenforceable;
> B. in the alternative, and without waiver of the foregoing, a Declaratory Judgment that the Purported Note and the First Trust are voidable and are hereby voided and unenforceable;
> C. a Declaratory Judgment that the trustee or substitute trustee under the First Trust does not have the authority to foreclose on the Property;
> D. an Order rescinding the Purported Note and the First Trust;
> E. an Order rescinding the Notice of Default;
> F. an Order rescinding the appointment of the Substitution of Trustee;
> G. an Award of actual, statutory, compensatory, and consequential damages in favor of Mrs. Willner against USBank and its Agents, jointly and severally, for all damages sustained as a result of their wrongdoing and/or that of their predecessors in interest, according to proof;

29

    **H.** an Award of punitive damages and/or exemplary damages as provided by applicable law;

    **I.** a Declaratory Judgment that the First Trust is unenforceable

    **J.** an Injunction enjoining USBank and its Agents to cease all foreclosure activity and remove all deeds of trust and recorded liens relating to the Property from the county land records;

    **K.** an Order quieting title to the Property in the Willners;

    **L.** an Award of attorneys' fees, expenses, and recoverable costs reasonably incurred in connection with the preparation for, commencement and prosecution of Mrs. Willner's claims;

    **M.** an Award of prejudgment interest at the maximum legal rate; and

    **N.** such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by the FDIC.

## G. MISCELLANEOUS

185. By executing and filing this Proof of Claim, Mrs. Willner does not waive any right with respect to any claim that she has or may have against USBank or its Agents or any other person or persons. The filing of this Proof of Claim is not intended and should not be construed to be an election of remedies or waiver of any past, present, or future claims Mrs. Willner may have against USBank or its Agents or anyone else deriving from the events described herein.

186. To Mrs. Willner's knowledge, the claims are not subject to any setoff or counterclaim not described herein, and no judgment has been rendered on the merits of the claims.

187. Mrs. Willner reserves her right to amend and/or supplement this Proof of Claim and to assert any and all other claims of whatever kind or nature that she has, or may have that come to her attention or arise after the filing of this Proof of Claim. The filing of this Proof of Claim shall not be deemed a waiver of any such claims or rights.

188. Nothing contained in this Proof of Claim shall be deemed or construed as: (a) a waiver of, or other limitation on, any rights or remedies of Mrs. Willner under the First Trust at law, or in equity, including any setoff rights, lien rights, rights of recoupment or rescission. or any other rights that Mrs. Willner may have against USBank, any of its Agents, or other related entities including affiliates, other agents, employees, predecessors in interest, the FDIC, or any other entity, past, present, or future (together, "Related Entities"), all of which rights are expressly reserved; (b) a consent by Mrs. Willner to the jurisdiction of any court with respect to proceedings, if any, commenced in any action against, or otherwise involving Mrs. Willner and USBank, its Agents or Related Entities; (c) a waiver or release of, or any limitation on Mrs. Willner's right to trial by jury in any court in any proceeding; (d) a waiver or release of, or any

other limitation on Mrs. Willner's rights to have any orders entered only after de novo review by the applicable court; (e) a waiver of, or any other limitation on, Mrs. Willner's right to seek a withdrawal of the reference with respect to any matter, including any matter relating to this Proof of Claim: or (f) a waiver or release of, or any other limitation on, Mrs. Willner's right to assert that any portion of the claims asserted herein are entitled to treatment as priority claims.

Without limiting the generality of the foregoing, Mrs. Willner asserts the right to set off the amount of all her claims against all claims and amounts assertable by or distributable to USBank, its Agents, or Related Entities in any capacity.

31

# EXHIBIT A-15

WAD2   M35



**Washington Mutual**

3063148179-071

## ADDENDUM TO LOAN APPLICATION

### NOTICES AND DISCLOSURES

**Important Information About Procedures for Opening a New Account**
To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.

What this means for you: When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

**Disclosure for Appraisals:** Lender will make arrangements for an appraisal or property valuation to be used internally in the evaluation of your loan application. In doing so, the Lender does not warrant the sales price, value, and/or conditions of the property, nor should you rely on any appraisals or other property valuations arranged for by the Lender in making your decision to purchase and/or borrow against the property.

**Disclosure of Right to Receive a Copy of an Appraisal:** If you are applying for a loan to be secured by a 1 to 4 family dwelling, you have the right to a copy of any appraisal or other property valuation used in connection with your application for credit as long as you have paid sufficient funds to cover the cost of the appraisal.

If you have not received a copy of your report at the time your loan request is closed, denied, or withdrawn, and you would like a copy, please write to us at Washington Mutual, Attn: Home Loan Administration, 3860MBA, 17877 Von Karman, Irvine, CA 92614. In your letter, give us (1) your name, (2) your loan/application number, and (3) your mailing address. We must hear from you no later than 90 days after notification of the action taken, withdrawal of your credit application, or loan funding, as applicable.

**Non-Discriminatory Underwriting Guidelines:** Anyone who inquires about the availability of credit from Lender has the right to receive a copy of our non-discriminatory underwriting guidelines. To obtain a copy of these underwriting guidelines, simply contact the manager at any one of our offices.

**Lender's Attorney:** It is the responsibility of the Lender's Attorney to protect the Lender's interest. Applicant may, at Applicant's expense, engage an attorney of Applicant's choice to represent Applicant's interest in the transaction.

**Ohio Law:** The Ohio Laws against discrimination require that all creditors make credit equally available to all creditworthy customers, and that credit reporting agencies maintain separate credit histories on each individual upon request. The Ohio Civil Rights Commission administers compliance with this law.

*Notice To HUD/FHA Applicants: This is notice to the applicants as required by the Right to Financial Privacy Act of 1978 that HUD/FHA has a right of access to financial records held by financial institutions in connection with the consideration or administration of assistance to you. Financial records involving your transaction will be available to HUD/FHA without further notice or authorization but will not be disclosed or released by this institution to another Government Agency or Department without your consent except as required or permitted by law.*

**Indian Tribal Lands:** If the type of land ownership is Indian Tribal Trust, Individual Trust or Allotments, the financial records involving your transaction may be available to the Bureau of Indian affairs and/or the U.S. Department of Interior without further notice or authorization as required to obtain their approval for your loan.

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

### CREDIT REPORT AUTHORIZATION

I hereby authorize ☐ Washington Mutual Bank ☐ Washington Mutual Bank fsb ☒ Washington Mutual Bank, FA (the "Lender"), and any of its agents and assignees, to verify my employment record(s), banking accounts, credit history, and/or any other information which any of them finds necessary in connection with my home loan application. I understand that the use of a photocopy of this form may be necessary to verify one or more of my credit references. I authorize this use and request that a photocopy be honored.

I understand that a credit report will be ordered from a consumer reporting agency prior to loan closing as a part of the application process, and may be ordered in connection with the Lender's review of my account, Quality Control Program, servicing or collection of the loan.

I also authorize the Lender and the Lender's affiliates to obtain a credit report on me, in consideration of any product or service which the Lender or the Lender's affiliates may consider offering me at any time during the application process and while I am a customer.

**By signing below, I authorize the Bank to obtain credit reports on me in the manner just described.**

_Michael A. Willmer_
_____            _____
Applicant Signature                               Co-Applicant Signature



**CERTIFICATION AND AUTHORIZATION**

3083149179-071

**Environmental - Applicant's Certification:** By signing below, I do hereby represent and warrant that I am not aware of any substances, materials or products which may be an environmental hazard such as, but not limited to, asbestos, formaldehyde, radon gas, lead-based paint, fuel or chemical storage tanks (above or below ground) and contaminated soil or water on the subject property. I acknowledge that the Lender is relying on this representation and warranty as a material part of its loan application process. I also am not aware of any landfill on the property or portion thereof.
Exceptions to the above: _____

I further acknowledge: (1) receipt of applicable disclosures from the seller in purchase transactions; (2) that lead-based paint may exist in housing constructed prior to 1978; (3) that the Lender performs no environmental investigation on my behalf and owes no duty to me to identify lead-based paint or any other environmental condition which might impact the property or its residents; and (4) that it is my sole obligation to investigate for potential impact to the property from environmental conditions.

**Certifications:** I certify by signing below that (1) if an Adjustable Rate Mortgage has been selected, I have received a copy of the Consumer Handbook on Adjustable Rate Mortgages and the appropriate Adjustable Rate Mortgage Loan Disclosure Statement; (2) all of the loan application information provided is true and complete; (3) I understand any intentional or negligent misrepresentation(s) of the information provided in conjunction with our application may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq. and liability for monetary damages to the Lender, its agents, successors and assigns, insurers and any other person who may suffer any loss due to reliance upon any misrepresentation which I have made on the application; and (4) any significant change from the information provided at time of application until the final Loan Application is signed may have a bearing on the approval of my application for a home loan.

**Insurance Quote(s):**
☐ I understand that Lender's affiliate, Washington Mutual Insurance Services, Inc. would like to contact me with a quote for hazard and, if applicable, flood insurance. Unless this box is checked, I authorize Lender to share information contained in my application with Washington Mutual Insurance Services for this purpose. I authorize Washington Mutual Insurance Services, as an affiliate of the Lender, to obtain a credit report from a third party credit bureau on me for purposes of preparing this quote. Purchasing hazard or flood insurance from Washington Mutual Insurance Services is not a requirement for obtaining the loan.

Are you a California registered domestic partner?
☐ Yes    ☑ No

This question is being posed in light of The California Domestic Partner Rights and Responsibilities Act of 2003, which extends the rights, protections, benefits, responsibilities, obligations and duties of spouses to persons who are members of Registered Domestic Partnerships.

Are you a Connecticut civil union partner?
☐ Yes    ☑ No

This question is being posed in light of an Act concerning Civil Unions in Connecticut, which extends to civil union partners the same benefits, protections and responsibilities under law, as are granted to spouses in a marriage.

You should consult with your own legal advisor for specific legal advice regarding the rights, protections, benefits, responsibilities, obligations and duties of persons who are partners in California Domestic Partnerships or Connecticut Civil Unions.

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

**By signing below, each Applicant hereby acknowledges (1) making the above certifications and authorizations and (2) that each Applicant has received and understands the above notices and disclosures.**

*Michael A Will*
Applicant Signature

*Michael A. Willner*
Printed Name

_____    09/06/2006
Social Security Number           Date

_____
Co-Applicant Signature

_____
Printed Name

_____    _____
Social Security Number           Date

# EXHIBIT D

**FDIC**

**Federal Deposit Insurance Corporation**
1601 Bryan Street Dallas, TX 75201                                    Division of Resolutions and Receiverships

May 13, 2015

MICHAEL WILLNER
11521 POTOMAC ROAD
LORTON, VA 22079-4264

SUBJECT:    **10015 – Washington Mutual Bank**
            **Henderson, NV –** In Receivership
            Closing Date: **September 25, 2008**
            Claims Bar Date: **December 30, 2008**
            Submission Deadline: **August 11, 2015**

            <u>**NOTICE TO DISCOVERED CLAIMANT TO PRESENT PROOF OF CLAIM**</u>

Dear Claimant:

On **September 25, 2008** (the "Closing Date"), the **Office of the Thrift Supervision** closed **Washington Mutual Bank** (the "Failed Institution") and appointed the Federal Deposit Insurance Corporation ("FDIC") as Receiver (the "Receiver").

The Receiver has discovered that you may have a claim against the Failed Institution.  If you do not have a claim against the Failed Institution, please disregard this notice.

**Published Notice/Claims Bar Date:**  The Receiver has published a notice in one or more newspapers stating that the Failed Institution was closed and that any claims against the Failed Institution must be filed **on or before December 30, 2008** (the "Claims Bar Date").

**How to File Your Claim:**  In order for the Receiver to consider your claim you must submit the properly completed Proof of Claim Form along with the supporting documentation to the Receiver by the Claims Bar Date.  You may submit your claim on-line, by mail, or by fax.

To file a claim on-line please refer to https://www2.fdic.gov/NDCWeb for important contact information and instructions on making an on-line claim.  When possible, it is recommended that claims be submitted to the FDIC on-line.

If you choose to file your claim via the mail, it is recommended that you send it by U.S. certified mail or a commercial delivery service that can provide you with a receipt of delivery.

To fax a claim you should contact a claims agent at the telephone number listed at the bottom of this letter to obtain a fax number.

**Filing After the Claims Bar Date:**  Failure to file your claim on or before the Claims Bar Date will result in disallowance by the Receiver, and the disallowance will be final.  12 U.S.C. 1821(d)(5)(C)(i).  By law, however, the Receiver may consider claims filed after the Claims Bar Date if: (1) the claimant did not receive notice of the appointment of the Receiver in time to file a claim, and (2) the claim is filed in time to permit payment of the claim (the "late-filed claim exception").  12 U.S.C. 1821(d)(5)(C)(ii).

Because the Claims Bar Date has passed in this case, you must prove to the Receiver's satisfaction that you did not receive notice of the appointment of the Receiver in time to file a claim before the Claims Bar Date.  Therefore, along with your Proof of Claim form and supporting documentation, you must prove that you lacked knowledge of the appointment of the Receiver.  For example, evidence that you were on active military duty stationed overseas at the time of the appointment of the Receiver.  You must submit your completed claim and the supporting documentation to the Receiver **on or before August 11, 2015** (your "Submission Deadline").  Submitting your claim no later than the Submission Deadline does not guarantee that it will be accepted as timely as the Submission Deadline does not extend the Claims Bar Date.

**<u>Failure to file your claim by the Submission Deadline will result in the disallowance of your claim.</u>**

**If you file your claim on or before the Submission Deadline and satisfy the late-filed exception:**

**Time for Receiver to Determine Your Claim:**  The Receiver has 180 days from the date it receives your claim to determine whether to allow or to disallow your claim.

**If Your Claim is Disallowed or You Do Not Receive a Timely Notice of Disallowance:**  Pursuant to 12 U.S.C. Section 1821(d)(6), if the Receiver notifies you of the disallowance of your claim or if you do not receive a notice of disallowance on or before the end of the 180-day period, you have the right to file a lawsuit on your claim (or continue any lawsuit commenced before the appointment of the Receiver).  Your lawsuit must be filed within 60 days after the date of the notice of disallowance by the Receiver OR within 60 days after the end of the 180-day period, **whichever is earlier**.  You must file your lawsuit either in the United States District (or Territorial) Court for the District where the Failed Institution's principal place of business was located or in the United States District Court for the District of Columbia.  The Receiver will not consent or agree to further administrative review of your disallowed claim.  12 U.S.C. 1821(d)(7)(A).

**Lawsuits:**  If you do not file a lawsuit (or continue any lawsuit commenced before the appointment of the Receiver) before the end of the 60-day period, the disallowance of your claim will be final and you will have no further rights or remedies with respect to your claim.  12 U.S.C. 1821(d)(6)(B)(ii).

**Insured Deposit Claims:**  Claims for insured deposits are claims against FDIC in its corporate capacity as deposit insurer - not against the Receiver.  If any portion of your claim is for an insured deposit, your rights differ from the rights described in the preceding paragraphs.  An insured depositor's rights are set forth in 12 U.S.C. Section 1821(f).  Please contact a claims agent at the below phone number for deposit claims inquiries.

**Note to Class Claimants**:  By law, the Receiver will not accept a claim filed on behalf of a proposed class of individuals or entities or a class of individuals or entities certified by a court.  EACH individual or entity must file a separate claim with the Receiver.

If you have any questions about this letter, please contact the undersigned at **(972) 761-8677.**


Sincerely,


CLAIMS AGENT
Claims Department


Enclosures: Proof of Claim Form, Instructions

## Instructions for filing Form FDIC 7200/19, Proof of Claim, and Supporting Documentation

**INSTRUCTIONS:  The following fields <u>MUST</u> be completed in order for your Proof of Claim (POC) to be considered**. (The numbers correspond with those located on the Proof of Claim.)

1.  **SSN/TAX ID NO**. The Claimant's tax identification number (if a company) or his/her Social Security Number (if an individual).
2.  **NAME OF PERSON COMPLETING THE PROOF OF CLAIM**.  Self-explanatory.
3.  **NAME OF THE CLAIMANT**. This is the person or entity actually making the claim.  This may be you or another person or entity on whose behalf you are authorized to file the claim.
4.  **AMOUNT OF CLAIM**. The dollar amount of the claim.
5.  **DESCRIPTION OF CLAIM**. Detailed description of what is being claimed (e.g., the invoice number, type of service being claimed, account number, etc.).  Additional information may be attached.
6.  **SIGNATURE**. The signature of the person completing the POC.  Include your title if you are filing this POC on behalf of the Claimant.
7.  **DATE**. Date the form is signed.
8.  **FIRM**. If you are filing this POC on behalf of the Claimant, include the name of your company or firm, if applicable.
9.  **ADDRESS**. The address (including City, State, and ZIP code) of the individual completing this POC.
10. **TELEPHONE NUMBERS**. Telephone number of the individual completing this POC.

### <u>REQUIRED SUPPORTING DOCUMENTATION</u>

*   <u>Claims for Goods Purchased by the Failed Institution</u>: You must enclose a copy of the purchase order or other correspondence from the Failed Institution requesting the goods, a copy of your invoice, and a receipt signed by the Failed Institution (or other evidence) indicating that the goods were received.

*   <u>Claims for Services Rendered</u>: You must enclose a copy of the correspondence or signed initial contract sent by the Failed Institution to request your services and an invoice.  In the case of law firms (or other professional firms) retained by the Failed Institution, enclose an itemized invoice detailing charges accruing prior to failure.  For appraisal services, enclose proof that the appraisal was completed.

*   <u>Other Types of Claims</u>: You must enclose a copy of documents that substantiate the nature and amount of the claim.  While you may enclose a copy of the complaint that you filed with a court, this alone is not sufficient to establish your claim.

### <u>SUBMITTING YOUR CLAIM</u>

There are three ways to submit your claim:

*   Electronically file via the internet by completing an online form FDIC 7200/19 and attaching supporting documentation.  Submitting your claim via the FDIC web site is convenient, secure, and inexpensive, and will also help to expedite the handling of your claim.  It is highly recommended. Please go to:  https://www2.fdic.gov/NDCWeb
*   Fax by calling a claims agent using the phone number in the enclosed letter.
*   Via mail to the following address: **1601 Bryan Street Dallas, TX 75201**  If you choose this option, we recommend you send it by U.S. certified mail or a commercial service that can provide you with a receipt of delivery.  **Please do not send originals.**

**NOTE**: If you choose to file by mail, it is very important that the Proof of Claim be the top document of your mailing.  The bar code allows for the automated creation of your claim file when the Proof of Claim is read or scanned into our system.  There is no need for a cover letter.

Page down to access form FDIC 7200/19

**Claimant ID: NS1001515320, Barcode Value: FD00144238, Fund: 10015**

**Federal Deposit Insurance Corporation
as Receiver for
Washington Mutual Bank, Henderson, NV**

## PROOF OF CLAIM

1. SSN/Tax ID No. _____

2. The undersigned _____
   *(Name of person completing the Proof of Claim)*

   hereby states that the subject Financial Institution, now in liquidation ("Failed Institution"), is indebted

3. to _____ (the "Claimant") in the sum of
   *(Name of Claimant)*

4. $ _____

5. Description of Claim

   ┌─────────────────────────────────────────────────────────────────────┐
   │                                                                       │
   │                                                                       │
   │                                                                       │
   │                                                                       │
   └─────────────────────────────────────────────────────────────────────┘

The undersigned further states that no part of said debt has been paid, that the Claimant has given no endorsement or assignment of the same or any part thereof, and that there is no set-off or counterclaim, or other legal or equitable defense to said claim or any part thereof.

6. NAME _____   7. DATE _____
   *(Name, Title, and Signature of person completing the Proof of Claim )*

8. FIRM _____
   *(if applicable)*

9. ADDRESS _____

   *( City, State, and ZIP Code)* _____

10. TELEPHONE NUMBER(S) _____

The penalty for knowingly making or inviting reliance on a false, forged, or counterfeit statement, document, or thing for the purpose of influencing in any way the action of the Federal Deposit Insurance Corporation is a fine of not more than $1,000,000 or imprisonment for not more than 30 years or both (18 U.S.C. Section 1007).

**IMPORTANT NOTE:** The bar code at the top of this Proof of Claim is unique to this claim and may not be re-used for other claims which you may have or by other potential claimants. If you have other unrelated claims, you must file a separate Proof of Claim with its own unique bar code. Additional Proof of Claim forms may be found on the FDIC web site or obtained by mail at the respective addresses indicated in the Instructions. Re-use of this Proof of Claim may result in processing delays or the rejection of your claim.

**PRIVACY ACT STATEMENT**

The FDIC is authorized to request this information from you by 12 U.S.C. § 1819, 1821, and Executive Order 9397. The purpose for collecting the information is to support the administration of claims against the failed financial institution. Furnishing the requested information is voluntary, but failure to provide the requested information in whole or in part may delay or prohibit the processing of your claim. The information provided by individuals is protected by the Privacy Act, 5 USC 552(a). The information may be furnished to third parties as authorized by law or used according to any of the routine uses described in the FDIC Insured Financial Institution Liquidation Records (30-64-0013) System of Records. This System of Records is available for review at www.fdic.gov/regulations/laws/rules/2000-4050.html#200030--64--0013. If you have questions or concerns about the collection or use of the information, you may contact the FDIC's Chief Privacy Officer at Privacy@fdic.gov.

FDIC 7200/19 (12-12)

# FDIC®

**Federal Deposit Insurance Corporation**
1601 Bryan Street Dallas, TX 75201                                    Division of Resolutions and Receiverships

**May 13, 2015**

**MARGUERITE WILLNER**
**11521 POTOMAC ROAD**
**LORTON, VA 22079-4264**

SUBJECT:      **10015 – Washington Mutual Bank**
              **Henderson, NV -- In Receivership**
              Closing Date: **September 25, 2008**
              Claims Bar Date: **December 30, 2008**
              Submission Deadline: **August 11, 2015**

### NOTICE TO DISCOVERED CLAIMANT TO PRESENT PROOF OF CLAIM

Dear Claimant:

On **September 25, 2008** (the "Closing Date"), the **Office of the Thrift Supervision** closed **Washington Mutual Bank** (the "Failed Institution") and appointed the Federal Deposit Insurance Corporation ("FDIC") as Receiver (the "Receiver").

The Receiver has discovered that you may have a claim against the Failed Institution.  If you do not have a claim against the Failed Institution, please disregard this notice.

**Published Notice/Claims Bar Date:**  The Receiver has published a notice in one or more newspapers stating that the Failed Institution was closed and that any claims against the Failed Institution must be filed **on or before December 30, 2008** (the "Claims Bar Date").

**How to File Your Claim:**  In order for the Receiver to consider your claim you must submit the properly completed Proof of Claim Form along with the supporting documentation to the Receiver by the Claims Bar Date.  You may submit your claim on-line, by mail, or by fax.

To file a claim on-line please refer to https://www2.fdic.gov/NDCWeb for important contact information and instructions on making an on-line claim.  When possible, it is recommended that claims be submitted to the FDIC on-line.

If you choose to file your claim via the mail, it is recommended that you send it by U.S. certified mail or a commercial delivery service that can provide you with a receipt of delivery.

To fax a claim you should contact a claims agent at the telephone number listed at the bottom of this letter to obtain a fax number.

**Filing After the Claims Bar Date:**  Failure to file your claim on or before the Claims Bar Date will result in disallowance by the Receiver, and the disallowance will be final.  12 U.S.C. 1821(d)(5)(C)(i).  By law, however, the Receiver may consider claims filed after the Claims Bar Date if: (1) the claimant did not receive notice of the appointment of the Receiver in time to file a claim, and (2) the claim is filed in time to permit payment of the claim (the "late-filed claim exception").  12 U.S.C. 1821(d)(5)(C)(ii).

Because the Claims Bar Date has passed in this case, you must prove to the Receiver's satisfaction that you did not receive notice of the appointment of the Receiver in time to file a claim before the Claims Bar Date. Therefore, along with your Proof of Claim form and supporting documentation, you must prove that you lacked knowledge of the appointment of the Receiver. For example, evidence that you were on active military duty stationed overseas at the time of the appointment of the Receiver. You must submit your completed claim and the supporting documentation to the Receiver **on or before August 11, 2015** (your "Submission Deadline"). Submitting your claim no later than the Submission Deadline does not guarantee that it will be accepted as timely as the Submission Deadline does not extend the Claims Bar Date.

**Failure to file your claim by the Submission Deadline will result in the disallowance of your claim.**

**If you file your claim on or before the Submission Deadline and satisfy the late-filed exception:**

**Time for Receiver to Determine Your Claim:** The Receiver has 180 days from the date it receives your claim to determine whether to allow or to disallow your claim.

**If Your Claim is Disallowed or You Do Not Receive a Timely Notice of Disallowance:** Pursuant to 12 U.S.C. Section 1821(d)(6), if the Receiver notifies you of the disallowance of your claim or if you do not receive a notice of disallowance on or before the end of the 180-day period, you have the right to file a lawsuit on your claim (or continue any lawsuit commenced before the appointment of the Receiver). Your lawsuit must be filed within 60 days after the date of the notice of disallowance by the Receiver OR within 60 days after the end of the 180-day period, **whichever is earlier**. You must file your lawsuit either in the United States District (or Territorial) Court for the District where the Failed Institution's principal place of business was located or in the United States District Court for the District of Columbia. The Receiver will not consent or agree to further administrative review of your disallowed claim. 12 U.S.C. 1821(d)(7)(A).

**Lawsuits:** If you do not file a lawsuit (or continue any lawsuit commenced before the appointment of the Receiver) before the end of the 60-day period, the disallowance of your claim will be final and you will have no further rights or remedies with respect to your claim. 12 U.S.C. 1821(d)(6)(B)(ii).

**Insured Deposit Claims:** Claims for insured deposits are claims against FDIC in its corporate capacity as deposit insurer - not against the Receiver. If any portion of your claim is for an insured deposit, your rights differ from the rights described in the preceding paragraphs. An insured depositor's rights are set forth in 12 U.S.C. Section 1821(f). Please contact a claims agent at the below phone number for deposit claims inquiries.

**Note to Class Claimants**: By law, the Receiver will not accept a claim filed on behalf of a proposed class of individuals or entities or a class of individuals or entities certified by a court. EACH individual or entity must file a separate claim with the Receiver.

If you have any questions about this letter, please contact the undersigned at **(972) 761-8677.**


Sincerely,



CLAIMS AGENT
Claims Department


Enclosures: Proof of Claim Form, Instructions

## Instructions for filing Form FDIC 7200/19, Proof of Claim,
## and Supporting Documentation

**INSTRUCTIONS:  The following fields <u>MUST</u> be completed in order for your Proof of Claim (POC) to be considered.** (The numbers correspond with those located on the Proof of Claim.)

1.  **SSN/TAX ID NO**. The Claimant's tax identification number (if a company) or his/her Social Security Number (if an individual).
2.  **NAME OF PERSON COMPLETING THE PROOF OF CLAIM**.  Self-explanatory.
3.  **NAME OF THE CLAIMANT**. This is the person or entity actually making the claim.  This may be you or another person or entity on whose behalf you are authorized to file the claim.
4.  **AMOUNT OF CLAIM**. The dollar amount of the claim.
5.  **DESCRIPTION OF CLAIM**. Detailed description of what is being claimed (e.g., the invoice number, type of service being claimed, account number, etc.).  Additional information may be attached.
6.  **SIGNATURE**. The signature of the person completing the POC.  Include your title if you are filing this POC on behalf of the Claimant.
7.  **DATE**. Date the form is signed.
8.  **FIRM**. If you are filing this POC on behalf of the Claimant, include the name of your company or firm, if applicable.
9.  **ADDRESS**. The address (including City, State, and ZIP code) of the individual completing this POC.
10. **TELEPHONE NUMBERS**. Telephone number of the individual completing this POC.

### REQUIRED SUPPORTING DOCUMENTATION

- <u>Claims for Goods Purchased by the Failed Institution</u>: You must enclose a copy of the purchase order or other correspondence from the Failed Institution requesting the goods, a copy of your invoice, and a receipt signed by the Failed Institution (or other evidence) indicating that the goods were received.

- <u>Claims for Services Rendered</u>: You must enclose a copy of the correspondence or signed initial contract sent by the Failed Institution to request your services and an invoice.  In the case of law firms (or other professional firms) retained by the Failed Institution, enclose an itemized invoice detailing charges accruing prior to failure.  For appraisal services, enclose proof that the appraisal was completed.

- <u>Other Types of Claims</u>: You must enclose a copy of documents that substantiate the nature and amount of the claim.  While you may enclose a copy of the complaint that you filed with a court, this alone is not sufficient to establish your claim.

### SUBMITTING YOUR CLAIM

There are three ways to submit your claim:

- Electronically file via the internet by completing an online form FDIC 7200/19 and attaching supporting documentation.  Submitting your claim via the FDIC web site is convenient, secure, and inexpensive, and will also help to expedite the handling of your claim.  It is highly recommended. Please go to:  https://www2.fdic.gov/NDCWeb
- Fax by calling a claims agent using the phone number in the enclosed letter.
- Via mail to the following address: **1601 Bryan Street Dallas, TX 75201** If you choose this option, we recommend you send it by U.S. certified mail or a commercial service that can provide you with a receipt of delivery.  **Please do not send originals.**

**NOTE:**  If you choose to file by mail, it is very important that the Proof of Claim be the top document of your mailing.  The bar code allows for the automated creation of your claim file when the Proof of Claim is read or scanned into our system.  There is no need for a cover letter.

Page down to access form FDIC 7200/19

**Claimant ID: NS1001515321, Barcode Value: FD00144239, Fund: 10015**

**Federal Deposit Insurance Corporation
as Receiver for
Washington Mutual Bank, Henderson, NV**

## PROOF OF CLAIM

1. SSN/Tax ID No. _____

2. The undersigned _____
    *(Name of person completing the Proof of Claim)*

    hereby states that the subject Financial Institution, now in liquidation ("Failed Institution"), is indebted

3.  to _____ (the "Claimant") in the sum of
    *(Name of Claimant)*

4.  $ _____

5.  Description of Claim

The undersigned further states that no part of said debt has been paid, that the Claimant has given no endorsement or assignment of the same or any part thereof, and that there is no set-off or counterclaim, or other legal or equitable defense to said claim or any part thereof.

6. NAME _____    7. DATE _____
    *(Name, Title, and Signature of person completing the Proof of Claim )*

8. FIRM _____
    *(if applicable)*

9. ADDRESS _____

    *( City, State, and ZIP Code)* _____

10. TELEPHONE NUMBER(S) _____

The penalty for knowingly making or inviting reliance on a false, forged, or counterfeit statement, document, or thing for the purpose of influencing in any way the action of the Federal Deposit Insurance Corporation is a fine of not more than $1,000,000 or imprisonment for not more than 30 years or both (18 U.S.C. Section 1007).

**IMPORTANT NOTE:** The bar code at the top of this Proof of Claim is unique to this claim and may not be re-used for other claims which you may have or by other potential claimants. If you have other unrelated claims, you must file a separate Proof of Claim with its own unique bar code. Additional Proof of Claim forms may be found on the FDIC web site or obtained by mail at the respective addresses indicated in the Instructions. Re-use of this Proof of Claim may result in processing delays or the rejection of your claim.

**PRIVACY ACT STATEMENT**

The FDIC is authorized to request this information from you by 12 U.S.C. § 1819, 1821, and Executive Order 9397. The purpose for collecting the information is to support the administration of claims against the failed financial institution. Furnishing the requested information is voluntary, but failure to provide the requested information in whole or in part may delay or prohibit the processing of your claim. The information provided by individuals is protected by the Privacy Act, 5 USC 552(a). The information may be furnished to third parties as authorized by law or used according to any of the routine uses described in the FDIC Insured Financial Institution Liquidation Records (30-64-0013) System of Records. This System of Records is available for review at www.fdic.gov/regulations/laws/rules/2000-4050.html#200030--64--0013. If you have questions or concerns about the collection or use of the information, you may contact the FDIC's Chief Privacy Officer at Privacy@fdic.gov.

# EXHIBIT E

**FDIC**

**Federal Deposit Insurance Corporation**

1601 Bryan Street Dallas, TX 75201 _____ Division of Resolutions and Receiverships

**CERTIFIED MAIL 7013 2630 0002 0577 5545**
**RETURN RECEIPT REQUESTED**

September 2, 2015

MICHAEL A. WILLNER
11521 POTOMAC ROAD
LORTON, VA 22079-4264

SUBJECT:   10015 – Washington Mutual Bank
           Henderson, NV – In Receivership
           Claimant ID:  NS1001515320
           Claim Amount:  $7,900,000.00
           **NOTICE TO CLAIMANT – DISALLOWANCE OF CLAIM AS UNTIMELY FILED**

Dear Claimant:

As you are aware, on September 25, 2008, Washington Mutual Bank, Henderson, NV was closed by the Office of the Thrift Supervision, and the Federal Deposit Insurance Corporation (FDIC) was appointed Receiver.

By published notice, the Receiver established **December 30, 2008**, as the last date for filing claims (the "Bar Date").  Under applicable law, the Receiver must disallow claims which are not filed by the Bar Date.

The Receiver has received your Proof of Claim after the specified Bar Date; it was not postmarked on or before the Bar Date (or received via hand delivery by close of business on the Bar Date).  In accordance with 12 U.S.C. Section 1821(d)(5)(C)(i), your claim is **DISALLOWED** as untimely filed.  Such determination is final.  The FDIC will not consent to any further administrative review of this claim determination.

The statutory provisions governing this claims process are found in section 1821(d)(3) - (13) of Title 12 of the United States Code.

If you have any questions about this letter, please contact the undersigned at (972) 761-8677.

Sincerely,

DGG

CLAIMS AGENT
Claims Department

# FDIC

**Federal Deposit Insurance Corporation**
1601 Bryan Street Dallas, TX 75201         Division of Resolutions and Receiverships

**CERTIFIED MAIL 7013 2630 0002 0577 5552**
**RETURN RECEIPT REQUESTED**

September 2, 2015

MARGUERITE EVANS WILLNER
11521 POTOMAC ROAD
LORTON, VA 22079-4264

SUBJECT:    10015 -- Washington Mutual Bank
               Henderson, NV – In Receivership
               Claimant ID:  NS1001515321
               Claim Amount:  $6,400,000.00
               **NOTICE TO CLAIMANT – DISALLOWANCE OF CLAIM AS UNTIMELY FILED**

Dear Claimant:

As you are aware, on September 25, 2008, Washington Mutual Bank, Henderson, NV was closed by the Office of the Thrift Supervision, and the Federal Deposit Insurance Corporation (FDIC) was appointed Receiver.

By published notice, the Receiver established **December 30, 2008**, as the last date for filing claims (the "Bar Date").  Under applicable law, the Receiver must disallow claims which are not filed by the Bar Date.

The Receiver has received your Proof of Claim after the specified Bar Date; it was not postmarked on or before the Bar Date (or received via hand delivery by close of business on the Bar Date).  In accordance with 12 U.S.C. Section 1821(d)(5)(C)(i), your claim is **DISALLOWED** as untimely filed.  Such determination is final.  The FDIC will not consent to any further administrative review of this claim determination.

The statutory provisions governing this claims process are found in section 1821(d)(3) - (13) of Title 12 of the United States Code.

If you have any questions about this letter, please contact the undersigned at (972) 761-8677.

Sincerely,

DGG

CLAIMS AGENT
Claims Department